NOS. 21-1685, 21-1707, 21-1760, and 21-2902

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

UNITED STATES OF AMERICA,
Appellee

v.

JAMEEL HICKSON, JAMAAL BLANDING,
ABDUL WEST, AND HANS GADSON,
Appellants

APPEALS FROM JUDGMENTS OF CONVICTION AND SENTENCE
IN CRIMINAL NO. 18-249 IN THE
UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

CONSOLIDATED BRIEF FOR APPELLEE UNITED STATES OF AMERICA

JACQUELINE C. ROMERO
United States Attorney

ROBERT A. ZAUZMER
Assistant United States Attorney
Chief of Appeals

EVERETT WITHERELL
TIMOTHY M. STENGEL
Assistant United States Attorneys

615 Chestnut Street, Suite 1250
Philadelphia, PA  19106
(215) 861-8200

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ...................................................................1

    I.    Subject Matter Jurisdiction ..........................................1

    II.    Appellate Jurisdiction ................................................1

STATEMENT OF ISSUES ........................................................... 2

STATEMENT OF THE CASE ...................................................... 5

    I.    Procedural History ..................................................... 5

    II.    Statement of Facts .................................................... 9

        A.    The Investigation ........................................... 11

            1.    Controlled buys of narcotics from OBH member Dontez Stewart................................. 11

            2.    The search of the Mansion.....................................12

            3.    Blanding is subject to a traffic stop.........................14

            4.    Trips to California and the search of the One Water Street apartment........................ 18

        B.    The Arrests of the Defendants........................................ 23

        C.    Searches of Cell Phones Seized During Investigation ................................................... 26

        D.    The Pretrial Motions ...................................... 27

            1.    Blanding's pretrial motions .................................. 27

2.    Other defense motions relevant to
this appeal ............................................... 30

3.    Government's motion to admit social
media evidence, including rap videos ................... 31

4.    Litigation related to evidence of
the murder of Robert Johnson ............................ 34

E.    The Government's Case At Trial ................................... 35

1.    Violence and firearms ............................................ 35

2.    Dontez Stewart and the murder of Robert
Johnson ............................................................. 38

3.    Summary charts .................................................... 42

4.    Testimony of DEA Supervisory Special
Agent Randy Updegraff ......................................... 46

F.    The Defense Case ................................................... 49

1.    Dr. Richard Cooper ............................................... 49

2.    Drug trafficking expert David Leff ........................... 50

G.    Jury Instructions and the Jury's Verdict ......................... 51

H.    The Sentencings .................................................... 52

STATEMENT OF RELATED CASES ......................................... 58

SUMMARY OF ARGUMENT ................................................. 59

ARGUMENT ............................................................... 68

I.     THE DISTRICT COURT DID NOT ERR WHEN IT DECLINED TO SUPPRESS EVIDENCE THAT WAS LAWFULLY SEIZED AND WAS LATER SEARCHED PURSUANT TO A VALID SEARCH WARRANT ................................................................. 68

     A.    The Initial Seizure of Blanding's Cell Phones Was Appropriate ............................................. 70

     B.    The Later Search of the Cell Phones Pursuant to a Valid Federal Search Warrant Was Permissible ............................... 73

II.    THE DISTRICT COURT PROPERLY DENIED BLANDING'S MOTION TO SUPPRESS EVIDENCE FROM CELL PHONES SEIZED DURING THE PROTECTIVE SWEEP OF THE APARTMENT IN WHICH HE WAS ARRESTED ............................................. 82

     A.    Law Enforcement Was Permitted to Conduct a Protective Sweep of the Apartment ........................................................ 83

III.   THE DISTRICT COURT PROPERLY CONCLUDED THAT HICKSON'S CSLI SUPPRESSION CLAIMS COULD NOT OVERCOME THE GOVERNMENT'S GOOD FAITH ......................................................... 92

IV.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN ADMITTING EVIDENCE OF THE MURDER OF ROBBIE JOHNSON ................................. 98

V.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY ADMITTING EVIDENCE IN THE FORM OF RAP LYRICS AND VIDEOS ..................... 116

VI.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING SEVERANCE OF THE TRIAL OF HICKSON ...................................................... 130

VII.   THE DISTRICT COURT ACTED WITHIN ITS DISCRETION BY LIMITING THE CROSS-EXAMINATION OF A GOVERNMENT EXPERT BY GADSON'S COUNSEL ....................................................... 136

VIII.  THE DISTRICT COURT DID NOT CONSTRUCTIVELY AMEND THE INDICTMENT IN THIS CASE BY CONCLUDING THAT THE CONTROLLED SUBSTANCES PLED IN THE INDICTMENT MAY BE PROVEN IN THE DISJUNCTIVE .......................... 142

IX.   THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN ADMITTING SUMMARY CHARTS ................................................................ 146

X.    THE TRIAL COURT'S JURY INSTRUCTIONS RELATED TO THE CONSPIRACY COUNT WERE NOT REVERSIBLE ERROR, AND HICKSON WAS NOT PREJUDICED BY THE ABSENCE OF AN INDIVIDUAL FINDING REGARDING THE QUANTITY INVOLVED IN THE OFFENSE .................................................... 151

     A.   The Jury Instructions Were Not Erroneous With Regard to the Conspiracy Charge, and Simply Resulted in Abandonment of Any Mandatory Minimum Penalty Related to That Charge .............................................153

     B.   Hickson's Challenge to the Sufficiency of the Evidence is Misplaced .....................................159

XI.   THE COURT DID NOT COMMIT ERROR IN IMPOSING SENTENCE ON BLANDING ......................... 164

     A.   The Court Did Not Abuse Its Discretion in Denying a Continuance ...................................165

B.    Blanding Waived A Challenge to Calculation
of the Statutory Penalties on Counts Six
And Twelve, and In Any Event There
Was No Plain Error ........................................................ 171

C.    The District Court Did Not Commit
Clear Error in Imposing the Drug
-Premises Enhancement ................................................179

XII.   THE DISTRICT COURT DID NOT COMMIT
ERROR IN IMPOSING SENTENCE ON
GADSON.................................................................................. 184

A.    The Court Did Not Commit Clear
Error in Denying a Minor Role
Reduction Under U.S.S.G. § 3B1.2 ............................... 185

B.    The Defendant Was Not Sentenced
Above the Applicable Sentencing
Guidelines Range On Count Six .................................... 190

XIII.  THE COURT DID NOT ERR IN CALCULATING
HICKSON'S SENTENCE ....................................................... 193

CONCLUSION.............................................................................197

# TABLE OF AUTHORITIES

## Cases

*Alleyne v. United States,*
   570 U.S. 99 (2013) ............................................................156

*Apprendi v. New Jersey,*
   530 U.S. 466 (2000) .............................................. 156, 158

*Arizona v. Gant,*
   556 U.S. 332 (2009) .............................................................. 70

*Brown v. Illinois,*
   422 U.S. 590 (1975) ........................................................ 77, 80

*Buchanan v. Kentucky,*
   483 U.S. 402 (1987) ..........................................................131

*Carpenter v. United States,*
   138 S. Ct. 2206 (2018) ...................................... 31, 93-96

*Carroll v. United States,*
   267 U.S. 132 (1925) ............................................................ 70

*Carter v. Hewitt,*
   617 F.2d 961 (3d Cir. 1980) .........................................118

*Davis v. United States,*
   564 U.S. 229 (2011) ............................................................. 94

*Delaware v. Van Arsdall,*
   475 U.S. 673 (1986) .............................................. 137, 139

*Descamps v. United States,*
   570 U.S. 254 (2013) .......................................................173

*Dollar v. Long Manufacturing Co.,*
   561 F.2d 613 (5th Cir. 1977) ........................................118

*Douglas v. Owens,*
    50 F.3d 1226 (3d Cir. 1995)...............................................................137

*Gall v. United States,*
    552 U.S. 38 (2007).........................................................................178

*Goodman v. Pa. Tpk. Comm'n,*
    293 F.3d 655 (3d Cir. 2002) ..................................................... 111, 118

*Herring v. United States,*
    555 U.S. 135 (2009) ................................................................passim

*Illinois v. Gates,*
    462 U.S. 213 (1983)...........................................................................70

*In re: Application of U.S. for an Order Authorizing*
    *Installation & Use of a Pen Register & Caller*
    *Identification System,*
    402 F. Supp. 2d 597 (D. Md. 2005) ...................................................93

*Johnson v. Zerbst,*
    304 U.S. 458 (1938) .......................................................................174

*Lindy Bros. Builders, Inc. v. American Radiator*
    *& Standard Sanitary Corp.,*
    540 F.2d 102 (3d Cir. 1976) .............................................................98

*Maryland v. Buie,*
    494 U.S. 325 (1990) .............................................................. 30, 83-88

*Mathis v. United States,*
    579 U.S. 500 (2016) .......................................................................173

*Molano-Garza v. U.S. Parole Com'n,*
    965 F.2d 20 (5th Cir. 1992).............................................................190

*Moncrieffe v. Holder,*
    569 U.S. 184 (2013).........................................................................173

*Murray v. United States,*
    487 U.S. 533 (1988) ........................................................... 76

*Noto v. United States,*
    367 U.S. 290 (1961) ......................................................... 126

*Oddi v. Ford Motor Co.,*
    234 F.3d 136 (3d Cir.2000) ............................................... 98

*Pritchard v. Liggett & Myers Tobacco Co.,*
    295 F.2d 292 (3d Cir. 1961)............................................. 146

*Rita v. United States,*
    551 U.S. 338 (2007) ......................................................... 186

*Segura v. United States,*
    468 U.S. 796 (1984) ........................................................... 77

*Sharrar v. Felsing,*
    128 F.3d 810 (3d Cir. 1997)........................................ 85, 87

*Spain v. Gallegos,*
    26 F.3d 439 (3d Cir. 1994) ............................................. 108

*Stecyk v. Bell Helicopter Textron, Inc.,*
    295 F.3d 408 (3d Cir. 2002) .............................................. 98

*Stich v. United States,*
    730 F.2d 115 (3d Cir.1984) ............................................... 98

*Street v. New York,*
    394 U.S. 576 (1969)........................................................ 126

*Townsend v. United States,*
    553 U.S. 1050 (2008).......................................................176

*Turner v. United States,*
    396 U.S. 398 (1970) ....................................................... 144

*United States ex rel. LaCorte v. SmithKline*
    *Beecham Clinical Lab'ys, Inc.*,
    149 F.3d 227 (3d Cir. 1998)...............................................117

*United States ex rel. O'Connor v. State of New Jersey*,
    405 F.2d 632 (3d Cir. 1969).............................................174

*United States v. Adams*,
    36 F.4th 137 (3d Cir. 2022).............................................164

*United States v. Adams*,
    252 F.3d 276 (3d Cir. 2001).......................................165, 169

*United States v. Aparco-Centeno*,
    280 F.3d 1084 (6th Cir. 2002).........................................175

*United States v. Bailey*,
    840 F.3d 99 (3d Cir. 2016).............................................108

*United States v. Baker*,
    432 F.3d 1189 (11th Cir. 2005)........................................104

*United States v. Baker*,
    855 F.2d 1353 (8th Cir. 1988).........................................105

*United States v. Balter*,
    91 F.3d 427 (3d Cir. 1996).............................................116

*United States v. Belfast*,
    611 F.3d 783 (11th Cir. 2010).........................................121

*United States v. Berry*,
    90 F.3d 148 (6th Cir. 1996).............................................71

*United States v. Bey*,
    2017 WL 15470006 (E.D. Pa.)..........................................124

*United States v. Booker*,
    543 U.S. 220 (2005)...................................................164

*United States v. Boone,*
   279 F.3d 163 (3d Cir. 2002) ............................................... 113

*United States v. Booth,*
   996 F.2d 1395 (2d Cir. 1993) ........................................... 165

*United States v. Bowie,*
   232 F.3d 923 (D.C. Cir. 2000) ........................................... 99

*United States v. Brown,*
   47 F.4th 147 (3d Cir. 2022) .............................................. 173

*United States v. Brown,*
   250 F.3d 811 (3d Cir. 2001) ............................................. 187

*United States v. Burden,*
   964 F.3d 339 (5th Cir. 2020) ........................................... 132

*United States v. Burton,*
   288 F.3d 91 (3d Cir. 2002) ............................................... 76

*United States v. Carr,*
   25 F.3d 1194 (3d Cir. 1994) ............................... 184, 189, 190

*United States v. Carter,*
   834 F.3d 259 (3d Cir. 2016) ...................................... 179, 180

*United States v. Casoni,*
   950 F.2d 893 (3d Cir. 1991) ........................................ 136-138

*United States v. Chapman,*
   915 F.3d 139 (3d Cir. 2019) ...................................... 168, 169

*United States v. Chavez,*
   894 F.3d 593 (4th Cir. 2018) ..................................... 94, 133

*United States v. Chin,*
   83 F.3d 83 (4th Cir. 1996) .............................................. 105

*United States v. Console,*
    13 F.3d 641 (3d Cir. 1993) ...............................................................133

*United States v. Cooper,*
    437 F.3d 324 (3d Cir. 2006) ........................................................... 164

*United States v. Copple,*
    24 F.3d 535 (3d Cir. 1994) ..............................................................112

*United States v. Cross,*
    308 F.3d 308 (3d Cir. 2002)................................ 104, 111, 112, 118, 119

*United States v. Cusumano,*
    943 F.2d 305 (3d Cir. 1991) .............................................................145

*United States v. Dahl,*
    833 F.3d 345 (3d Cir. 2016) .............................................................173

*United States v. Daraio,*
    445 F.3d 253 (3d Cir. 2006) ......................................................142, 144

*United States v. Davis,*
    397 F.3d 173 (3d Cir. 2005) .............................................................132

*United States v. Davis,*
    402 F. Supp. 2d 252 (D.D.C. 2005) .................................................. 104

*United States v. Day,*
    591 F.2d 861 (D.C. Cir. 1978) .................................................. 109, 119

*United States v. Dennis,*
    625 F.2d 782 (8th Cir. 1980) ...........................................................119

*United States v. Diaz,*
    176 F.3d 52 (2d Cir. 1999)...............................................................134

*United States v. Ellis,*
    156 F.3d 493 (3d Cir. 1998) ........................................................... 136

*United States v. Estrada,*
    320 F.3d 173 (2d Cir. 2003) ............................................................ 105

*United States v. Eufrasio,*
    935 F.2d 553 (3d Cir. 1991) ............................................................. 133

*United States v. Figueroa,*
    729 F.3d 267 (3d Cir. 2013) ............................................................ 108

*United States v. Finley,*
    726 F.3d 483 (3d Cir. 2013) ............................................................ 108

*United States v. Flores-Rivera,*
    56F3d 319 (1st Cir. 1995) ............................................................... 112

*United States v. Gamory,*
    635 F.3d 480 (11th Cir. 2011) ......................................................... 124

*United States v. Gartmon,*
    146 F.3d 1015 (D.C. Cir. 1998) ...................................................... 119

*United States v. Gibbs,*
    190 F.3d 188 (3d Cir. 1999) ..........................................101-104, 107, 165

*United States v. Gimelstob,*
    475 F.2d 157 (3d Cir. 1973) ............................................................ 144

*United States v. Glass,*
    904 F.3d 319 (3d Cir. 2018) ........................................................... 195

*United States v. Glover,*
    957 F.2d 1004 (2d Cir. 1992) ............................................................ 71

*United States v. Goings,*
    517 F.2d 891 (3d Cir. 1975) ............................................................ 136

*United States v. Goldstein,*
    902 F.3d 411 (3d Cir. 2018) ............................................................. 95

*United States v. Goldstein*,
    914 F.3d 200 (3d Cir. 2019)..........................................................93-96

*United States v. Graham*,
    824 F.3d 421 (4th Cir. 2016)............................................................. 94

*United States v. Green*,
    617 F.3d 233 (3d Cir. 2010) ...................................................... 99, 106

*United States v. Gricco*,
    277 F.3d 339 (3d Cir. 2002)............................................................. 113

*United States v. Grier*,
    475 F.3d 556 (3d Cir. 2007) ............................................................ 164

*United States v. Grimmond*,
    137 F.3d 823 (4th Cir. 1998) .......................................................... 105

*United States v. Guerrero*,
    803 F.2d 783 (3d Cir. 1986)............................................................ 116

*United States v. Gunn*,
    369 F.3d 1229 (11th Cir. 2004) ....................................................... 113

*United States v. Harris*,
    788 F. App'x 135 (3d Cir. 2019) ..................................................... 182

*United States v. Haut*,
    107 F.3d 213 (3d Cir. 1997) ............................................................187

*United States v. Headley*,
    923 F.2d 1079 (3d Cir. 1991)......................................................... 189

*United States v. Heatherly*,
    985 F.3d 254 (3d Cir. 2021) ........................................................... 115

*United States v. Henderson*,
    841 F.3d 623 (3d Cir. 2016) ...........................................................173

*United States v. Henry,*
    48 F.3d 1282 (D.C. Cir. 1995) ........................................... 86

*United States v. Hicks,*
    368 F.3d 801 (7th Cir. 2004) ........................................... 105

*United States v. Hodge,*
    246 F.3d 301 (3d Cir. 2001) ................................... 80, 81, 90

*United States v. Holman,*
    168 F.3d 655 (3d Cir. 1999) ............................................. 187

*United States v. Hunter,*
    604 F. App'x 214 (3d Cir. 2015) ...................................... 165

*United States v. Isaza-Zapata,*
    148 F.3d 236 (3d Cir. 1998) ............................................. 187

*United States v. Jackson,*
    649 F.2d 967 (3d Cir. 1981) ............................................. 131

*United States v. Jarmon,*
    2021 WL 4187836 (3d Cir. 2021) ..................................... 148

*United States v. John-Baptiste,*
    747 F.3d 186 (3d Cir. 2014) ............................................. 132

*United States v. Johnson,*
    737 F.3d 444 (6th Cir. 2013) ................................... 179, 180

*United States v. Jones,*
    566 F.3d 353 (3d Cir. 2009) ............................................. 104

*United States v. Jones,*
    908 F. Supp. 2d 203 (D.D.C. 2012) .................................. 94

*United States v. Katzin,*
    769 F.3d 163 (3d Cir. 2014) ....................................... 94, 96

*United States v. Kemp,*
    500 F.3d 257 (3d Cir. 2007) ............................................................ 108

*United States v. Latz,*
    162 Fed. App'x 113 (3d Cir. 2005) ................................................ 84, 87

*United States v. Lee,*
    612 F.3d 170 (3d Cir. 2010) ............................................................ 126

*United States v. Leon,*
    468 U.S. 897 (1984) ............................................................ 75, 79, 80

*United States v. Lore,*
    430 F.3d 190 (3d Cir. 2005) ...................................................... 130, 132

*United States v. McCullah,*
    76 F.3d 1087 (10th Cir. 1996) ....................................................... 105

*United States v. Miller,*
    116 F.3d 641 (2d Cir. 1997) .......................................................... 105

*United States v. Miller,*
    638 F. App'x 543 (8th Cir. 2016) ................................................... 120

*United States v. Miller,*
    698 F.3d 699 (8th Cir. 2012) ........................................................ 182

*United States v. Moody,*
    485 F.3d 531 (3d Cir. 1973) ............................................................ 70

*United States v. Moore,*
    639 F.3d 443 (8th Cir. 2011) ......................................................... 120

*United States v. Mosley,*
    454 F.3d 249 (3d Cir. 2006) ............................................................ 74

*United States v. Murillo,*
    933 F.2d 195 (3d Cir.1991) ........................................................... 186

*United States v. Murray*,
    103 F.3d 310 (3d Cir. 1997) ...................................................... 109, 110

*United States v. Nasir*,
    17 F.4th 459 (3d Cir. 2021) ............................................................ 194

*United States v. Nichols*,
    151 F.3d 850 (8th Cir. 1998) .......................................................... 186

*United States v. Niederberger*,
    580 F.2d 63 (3d Cir. 1978) ............................................................. 144

*United States v. Olano*,
    507 U.S. 725 (1993) ...................................................................... 174

*United States v. Olfano*,
    503 F.3d 240 (3d Cir. 2007) .......................................................... 166

*United States v. Pelullo*,
    173 F.3d 131 (3d Cir. 1999) ........................................................ 73, 89

*United States v. Perez*,
    280 F.3d 318 (3d Cir. 2002) ........................................ 68, 76, 77, 82, 92

*United States v. Pierce*,
    785 F.3d 832 (2d Cir. 2015) ..................................................... 120, 121

*United States v. Price*,
    13 F.3d 711 (3d Cir. 1994) ............................................................. 187

*United States v. Price*,
    558 F.3d 270 (3d Cir. 2009) ............................................................ 76

*United States v. Provenzano*,
    688 F.2d 194 (3d Cir. 1982) ........................................................... 131

*United States v. Quintero*,
    38 F.3d 1317 (3d Cir. 1994) ........................................................... 131

*United States v. Ramos,*
        443 F.3d 304 (3d Cir. 2006) ................................................................71

*United States v. Recio,*
        884 F.3d 230 (4th Cir. 2018) ........................................................ 120

*United States v. Rodriguez,*
        40 F.4th 117 (3d Cir. 2022) ........................................................ 180

*United States v. Rowe,*
        919 F.3d 752 (3d Cir. 2019)........................................................ 160

*United States v. Scarborough,*
        128 F.3d 1373 (10th Cir. 1997) ........................................................71

*United States v. Scarfo,*
        41 F.4th (3d Cir. 2022)........................................................ 60, 95, 96

*United States v. Schneider,*
        14 F.3d 876 (3d Cir. 1994)........................................................ 151

*United States v. Serafini,*
        233 F.3d 758 (3d Cir. 2000) .................................................... 98, 146

*United States v. Sloman,*
        909 F.2d 176 (6th Cir. 1990)........................................................175

*United States v. Smith,*
        252 F. App'x 20 (6th Cir. 2007) ........................................................175

*United States v. Solis,*
        299 F.3d 420 (5th Cir. 2002)........................................................134

*United States v. Somers,*
        496 F.2d 723 (3d Cir. 1974) ........................................................132

*United States v. Sriyuth,*
        98 F.3d 739 (3d Cir. 1996) ........................................................ 126

*United States v. Starnes,*
    583 F.3d 196 (3d Cir. 2009)........................................................ 111, 118

*United States v. Steiner,*
    847 F.3d 103 (3d Cir. 2017) ..................................................... 112

*United States v. Stimler,*
    864 F.3d 253 (3d Cir. 2017) ..................................................... 95

*United States v. Stuckey,*
    253 F. App'x 468 (6th Cir. 2007) ............................................. 121

*United States v. Sundby,*
    186 F.3d 873 (8th Cir. 1999) ....................................................71

*United States v. Sussman,*
    709 F.3d 155 (3d Cir. 2013)......................................................175

*United States v. Terzado-Madruga,*
    897 F.2d 1099 (11th Cir. 1990).......................................... 109, 119

*United States v. Thai,*
    29 F.3d 785 (2d Cir. 1994) ...................................................... 103

*United States v. Trigg,*
    119 F.3d 493 (7th Cir. 1997) .................................................... 190

*United States v. Universal Rehab. Servs. (PA), Inc.,*
    205 F.3d 657 (3d Cir. 2000) .................................................... 114

*United States v. Urban,*
    404 F.3d 754 (3d Cir. 2005) ..............................................131, 132

*United States v. Vampire Nation,*
    451 F.3d 189 (3d Cir. 2006) ....................................................145

*United States v. Voigt,*
    89 F.3d 1050 (3d Cir. 1996) ....................................................132

*United States v. Vosburgh,*
   602 F.3d 512 (3d Cir. 2010) ............................................................116

*United States v. Ward,*
   732 F.3d 175 (3d Cir. 2013) ............................................................170

*United States v. White,*
   748 F.3d 507 (3d Cir. 2014) ......................................................83, 84

*United States v. Williams,*
   892 F.2d 296 (3d Cir. 1989)...........................................136, 139, 141

*United States v. Williams,*
   974 F.3d 320 (3d Cir. 2020) .....................................................passim

*United States v. Zimmerman,*
   277 F.3d 426 (3d Cir. 2002)............................................................. 79

*Whren v. United States,*
   517 U.S. 806 (1996)........................................................................ 73

*Wisconsin v. Mitchell,*
   508 U.S. 476 (1993) ..................................................................... 126

*Wong Sun v. United States,*
   371 U.S. 471 (1963)........................................................................ 78

*Zafiro v. United States,*
   506 U.S. 534 (1993) ..............................................................131, 132

## Statutes and Rules

18 U.S.C. § 922(g)(1) ....................................................................... 6

18 U.S.C. § 924(c) ............................................................................ 6

18 U.S.C. § 924(e) ......................................................................... 171

18 U.S.C. § 924(e)(2) ....................................................................172

18 U.S.C. § 1512(b) ............................................................. 36

18 U.S.C. § 2073(d) ....................................................... 95, 97

18 U.S.C. § 3231 .................................................................. 1

18 U.S.C. § 3553 ......................................................... 157, 191

18 U.S.C. § 3742 .................................................................. 1

21 U.S.C. § 802 .......................................................... 172, 173

21 U.S.C. § 841 ........................................................... passim

21 U.S.C. § 846 ........................................................... passim

21 U.S.C. § 848(e)(1)(A) ................................................... 109

28 U.S.C. § 1291 .................................................................. 1

35 Pa. Cons. Stat. § 780-113(a)(30) ................................. 195

Controlled Substances Act,
    Pub. L. No. 91-513, 84 Stat. 1242 (1970) .......................... 172

Fed. R. Crim. P. 29 ...................................................... 8, 53

Fed. R. Crim. P. 32 ......................................................... 170

Fed. R. Crim. P. 33 .................................................. 8, 53, 155

Fed. R. Evid. 403 ................................................... 99, 107-112

Fed. R. Evid. 404(b) ...................................................... passim

Fed R. Evid. 611(a) ......................................................... 149

Fed R. Evid. 901 .............................................................. 42

Fed R. Evid. 1006 ................................................................. 148

U.S.S.G. § 2D1.1(b)(12) ....................................... 63, 179, 180

U.S.S.G. § 3B1.2 ............................................................ 184-187

U.S.S.G. § 3B1.2(b) ................................................................ 185

U.S.S.G. § 3D1.2(d) ............................................................... 191

U.S.S.G. § 4B1.1 .................................................................... 182

U.S.S.G. § 4B1.1(a)(2) ........................................................... 195

U.S.S.G. § 5G1.2 .................................................................... 191

# JURISDICTIONAL STATEMENT

## I. Subject Matter Jurisdiction

Because the defendants were charged in an indictment with violations of federal criminal law, the district court had subject matter jurisdiction over the case pursuant to 18 U.S.C. § 3231.

## II. Appellate Jurisdiction

Based upon the timely filing of notices of appeal from the orders of judgment in a criminal case entered on April 15, 2021 (Blanding), April 15, 2021 (Hickson), April 21, 2021 (West), and October 5, 2021 (Gadson), this Court has jurisdiction over this matter under 28 U.S.C. § 1291. In addition, this Court has jurisdiction pursuant to 18 U.S.C. § 3742 to review the sentences imposed on the defendants.

# STATEMENT OF ISSUES

1. Did the district court err in denying a motion to suppress evidence obtained from cell phones seized from Blanding during a traffic stop?

2. Did the district court err in denying a motion to suppress evidence obtained from cell phones belonging to Blanding found in the apartment he occupied?

3. Did the district court err in ruling that the government acted in good faith in obtaining prospective CSLI information under the Stored Communication Act, without a warrant, prior to *Carpenter*?

4. Did the district court abuse its discretion in admitting evidence of a murder as intrinsic to the charged conspiracy?

5. Did the district court abuse its discretion in admitting evidence from rap lyrics and videos in which, the government asserted, West admitted his criminal conduct, including direction of a murder?

6. Did the district court abuse its discretion in denying severance of the charges against Hickson?

7. Did the district court abuse its discretion in limiting cross-examination by Gadson's counsel of the government's drug trafficking expert witness?

8. Did the district court constructively amend the indictment by instructing the jury that Count One, charging conjunctively a conspiracy to distribute various narcotics, may be proved disjunctively?

9. Did the district court commit plain error in admitting a summary chart that, according to Hickson, included one factual error?

10. Did the district court err in instructing the jury to find the quantity involved in the conspiracy as a whole without attribution to individual defendants, where the court did not then impose any mandatory minimum sentence on this count; and was the evidence as to Hickson sufficient to prove the quantity involved in the conspiracy charge?

11. Did the district court abuse its discretion in denying Blanding's request for a continuance of the sentencing hearing, or commit plain error in limiting Blanding's ability to allocate?

12. Did Blanding waive his challenge to the calculation of the statutory mandatory minimum sentences on Counts Six and Twelve, and if not, did the court commit plain error warranting correction?

13. Did the district court commit clear error in imposing on Blanding the two-level increase for maintaining drug premises, § 2D1.1(b)(12), and even if it did, was the error harmless?

14. Did the district court commit clear error in denying Gadson's request at sentencing for a minor role reduction?

15. Did the district court impose an excessive sentence on Gadson on Count Six?

16. Did the district court err in the guideline calculation applicable to Hickson?

## STATEMENT OF THE CASE

## I. Procedural History

On June 13, 2018, a grand jury sitting in the Eastern District of Pennsylvania returned a one-count indictment against Richard Chase Hoover. App. 120. On October 17, 201, the grand jury returned a six-count superseding indictment against Hoover and eight others, including appellants Abdul West, Jamaal Blanding, Jameel Hickson, and Hans Gadson. App. 121.

On August 14, 2019, the grand jury returned a 16-count second superseding indictment, charging West, Blanding, Hickson, Gadson, and five others, including Hoover, with a variety of crimes related to their involvement in a drug trafficking organization. App. 152. Specifically, the second superseding indictment[1] charged the following crimes:

- one count of conspiracy to distribute 5 kilograms or more of cocaine, 280 grams or more of cocaine base ("crack"), and 50 grams or more methamphetamine (actual), in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A), and 100 grams or more of heroin, in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(B) [Count One];

- three counts of distribution of cocaine base ("crack"), in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C) [Counts Two, Three, and Four];

---

[1] All subsequent references in this brief to counts are to the second superseding indictment.

- three counts of distribution of 28 grams or more of cocaine base ("crack"), in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B) [Counts Five, Eight, and Nine];

- one count of possession with intent to distribute 28 grams or more of cocaine base ("crack"), 100 grams or more of heroin, and methamphetamine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B), (b)(1)(C) [Count Six];

- one count of possession with intent to distribute 28 grams or more of cocaine base ("crack") and cocaine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B), (b)(1)(C) [Count Seven];

- three counts of possession of a firearm by a felon, in violation of 18 U.S.C. § 922(g)(1) [Counts Ten, Fourteen, and Sixteen];

- one count of distribution of 50 grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A) [Count Eleven];

- one count of possession with intent to distribute 5 kilograms or more of cocaine and 50 grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A) [Count Twelve];

- one count of possession with intent to distribute marijuana, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(D) [Count Thirteen]; and

- one count of possession of a firearm in furtherance of a drug trafficking crime, in violation of 18 U.S.C. § 924(c) [Count Fifteen].

App. 189-234. West was charged in Counts One, Four, Five, Six, and Twelve. Blanding was charged in Counts One, Six, Eleven, and Twelve. Hickson was charged in Counts One, Six, and Twelve. Gadson was charged in Counts One and Six. App. 189-234.

Prior to trial, some of the defendants filed pretrial motions. Related to the instant appeal, Blanding filed motions to suppress, including a motion to suppress evidence obtained in connection with a traffic stop and a motion to suppress evidence obtained during a protective sweep of an apartment in which he was arrested. App. 235-356, 628-58, 805-69. The district court denied both motions, and Blanding has appealed the denial of his motions. App. 46-57, 59-70.

The government also filed pretrial motions. This included a motion to admit evidence related to the murder of a rival drug dealer, Robert Johnson, a motion to admit certain social media posts, and a motion to admit certain rap lyrics by West, in both written and video form. DDE #352, DDE #407, DDE #482, Supp. App. 67-87. The district court granted the government's motions with some limitations, and the appellants now appeal those orders as well. App. 73-89.

In opposing the admission of the social media evidence, Hickson requested a severance in the event the social media evidence was admitted. DDE #393. It is not clear from the record when the district court formally ruled on the motion to sever, but the four appellants proceeded to trial on November 4, 2019. App. 1163. On November 19, 2019, the jury convicted West and Gadson on all counts with which they were charged. The

government dismissed Count Eleven at trial, but Blanding was convicted on all other counts with which he was charged. Hickson was convicted on Counts One and Twelve; he was acquitted on Count Six.

After trial, Blanding and Hickson filed motions pursuant to Federal Rules of Criminal Procedure 29 and 33, raising some of the same issues now before this Court. App. 90-92. On March 29, 2021, the district court denied those motions, and the defendants proceeded to sentencing. App. 90-92.

On April 7, 2021, the district court imposed on Blanding a sentence of 300 months' imprisonment, a term of supervised release of 10 years, a fine in the amount of $5,000, and a $400 special assessment. App. 10-18. That same day, the district court imposed on Hickson a sentence of 240 months' imprisonment, a term of supervised release of five years, a fine in the amount of $5,000, and a $400 special assessment. App. 19-27. On April 15, 2021, the district court imposed on West a sentence of 540 months' imprisonment, a term of supervised release of 10 years, a fine in the amount of $5,000, and a special assessment of $500. App. 28-36. On October 4, 2021, the district court imposed on Gadson a sentence of 196 months' imprisonment, a term of supervised release of five years, and a

$200 special assessment. App. 37-45. West, Blanding, Hickson, and Gadson all filed timely appeals. App. 1-9.

## II. Statement of Facts

As set forth below, the evidence at trial established that West, Blanding, Hickson, and Gadson were all members of a violent drug trafficking organization known as the Original Block Hustlers or "OBH." App. 1290-94, 1299-1301, 1310-15, 1412-13. From at least March 2017 until June 2018, they, along with others charged and convicted in this case, conspired to distribute, and did distribute, large quantities of cocaine, crack cocaine, and methamphetamine to customers in and around Philadelphia. The defendants in this case imported drugs from California, stored and prepared those drugs for sale in various properties they controlled, and then sold those drugs in both bulk and street-level transactions.

Throughout the conspiracy, the defendants communicated extensively with each other – and others – through text messages and social media.

The evidence at trial also established that West was the leader of OBH. As the leader, he oversaw the day-to-day drug operations of the drug trafficking organization and made most of the decisions. Supp. App. 26. West established roles and responsibilities for members of the drug

trafficking organization, including assigning certain narcotics trafficking streams to various "lieutenants," including Jamaal Blanding.

West, an aspiring rap artist, was the driving force behind the violent character of OBH. As shown at the trial in this case, West routinely posted rap videos and other messages on social media, in which he communicated threats of violence, and which demonstrated his power and authority within OBH. But West did not merely talk about violence; he orchestrated it. This included ordering the murder of an OBH associate turned rival, Robert Johnson, on October 14, 2017, a crime about which he later bragged in a rap video.

The evidence at trial also established that Blanding and Hickson, along with their co-conspirator, Richard Chase Hoover, were primarily responsible for facilitating the importation of narcotics from California. Both Blanding and Hickson provided or helped obtain stash house locations for the members of OBH to use to further their drug trafficking. Hans Gadson was primarily responsible for distributing cocaine and crack cocaine under the supervision of West.

## A.    The Investigation.

### 1.    Controlled buys of narcotics from OBH member Dontez Stewart.

The federal investigation that led to the charges in this case began in the spring of 2017 with several controlled purchases of narcotics and the purchase of a firearm from co-conspirator – and eventual cooperating witness – Dontez Stewart. App. 1501-20. During those controlled purchases, Stewart obtained crack cocaine from Abdul West, and then sold that crack to a confidential informant. App. 1508-14, 1586-86, 1592-95. The controlled purchases of crack and a firearm from Dontez Stewart were part of the conspiracy charged in Count One of the second superseding indictment, and each controlled buy was charged separately in Counts Two, Three, Four, Five, Nine, and Ten.[2] App. 189-234. West was charged in Counts Four and Five, and he was convicted on those counts at trial.[3] App.

---

[2] During the sale of crack and a firearm, charged in Counts Nine and Ten, Stewart also sold methamphetamine. Stewart obtained the methamphetamine from OBH associate turned rival Robert Johnson prior to his murder, discussed in more detail below. The sale of the methamphetamine was charged in Count Eight.

[3] In his opening statement, West admitted that he was a drug dealer involved in the sale of "marijuana, crack-cocaine, and cocaine." App. 1172. West denied being involved in the sale of heroin or methamphetamine. App. 1173. West then conceded his guilt on Counts Four and Five in his closing argument. App. 2787-89.

3405-23. None of the other appellants were charged in connection with these specific controlled buys.

Prior to one of the controlled buys, Stewart and West met at 3234 No. Sydenham Street in Philadelphia, a property used by the defendants and known to them as "the Mansion." App. 1294. Subsequently, the FBI installed a pole camera outside the Mansion in August 2017, and over the next several weeks, the FBI observed all four of the appellants meeting with other OBH members at that property. App. 1295-96, 1350-61.

## 2.    The search of the Mansion.

On September 11, 2017, the Philadelphia Police Department, independent from the FBI and as part of another criminal investigation, executed a search warrant at the Mansion.[4] The Philadelphia Police seized numerous items related to drug trafficking, including but not limited to approximately 62 grams of crack cocaine, 229 grams of heroin, 48 grams of a methamphetamine mixture, and a firearm. App. 1119-1220.

---

[4] This search was related to the murder of S.W. earlier that night by OBH member Abaz Parker, a/k/a "Skinny Me." Parker was subsequently convicted of that murder in state court. Notably, the government did not present evidence of this murder at trial because, unlike the murder of Robert Johnson, discussed below, the government did not have sufficient evidence to establish that the murder of S.W. was related to the drug trafficking conspiracy charged in this case.

In the months after the search of the Mansion, federal agents obtained text messages and social media posts, many of which were presented at trial, which confirmed that the defendants used the Mansion as a "trap house" – i.e., a property used to sell drugs. For example, in one social media post, West posted a photograph of himself outside the Mansion and included in the comment field an express reference to his "trap house." App. 1836, 2520; Supp. App. 11. Other social media posts showed members of OBH, including West, Blanding, and Gadson at the Mansion. App. 1836-39; Supp. App. 2, 5, 9, 11, 12. Also, shortly after police executed the search warrant on September 11, several of the defendants – including West and Blanding – discussed via a group text that the Mansion had been searched by police, demonstrating their use of that property. App. 1477-78. Other text messages presented at trial showed the defendants utilizing the Mansion as a trap house. App. 1477-80.

The narcotics seized from the Mansion on September 11, 2017, served as the basis for Count Six with which West, Blanding, Hickson, and Gadson were charged. West, Blanding, and Gadson were convicted on Count Six; Hickson was acquitted.

In addition, on September 11, 2017, law enforcement seized two vehicles registered to West outside the Mansion, including a white Jeep

Cherokee. App. 118, 1191-92, 1219, 1635-37. The vehicles were searched but no items related to drug trafficking were initially found. App. 1636-42. However, in November 2017, a second search of the vehicles revealed a hidden compartment containing cocaine, crack cocaine, a firearm, and other items consistent with narcotics trafficking. App. 1642-43.

Several days after the search of the Mansion, West texted a contact named "Poerilla," his apparent source of supply, about law enforcement's search of the Mansion, stating that he felt he had to quit because he took a beating this time. App. 2165-72. "Poerilla" told West that he would be able to work off the debt for the lost drugs. App. 2172.

### 3.    Blanding is subject to a traffic stop.

On October 25, 2017, Task Force Officer ("TFO") Gregory Stevens with the FBI contacted Officer Michael Vargas with the Philadelphia Police Department to ask Officer Vargas to assist the FBI in an ongoing drug investigation, by tracking and, if warranted, stopping a Chrysler Pacifica, bearing Florida registration HKMS25. App. 244-45. At the time, the Pacifica was being driven by appellant Jamaal Blanding. App. 255.

At approximately 2:13 p.m., Officer Vargas observed the Chrysler Pacifica traveling northbound on Route 1 in Philadelphia, just north of Ridge Avenue. App. 245. He then followed the Pacifica onto the 2900 block

of Abbotsford Avenue. App. 246. Vargas was approximately two car lengths behind the Pacifica when he observed the Pacifica roll through a stop sign and come to a stop on the crosswalk at the intersection of Abbotsford Avenue and Wissahickon Avenue. App. 246.

Officer Vargas knew that it was a violation of the Pennsylvania Motor Vehicle Code to stop in the crosswalk, so Officer Vargas conducted a traffic stop of the Pacifica. App. 251-54. Vargas approached the Pacifica and observed that Blanding was the sole occupant of the car. App. 255. While speaking to Blanding from the passenger side of the vehicle, Officer Vargas smelled what, in his training and vast experience, he knew to be the odor of burnt marijuana coming from inside the vehicle. App. 255-56. Officer Vargas requested that Blanding gather his driver's license, registration, and proof of insurance, and bring them to the rear of the vehicle. App. 256-57.

Blanding exited the vehicle and provided Officer Vargas with a vehicle rental agreement and his Pennsylvania driver's license. App. 256. At this time, Vargas noticed that Blanding seemed nervous, that his hands were shaking, and that he was breathing heavily. Additionally, Vargas observed that Blanding had two large bulges visible in his front pants pockets. While at the rear of the Pacifica, Officer Vargas explained to Blanding that he pulled him over because he observed Blanding's vehicle stop in a crosswalk.

He then inquired about the bulges in Blanding's pockets. Blanding stated that the bulges were money. App. 256-257.

Officer Vargas returned to his patrol car to check the information Blanding provided to him, which revealed that Blanding's license was suspended. App. 257-58. Vargas called for back-up and a canine unit. App. 258-59. At approximately 2:30 p.m., Narcotics Canine Officer Sampson and his drug detection canine, Arko, arrived on scene. App. 259. Upon arrival, Officer Sampson deployed Arko, and the dog gave positive alerts for narcotics in Blanding's vehicle. App. 260.

Based on Blanding's demeanor, the odor of burnt marijuana emanating from the car, and the positive alert provided by the drug detection canine, Officer Vargas informed Blanding that he was going to search his vehicle. App. 261. Blanding told Officer Vargas to "go ahead and search." App. 292.

A search of the vehicle uncovered a clear plastic baby bottle containing a purple liquid, which Officer Vargas recognized, based on his experience and training, as liquid codeine. App. 262-63. That the codeine was in a baby bottle was significant to Officer Vargas because he knew that buyers and sellers of codeine use baby bottles to ensure accurate measurement when purchasing or selling the drug. App. 264. The search

also uncovered a vaporizer pen containing a yellow liquid believed to be

THC oil. App. 262-63. Officer Vargas believed that this vaporizer pen

contained THC oil because he smelled burnt marijuana but did not find

other evidence of marijuana use when he searched the Pacifica. App. 264.

Two cell phones, mail, bills, receipts, and car titles were also recovered

from the Pacifica. App. 264.

As a result of the search, Blanding was arrested and charged in state

court with possession of a controlled substance and transported for

processing. App. 265-67. Officer Vargas recovered $7,567 from Blanding's

pockets in a search incident to his arrest. App. 265. The narcotics, the

money, and the cell phones were logged as evidence in the state case

against Blanding. App. 265-69.

Officer Vargas arranged for the Pacifica, which he determined was a

rental car, to be moved back to his headquarters, and he contacted the

rental car company to pick it up. App. 267-68. Upon taking the Pacifica to

headquarters, officers conducted an inventory search and took possession

of several additional items, including a soundbar, a pair of shoes, and

sporting event tickets. App. 268-70.

On January 31, 2018, during the pendency of the state case against

Blanding, agents with the FBI took possession of the two cell phones, which

were seized from Blanding during the October 25, 2017, traffic stop, and which were being held in Philadelphia Police evidence. App. 336. Two days later, on February 2, 2018, FBI agents sought and obtained a federal search warrant to search the cell phones based on probable cause developed over the intervening months. App. 336.

The warrant obtained by the FBI specified that the phones were seized during an arrest of Blanding on October 25, 2017, but it did not rely much – if at all – on the facts leading to his arrest to establish the probable cause to search the phones. *See* App. 3151. As set forth below, Blanding later sought to suppress the evidence obtained from those cell phones by challenging the traffic stop and the subsequent search of his vehicle. App. 235-355.

### 4. Trips to California and the search of the One Water Street apartment.

Following the search of the Mansion, federal agents continued to investigate OBH and, through toll record analysis, determined that West was in frequent contact with co-conspirator Richard Chase Hoover. App. 1299. Agents learned that Hoover maintained a commercial driver's license that allowed him to drive trucks. App. 1299. Agents obtained a pen register / trap and trace device and cell site location information ("CSLI") for Hoover's phone and tracked Hoover as he traveled from Philadelphia to Los

- 18 -

Angeles and back between November 2, 2017, and November 20, 2017. App. 1301, 2437-44.

Upon Hoover's return on November 20, 2017, agents established surveillance and followed him to an apartment building located at 1 Brown Street in Philadelphia, which is where Hickson lived. App. 1883-87. Agents observed Hoover enter 1 Brown Street carrying a black backpack and saw him leave a few minutes later without the backpack. App. 1884-89, 1901-07. They later confirmed that Hoover entered Hickson's apartment while at 1 Brown Street. App. 1884-89, 1901-07.

They also confirmed that both Hickson and Blanding had been in Los Angeles with Hoover a few days earlier. App. 2084-85, 2437-41. Approximately two weeks later, on December 3, 2017, West posted on Instagram a picture of himself with Hickson standing outside 1 Brown Street. The photograph was captioned: "Boss Talk Amongst Bosses... #NewInvestments #CommercialProperty #ObhRecords." App. 2126; Supp. App. 15. This, the government argued at trial, showed that OBH was using 1 Brown Street as a stash house.

Over the next several months, agents tracked Hoover, Hickson, and Blanding as the three men traveled to Los Angeles and then back to Philadelphia. App. 2084-86. Including the November trip described above,

the three defendants made a total of six trips, at the rate of approximately one trip per month. App. 1301-02, 1307, 2437-57. Each round trip took between 10 and 14 days. App. 2083-87. Each time, as confirmed by physical surveillance and other evidence, Blanding and Hickson flew from Philadelphia to Los Angeles and met Hoover there. App. 1304-06, 2084-87, 2140-47; Supp. App. 3, 8, 20-22, 33-36. During one trip, law enforcement saw all three men in the same vehicle and witnessed Hickson handling what appeared to be a kilogram of cocaine. App. 2142. After each trip, Hoover drove back to Philadelphia, while Hickson and Blanding flew back. App. 1595-99, 2119-56, 2173-97, 2437-57.

During their trips, Blanding and Hickson posted on social media and sent text messages demonstrating the unlawful nature of their trips. Supp. App. 3, 8, 20,24, 36. For example, during the December 2017 trip, Blanding posted a photograph of himself and Hickson. The location was listed as Los Angeles and the caption read, "I'll Make It Snow In LA," a reference to cocaine. Supp. App. 3. On February 25, 2018, while Hickson was in Los Angeles with Hoover and Blanding, he texted West and OBH member and co-defendant Amir Boyer a photograph of himself wearing an OBH hat and told Boyer to get his "weight up" because there was "$ to be made." App. 2176-77; Supp. App. 24.

After the second, third, fourth, and fifth trips to California, Hoover left his red Volvo truck tractor in a lot in South Philadelphia and then drove in a separate vehicle to the Edgewater Apartments, located at 2323 Race Street, with a backpack or a suitcase. App. 1306-09, 2068-70, 2172-73, 2197. West, Blanding, and Gadson were observed at the same locations at those times. App. 2308-20, 2134-54, 2187-91. Twice, West and Blanding met Hoover at the truck lot. App. 2179; Supp. App. 25. Law enforcement surveillance showed West with Hoover as Hoover moved duffel bags and suitcases into the apartment complex. App. 2189-91.

At trial, the government introduced evidence to show that the defendants used an apartment in 2323 Race Street, which was rented using a fake North Carolina driver's license in the name Tabitha Bishop. App. 1916-27, 1939-45. Notably, on December 8, 2017, Blanding and Amir Boyer discussed by text message signing Tabitha Bishop's name to something. App. 1935-36. Although they did not specify what they were signing, the clear reference to Tabitha Bishop, a false identity associated with the apartment at 2323 Race Street, tied them to that apartment.

On the sixth and last trip, Hoover went to a new location, Apartment 717 of the One Water Street Apartments, located at 250 North Columbus Blvd. App. 1309-10, 2198-2205. Hoover met with Blanding prior to going to

the apartment. App. 2197-98. At trial, the jury was shown video of the two men entering the apartment complex, which showed Blanding unlocking the door to Apartment 717. App. 2198. At the time, Hoover was carrying a gray rolling suitcase. App. 2078, 2197.

On May 17, 2018, the FBI executed a search warrant at Apartment 717 of the One Water Street Apartments, during which they seized approximately ten kilograms of cocaine, five pounds of methamphetamine, and $20,000. App. 2198-99, 2022-23. Hoover was the only one in the apartment at the time and was placed under arrest. App. 2196-97.

After the FBI raided the apartment at One Water Street, and Blanding realized what happened, his first two calls were to Hickson, and his third call was to West. App. 2201-22. Electronic and physical surveillance showed that Blanding went back to the apartment and then left One Water Street, immediately after which he went to Hickson's apartment at 1 Brown Street before again returning to One Water Street. App. 2220-21. In the days following the seizure, Hickson sent messages to others, including other defendants, that tied him (and them) to the drugs seized at One Water Street. App. 2223-26; Supp. App. 30-31, 40-41. In one, he wrote to West: "I know it's a bad time for us, but we're going to get through this shit." Supp. App. 30.

Following the seizure at One Water Street, investigators discovered –
and the government introduced evidence at trial to prove – that Blanding,
Hickson, West, and Hoover had worked together to secure the apartment at
One Water Street for use in their drug trafficking activities. App. 2205-20.
For example, investigators learned that Blanding obtained a fake California
driver's license in the name of DeAngelo Smith, and he did so with
Hickson's help. Supp. App. 27-28, 38-39.

The drugs seized on May 17, 2018, were the basis for Count Twelve,
with which West, Blanding, Hickson, and Hoover were charged. Hoover
pleaded guilty to that count. The other three were all convicted at trial.
Notably, the drugs seized from One Water Street were also included in the
overall conspiracy count, Count One, of which all defendants were
convicted. This included Hans Gadson, who was not charged in Count
Twelve but was nonetheless tied to that apartment through text messages in
which he warned others of law enforcement scrutiny after the search of One
Water Street. Supp. App. 1.

## B.    The Arrests of the Defendants.

Following the search of the One Water Street Apartment, a grand jury
returned the original indictment in this case against Richard Chase Hoover
on June 13, 2018. App. 120. Federal investigators then continued to

investigate, and on October 17, 2018, the grand jury returned a superseding indictment against Hoover and eight others, including the four appellants. App. 121. On October 18, 2018, pursuant to federal arrest warrants, federal authorities orchestrated the arrests of several of the defendants, including West, Blanding, and Hickson. App. 122-23. Gadson, who fled to California, was arrested much later.[5] App. 2366.

West was arrested at his home in Brookhaven, Pennsylvania. App. 2001-02. During his arrest, agents seized, among other things, two cell phones, which West acknowledged were his. App. 2005-07. Hickson was arrested at his apartment at 1 Brown Street. App. 2227. Following his arrest, agents conducted a search of Hickson's apartment and vehicle. App. 2227. They seized multiple items, including multiple cell phones, and a digital scale with methamphetamine residue on it. App. 2228-30.

Blanding, whose arrest is the basis for issues presented in this appeal, was arrested at an apartment located at 1815 John F. Kennedy Boulevard in Philadelphia. App. 818. This apartment belonged to a female associate of Blanding, but Blanding stayed there occasionally, and the FBI established surveillance on the apartment building the night before to confirm that he

---

[5] At times, the record reflects that Gadson was arrested in March 2018. In reality, he was arrested in March 2019.

would be there. App. 818-19. At approximately 6:00 a.m., approximately nine agents gathered at the door of the apartment, knocked on the door to the apartment, and announced their presence. App. 826. Blanding answered the door and was immediately taken into custody at the threshold of the apartment. App. 826. He did not shut the door behind him; rather, the door remained open. App. 827, 843.

Given that members of OBH were known to engage in violent behavior, agents conducted a brief protective sweep of the apartment to ensure their safety. App. 826-30. The agents did not encounter anyone in the apartment, but while conducting the protective sweep, Special Agent Charles Simpson, one of the two lead case agents, saw two cell phones on a couch, along with a blanket, and it appeared that Blanding had been sleeping on the couch. App. 830-31. The evidentiary value of these phones was immediately apparent to Special Agent Simpson because, as part of their investigation, the FBI had searched other cell phones belonging to members of OBH, including phones belonging to Blanding. App. 831, 3511. The information contained on the phones seized during the investigation, especially those previously seized from Blanding, contained highly incriminating evidence, but as set forth below, the phones seized from

Blanding the day of his arrest did not provide much – if any – of the evidence presented at trial.

### C.    Searches of Cell Phones Seized During Investigation.

During the investigation, federal investigators seized a total of approximately 60 cell phones, including those seized during the arrests of the appellants, and applied for search warrants to search them. App. 1310, 1317. They seized cell phones (or took possession of them after someone else seized them) because, in the words of one of the lead case agents, "[a] wealth of evidence can be obtained from a cell phone search warrant." App. 1317. And indeed, in this case, that held true. Investigators were not successful in gaining access to the information on all the seized cell phones, and on some cell phones, they found little to no evidence. App. 1319. But in others, the investigating agents obtained compelling evidence of the crimes charged in this case, including text messages between and among the members of OBH, and contact numbers, saved as nicknames, which allowed investigators to attribute the numbers to specific members of OBH. App. 1326, 1406-07, 1412-13, 3589-92. This evidence was taken from the cell phones in the form of voluminous data extraction reports. App. 1258-74, 1326.

To assist the jury in determining which phone numbers belonged to which defendants, and to set the stage for presenting to the jury the text messages extracted from the cell phones, the government introduced a series of charts, which are discussed more fully below. The first, Government Exhibit 3001, which was introduced through the testimony of Special Agent Simpson, listed "a select group of . . . devices that were searched in this investigation." App. 1321. This included phones attributed to appellants West, Blanding, and Hickson. App. 3511.

### D.    The Pretrial Motions.

Before the trial in this matter, several of the defendants and the government filed pretrial motions.

### 1.    Blanding's pretrial motions.

Relevant to the instant appeal, Blanding filed a series of motions to suppress evidence seized at various times during the investigation, as well as various supplements. App. 46, 59. Specifically, he moved to suppress evidence extracted from two of his cell phones seized during the traffic stop on October 25, 2017, and from the two cell phones seized during his arrest nearly a year later, on October 18, 2018.

The government filed a response on April 15, 2019. App. 140. The district court then held an evidentiary hearing on April 16, 2019, after

which the district court ordered supplemental briefing. App. 140, 235-56. The main issue to emerge from that evidentiary hearing was whether the October 25 traffic stop was lawful. App. 348-55, 628-45. According to Blanding, the traffic stop was not supported by reasonable suspicion, and therefore, any evidence seized during that stop, including evidence contained in the two cell phones, should have been suppressed as fruit of the poisonous tree. App. 628-45.

The parties did not address any other issues at the hearing or during the subsequent oral argument related to the propriety of the traffic stop or the subsequent search of Blanding's car or his arrest. App. 628-45. The parties did, however, address whether the exclusionary rule should apply in the event the district court found a Fourth Amendment violation. App. 645-58. Despite the limited focus of the oral argument, in denying Blanding's motion to suppress, which the district court did in an order dated June 24, 2019, the district court addressed all issues presented in Blanding's various motions and supplements related to the October 25, 2017, traffic stop. App. 46-57. Specifically, the district court found that Officer Vargas had reasonable suspicion to conduct the traffic stop, that he had probable cause to search Blanding's vehicle and to seize property, including Blanding's cell phones, and that he had probable cause to arrest Blanding, incident to

which Officer Vargas seized Blanding's cell phones. App. 46-57. The district court also found that the exclusionary rule should not apply in any event. App. 53-56.

Blanding also filed two motions to suppress evidence seized from the apartment of a female associate on two separate occasions, June 1, 2018, and October 18, 2018. App. 807-808. Only the second motion is relevant to the instant appeal. In that motion, Blanding attempted to suppress evidence from the cell phones that were seized during a protective sweep of the apartment in which he was arrested. App. 60. Those phones were in plain view when seized by the FBI and were subsequently searched pursuant to a federal search warrant. App. 830-31.

The district court held an evidentiary hearing on this motion on October 7, 2019. App. 805-69. During the hearing, Special Agent Simpson described the events surrounding Blanding's arrest, consistent with the description above, including that the FBI knew OBH to be a violent drug trafficking organization and that they believed that someone else was likely in the apartment. App. 816-53. Blanding, for his part, introduced a 16-second video taken from a home security camera that he claimed showed him leaving the apartment before he was arrested. App. 837-43.

The district court, however, found Special Agent Simpson credible and rejected Blanding's account of events. App. 63-64. The district court specifically found that Blanding answered the door in response to the agents announcing their presence and then tried to step out and swing the door shut, but he was arrested immediately, and the door never shut behind him. App. 63. As described by Special Agent Simpson, to the extent Blanding was out of the apartment, it was only by virtue of the agents physically taking him into custody. App. 843.

In briefing in support of his position, Blanding argued that the search of the apartment was too invasive to be deemed a protective sweep. App. 64. The district court disagreed, finding that the protective sweep was justified under *Maryland v. Buie*, 494 U.S. 325 (1990), and that the seizure of Blanding's phones, which were unquestionably in plain view, was justified. App. 64. The district court also accepted Agent Simpson's claim that the FBI believed there was a high likelihood that someone else may have been in the apartment, but the trial court did not ultimately base its decision on this belief. App. 64.

## 2.    Other defense motions relevant to this appeal.

On September 9, 2019, as part of his opposition to the admission of certain social media evidence, Hickson requested that the court sever his

case from his co-defendants. DDE #393. His counsel then expressed a desire to reassert that request after the district court ruled on the government's motion to admit the social media evidence. App. 972-76. Hickson also filed a motion to suppress cell site location information under *United States v. Carpenter* because the government did not obtain a warrant authorizing them to collect such information. App. 3276-83.

### 3. Government's motion to admit social media evidence, including rap videos.

Prior to the trial, on August 9, 2019, the government filed a motion *in limine* to admit as evidence certain social media posts of the defendants, as well as four short videos taken from social media. DDE #352. The defendants either responded in opposition or joined in the responses of others, and on September 23, 2019, the district court convened a pretrial hearing (on this and other issues). App. 761-803.

Most of the social media evidence offered by the government was in the form of posts by the individual defendants on Instagram. App. 771. The government planned to offer those posts into evidence because they "document[ed], through the course of the conspiracy, various defendants engaged in narcotic trafficking at various locations that [were] identified in the indictment, and therefore were intrinsic to the charged crimes." App. 772.

Although the government was in possession of thousands of social media records, the government identified approximately 100 Instagram posts that it intended to use at trial, and many of these were ultimately introduced as trial exhibits. *See, e.g.*, Supp. App. 1-41. Notably, these social media posts were compelling evidence of the conspiracy charged in this case, but the government does not understand any of the appellants to be challenging the admission of the Instagram posts.

Rather, the appellants are disputing the admission of four videos, which were pulled from social media, and were also part of this pretrial litigation. West Br. 34. Three of those videos were rap videos by Abdul West, an aspiring rap artist (only two of which were presented at the hearing), and a fourth was a video of West and OBH member Abaz Parker, a/k/a "Skinny Me," who was not charged in this case, threatening violence should anything happen to "Skinny Me." App. 780-82, 778-80.

In one of the rap videos, West appeared to rap about the murder of Robert Johnson, whom West solicited OBH member Dontez Stewart to kill. Notably, federal investigators found on one of West's phones lyrics to the song West performed in the video. Those lyrics, which reference "Tez" bringing someone's "head" to West, were created just four days after the murder of Johnson. App. 3670.

In another of the rap videos, West rapped about the seizure at One Water Street on May 17, 2018. West appeared to refer to the loss of $120,000 of cocaine and methamphetamine and the arrest of Richard Chase Hoover. App. 175-76. West also expressed his concern that Hoover would tell federal investigators for whom he worked, i.e., West. App. 175-76.

A third rap video included a lyric in which West rapped about his life changing when "Meliano" (a known nickname for Hickson, *see* App. 1720, 1855, 1874-75; Supp. App. 16, 19) dropped a brick on him, which the government argued was a reference to a bulk quantity of narcotics. App. 175.

At a subsequent pretrial hearing, on October 15, 2019, the defense presented testimony from Dr. Richard Cooper, a professor at Widener University. App. 870-959. Dr. Cooper, following *voir dire*, was qualified as an expert in the area of "rap lyrics and their interpretation by listeners." App. 895. During direct, he expressed opinions about a listener's ability to determine the veracity of statements made in rap music, noting for example that references to murder are commonplace in rap lyrics. App. 904. Ultimately, the purpose of Dr. Cooper's testimony was to suggest to the court that the proffered rap videos would have minimal probative value.

West Br. 38-41. But on cross, he acknowledged that West was portraying the persona of a violent drug dealer, and he agreed that he could express no opinion as to whether West actually was a violent drug dealer. App. 926-929.

### 4.    Litigation related to evidence of the murder of Robert Johnson.

Prior to pleading guilty, and cooperating with the government, Stewart moved *in limine* to exclude evidence of the murder of Robert Johnson. DDE #392. The government responded to the motion and, after Stewart pled guilty and agreed to cooperate with the government, supplemented its response. DDE #407, DDE #482; Supp. App. 67-88.

The government requested that the court admit evidence that West, acting as the leader of OBH, ordered a lower ranking member – that is, Dontez Stewart – to murder Johnson, an associate turned rival drug dealer. As set forth below, the evidence came largely from the testimony of Stewart. Additional evidence corroborating Stewart's testimony, including cell phone records, an Instagram message, audio of Stewart's sale to the confidential source, lyrics found on West's phone, and a portion of a rap video, was also introduced. App. 1518-19, 1846, 1849-51, 1855.

### E.     The Government's Case At Trial.

The government established the facts set forth above through an extensive amount of evidence. This included testimony from federal agents and state law enforcement officers, including officers who participated in traffic stops and searches, which were the subject of pretrial litigation, and expert witnesses, as well as autobiographical rap lyrics and videos, social media posts, and hundreds of text messages between and among the defendants. This included evidence of violence and threats of violence. The government has included below brief descriptions of some of that evidence relevant to the instant appeals.

### 1.     Violence and firearms.

Acts of violence and numerous threats of violence committed in furtherance of OBH's narcotics distribution conspiracy were offered into evidence at trial. The threats were routinely posted to various social media sites and included the following:

- An Instagram photo taken from West's Instagram account. The photo is of numerous members of OBH, including Blanding and Daryl Baker, standing in front of the Mansion. The picture is captioned: 100 shooters and they pledge their allegiance. App. 1840; Supp. App. 7.

- An Instagram photo taken from West's Instagram account. The photo is of West, Blanding, Baker, and Charles Salley a/k/a

"Dark Lo."[6] The picture is captioned: All debts get paid in full #ElPatron #KingAb #Sturdy #Protocol #ObhMafia #OBHGG. The photo was posted on October 15, 2017, the day after OBH rival Robert Johnson was murdered (discussed below). App. 1842; Supp. App. 6.

- An Instagram photo taken from West's Instagram account. The photo is of West, Blanding, and Salley. The picture is captioned: I lost every internet fight... but I'am Undefeated in The Streets... @bionckhaz @darklo #ObhMafia #OBHGG. App. 1843; Supp. App. 4.

- An Instagram photo taken form West's Instagram account. The photo is of Baker, West, and Malik West a/k/a "Lik Moss." The picture is captioned: My 2 Assassins @likmoss_obhgg #Shotti They Don't Come out Unless it's SERIOUS!!! #Sturdy #Protocol #OBHGG. App. 1843; Supp. App. 17.

- An Instagram photo taken from West's Instagram account. The photo is of West at a house frequented by OBH members known as the Lounge. The picture is captioned: Q-What's Da Punishment For Treason???? A.- Death Sentence #ElPatron #KingAb #Sturdy #ObhRecords. App. 1844; Supp. App. 10.

- An Instagram photo taken from West's Instagram account. The photo is of numerous individuals including West and Baker. The picture is captioned: If U Spin Our Corner, I Hope U Have

---

[6] Salley sent a threatening letter to cooperating defendant Dontez Stewart the day prior to Stewart's scheduled appearance as a witness for the government. In substance, the letter threatened violence against Stewart and his child's mother if Stewart testified against West and other members of OBH at trial. *See* App. 1608, 1611, 1694-97. On the day Stewart testified, FBI agents arrested Salley and seized a loaded semi-automatic firearm with an extended magazine from Salley's bedroom during a court-authorized search of his residence. Salley was charged with witness tampering, in violation of 18 U.S.C. § 1512(b). He ultimately pled guilty and was sentenced to 90 months' imprisonment.

Life Insurance #theMend... @cuzz012 #reezy #Shaddi...
#Sturdy #Protocol #OBHGG. App. 1845; Supp. App. 13.

- An Instagram photo taken form West's Instagram account. The photo is of Blanding, West, and Baker outside of the Mansion. A firearm can be seen next to the men. The picture is captioned: Do U Think Yall Gonna Come For Us & We Don't Fire Back? None Of My Brothers Gonna Be Afraid!!! #KingAb #Shaddi & @Bioncikhaz #Sturdy # Protocol #OBHGG #ObhMafia. App. 1845; Supp. App. 18.

- A video posted to a public internet site on April 28, 2018. In the video, West, Abbas Parker a/k/a "Skinny Me," and Blanding can be seen. During the video West and Parker threaten anyone who has an "issue" with any member of OBH. West brags that he has enough money so that he "don't even have to get my hand dirty" and that he can "dispatch" people to kill his enemies. West also describes how scared an individual named "Shady" was after West had sent people after him. App. 1856-67, GX 902b.

In addition, evidence was introduced to show that members of OBH kept firearms with them and at various residences to intimidate those with whom they dealt, and to protect their drug stashes. Firearms were recovered from various locations as follows:

- Inside the Mansion on September 11, 2017. App. 1217.

- Inside a secret compartment of one of West's vehicles seized outside of the Mansion on September 11, 2017. App. 1651-53.

- Sold by Dontez Stewart to a confidential source on October 19, 2017. App. 1517-18.

- During the arrest of co-conspirator Amir Boyer at the Mansion on October 18, 2018. App. 1523-24.

### 2. Dontez Stewart and the murder of Robert Johnson.

On October 17, 2019, less than two weeks prior to the trial, Dontez Stewart pled guilty pursuant to a cooperation plea agreement. App. 1708. Stewart then testified extensively about OBH and West's control of the drug trafficking organization. App. 1705, 1712-25. Stewart explained that OBH was a rap group that sold drugs and did "a lot of criminal activity." App. 1705. Stewart's role within the drug trafficking organization was to "sell coke and be on call." App. 1717.

Stewart testified that he met West at the Mansion, which he described as a house used for storing and selling drugs. App. 1712-14. Stewart stated that numerous people would be at the Mansion to conduct narcotics business "like, dealing with coke, the crack, the money that was being transferred from the outside" at the behest of Abdul West or his "lieutenant" Daryl Baker, a/k/a "Shatti." App. 1717-18. Stewart stated that everyone who was at the Mansion was armed with weapons. App. 1714. Stewart identified Blanding, a/k/a "Khaz," Hickson, a/k/a "Melliano" or "OG," and Gadson, a/k/a "No Brakes Bras," as being at the Mansion at different times. App. 1719-21.

Stewart explained that when he first started going to the Mansion, West did not provide Stewart with any narcotics to sell. App. 1714. Stewart

said he had to earn West's trust by "being around" before he worked his way into "the trust circle." App. 1714. Stewart began selling crack cocaine for West around mid-2016, or the beginning of 2017. App. 1711-16. Stewart stated that he would get crack from West or, if West was not around, Gadson. After selling the narcotics, Stewart gave the money to West or Gadson. App. 1721-1725.

On October 13, 2017, Stewart met with West and Daryl Baker. App. 1727. West instructed Stewart to kill Robert Johnson, because Johnson had been dealing drugs not only with West, but also with West's "enemy." App. 1733-34. West and Baker discussed different ways in which Stewart should carry out the murder. App. 1727-29. Ultimately, West decided to set up a narcotics transaction between Johnson and Stewart as a ruse for Stewart to meet with Johnson and kill him. App. 1728-29.

On direct examination, when asked why he agreed to kill Johnson, Stewart answered, "Abdul West told me to." App. 1730. Stewart explained that if he refused to do what West ordered him to do, he might be killed himself or might be denied any future drugs to sell. App. 1730.

Under the ruse of a drug transaction, set up by West, Stewart met with Johnson. At that time, Johnson provided Stewart with methamphetamine, but Stewart was unable to kill Johnson because "there

were too many people around." Stewart testified that West was mad when Stewart informed him that he had not killed Johnson. West told him, "Oh, man, you fucking up. I got to call my folks and tell them you ain't do what I asked you to do." In response, Stewart informed West that he would finish the job and kill Johnson. App. 1730-34.

Stewart contacted Johnson via text to arrange a second meeting to purchase additional methamphetamine. App. 1735. Johnson informed Stewart that he was going to a club named "Vanity Grand," which closed around 2 or 3 in the morning, but he would meet Stewart after. App. 1735. Stewart then contacted another member of OBH, "OBH Berto," and told him that West wanted Stewart to kill Johnson. App. 1736-37. OBH Berto agreed to help Stewart commit the murder. Stewart testified that the two men met with Johnson on October 14, 2017, and that OBH Berto shot Johnson in Johnson's car while Stewart was pretending to retrieve money from his car to pay for the methamphetamine. App. 1737. Stewart then kept the methamphetamine he was supposed to purchase.

After the shooting, West arranged for other members of OBH to pay Stewart in narcotics for carrying out the homicide. Stewart received cocaine and crack from Gadson and a "trash bag with weed in it" from another individual. App. 1739-1742. Stewart testified that the street value of the

narcotics he received, as payment for the murder, was between $7,000 and $10,000. App. 1743.

Stewart ultimately sold the methamphetamine that he took from Johnson, along with a firearm, to a law enforcement confidential source, on October 19, 2017. App. 1745. The sale of the methamphetamine formed the basis for Count Eight. The sale of the methamphetamine, which Stewart took from Johnson after he was killed, was also charged as an overt act in the overall conspiracy charged in Count One. App. 197.

The government introduced additional corroborating evidence that supported Stewart's testimony concerning the homicide. This included testimony concerning the location of Stewart's phone at various times surrounding the homicide and the locations of Stewart's and West's cell phones on the night before the murder, when Stewart and West met to plan the homicide. App. 2460-62. The government also introduced a text message from Blanding to West on October 14, 2017, prior to the homicide. In the message, Blanding informed West that Johnson was at "Vanity." App. 1847. In addition, as discussed above, the government introduced evidence taken from one of West's phones, including a note, dated October 18, 2017, that is, four days after the murder of Robert Johnson. Supp. App. 32. The note contained rap lyrics in which West identified "Tez"

(Dontez Stewart) and described Stewart committing a murder on West's behalf. App. 1848-50.

### 3.   Summary charts.

As referenced above, the government presented a significant amount of evidence that was extracted from some of the approximately 60 cell phones seized during the investigation. This included a slew of text messages between and among the members of the conspiracy.

To introduce the text messages into evidence, the government had to show that the text messages were what the government purported them to be, that is, communications between the members of the charged conspiracy. Fed R. Evid. 901. The government did this principally through a series of summary charts, which summarized voluminous electronic evidence in the form of cell phone data reports, phone records, social media records, and other miscellaneous records, and through compilations of text messages. App. 1320-60, 1405-12, 2254-81. The charts, taken together, established telephone numbers and nicknames used by the defendants, and they ultimately allowed the government's drug trafficking expert, DEA Supervisory Special Agent Randy Updegraff, to opine as to the meanings of some of the text messages, in which the defendants used coded language.

Many of these text messages were used to establish drug weights attributable to the defendants in this case. App. 2540-67.

The first chart, marked as Government Exhibit 3001, was introduced through Special Agent Charles Simpson. App. 1320-21, 3511. Government Exhibit 3001, which was a chart with five columns, listed certain devices searched during the investigation and was distilled from a larger spreadsheet Agent Simpson used to track the many devices the FBI seized during the investigation. App. 1322. The actual devices were introduced into evidence, and the data extraction report for each phone was marked as an exhibit. The exhibit number for each data extraction report was then reflected in the left-hand column of Government Exhibit 3001. App. 1324-26, 3511.

In Agent Simpson's larger spreadsheet, which was not introduced into evidence, he assigned a number to each seized phone as an internal control number. This number was then listed in the second column of Government Exhibit 3001 to identify the corresponding phone that had been entered into evidence. App. 1322.

The third column of Government Exhibit 3001 described from where each particular phone was seized, generally, and the fourth column listed the month and year the phone was seized, as a way to fit the seizure of each

respective phone within the context of the investigation and the other evidence presented to the jury. App. 1323. For example, for Phone 1, Government Exhibit 3001 listed in the third column that the phone was "Seized from Jamaal Blanding by PPD," and listed in the fourth column that it was seized in "Oct-17." App. 3511. This was then fleshed out through the testimony of Special Agent Simpson to show that Phone 1 was seized from Blanding during the October 25, 2017, traffic stop conducted by the Philadelphia Police Department, as described above. App. 1327. The government then did this for several of the phones included on Government Exhibit 3001 to assist the jury in understanding the chart. App. 1327-1335. The fifth – or right-hand – column listed the phone number associated with each device, which the FBI knew through the respective data extraction reports. App. 1323.

The second chart, marked as Government Exhibit 3003, was introduced through Special Agent William Becker. App. 1412, 3589-92. Exhibit 3003, which Agent Becker created, summarized some of phone numbers used by the various defendants throughout the conspiracy. It also included nicknames used by the various defendants, which came from a variety of sources, including the names under which certain numbers were saved in the contacts of the seized phones. Agent Becker testified

extensively as to where and how he obtained the information in this chart. App. 1412-19, 1430-64, 2647.

Notably, at the time the government introduced Exhibit 3003, no one challenged its admission, except for a handful of requests for minor clarifications, which the government affirmatively made during its direct examination of Special Agent Becker. App. 1411-19, 1428-68. Later in the trial, however, the defendants attempted to attack Exhibit 3003 during the testimony of Special Agent Updegraff, even though he had nothing to do with its creation. App. 2590-2606.

Government Exhibit 3002 was a compilation of text messages compiled by Special Agent Becker pertaining to specific drug transactions. App. 1468. Throughout the trial, the government introduced individual text messages that were related to larger events in the investigation. For example, the government introduced individual text messages that helped establish that the defendants used the Mansion and One Water Street as stash houses and helped tie the defendants to the drugs seized from those two locations. App. 1471-80.

By comparison, Exhibit 3002 included text messages that Special Agent Becker believed showed the defendants engaging in specific instances of drug trafficking. App. 1468-70. His belief was then confirmed through

the testimony of the drug trafficking expert, Special Agent Updegraff, who interpreted the texts and, based on his training and experience, assigned types of drugs and amounts, where possible, based on the language used in the text messages. App. 2538-67. Agent Updegraff's opinions were then reflected in a fourth exhibit, Government Exhibit 3004, which is essentially Exhibit 3002 with Special Agent Updegraff's conclusions added to it. *Compare* App. 2538-67, *with* App. 3593-3669.

### 4.    Testimony of DEA Supervisory Special Agent Randy Updegraff.

Special Agent Updegraff, who has appeared in federal court as a drug trafficking expert multiple times, testified as to his qualifications, including his familiarity with coded language and slang terms, and he was qualified as an expert without objection. App. 2506-13. He then provided background to the jury about the way in which drugs are imported to the United States and then distributed throughout the country, and he defined for the jury several important terms related to the drug trade. App. 2513-29. He also opined that the amounts of drugs seized from the Mansion and One Water Street and the circumstances of the seizures were consistent with distribution and not personal use. App. 2529-31.

A large portion of his testimony pertained to how he "cracks the code" of coded language and how he interpreted the text messages included in

Government Exhibit 3002, which led to his conclusions, as reflected in

Government Exhibit 3004. App. 2533-67. This testimony attributed certain

types and amounts of drugs to each defendant. For example, Government

Exhibit 3004 was rife with text messages between West and Gadson, in

which Gadson kept West apprised of "the count," that is, amounts of

cocaine and crack cocaine that he sold, as well as the drug proceeds he had

as a result of those sales. App. 2547. Government Exhibit 3004 also

included a significant number of text messages to and from Blanding,

mostly related to methamphetamine, and one text message from Hickson,

in which he requested that Blanding supply him with a pound of

methamphetamine. App. 2452-53.

These conclusions were thoroughly tested during cross-examination,

and the defense attempted several lines of attack on Special Agent

Updegraff. West's trial counsel highlighted that the amounts of drugs

included in "the count" had the potential to be counted twice (or more)

because they referred to drugs on hand and not specific transactions. App.

2570-71. He also challenged Special Agent Updegraff on his ability to

distinguish between powder cocaine and crack cocaine, which pertained

largely to West and Gadson, who was the one providing West with "the

count." App. 2570-83.

Blanding's counsel challenged Special Agent Updegraff on his opinion that Blanding trafficked in methamphetamine and then attempted to attack Government Exhibit 3002 through Special Agent Updegraff, even though Special Agent Updegraff was not involved in its creation. App. 2590-91.

Hickson's counsel asked a series of questions suggesting that texts referring to methamphetamine could have referred to marijuana, then he resurrected Blanding's attack on a summary chart that Special Agent Updegraff had no hand in creating. App. 2599-2605, 2644-46. Notably, when government counsel used redirect of Agent Updegraff to clear up any uncertainty about Government Exhibit 3002, Blanding's counsel objected, "This isn't [his] chart." App. 2637.[7]

Gadson's counsel went last and drew from Special Agent Updegraff a concession that his interpretation was subjective and could have been influenced by information provided to him by the government. App. 2607-11. Gadson's counsel then asked a series of objectionable questions to attack Agent Updegraff's attribution of certain amounts of cocaine and crack cocaine to Gadson. App. 2608-33. After a significant amount of cross-

---

[7] Following the defense's attempt to cross-examine Agent Updegraff on charts he did not create, the government again called Agent Becker to clarify the information on his chart, with an emphasis on why he believed that a certain number saved as "Mizzo 2" in one of the phones was attributable to Hickson. App. 2647-54.

examination (well over half an hour by Gadson's counsel alone), the district court gave Gadson's counsel five minutes to finish. App. 2629-33.

## F.    The Defense Case.

The defense called several witnesses during the government's case-in-chief due to scheduling issues. This included two individuals who were called to help establish that Blanding was involved in the music business (and not just the drug business), as well as two experts.

### 1.    Dr. Richard Cooper.

Dr. Richard Cooper, who testified at the pretrial hearing related to the government's motion *in limine* to admit rap videos, also testified at trial. App. 2236-53. During his testimony, which was relatively short compared to that at the pretrial hearing, Dr. Cooper explained for the jury that "gangsta" rap commonly includes references to "guns, bling, money, tough talk, swagger, [and] cursing," and that gangsta rappers are trying to portray a character. App. 2238-39. He described gangsta rap as a form of art, but on cross, he acknowledged that he is unable to determine whether rap lyrics contain true assertions, without more, and that inclusion of a fact in a rap song does not make that assertion "automatically false." App. 2247-48. Dr. Cooper also acknowledged that he did not review other evidence in the

case, which the government asserted tended to show that the lyrics at issue described actual events. App. 2249-50.

### 2. Drug trafficking expert David Leff.

After the government rested, and to rebut some of the testimony of Special Agent Updegraff, Blanding called his own drug trafficking expert, David Leff. App. 2656-97. Mr. Leff provided contrasting opinions as to several of the terms interpreted by Updegraff, mostly focused on Updegraff's conclusions that certain text messages referred to methamphetamine. App. 2671-77.

But Mr. Leff's testimony was as notable for the ways in which he agreed with Agent Updegraff as it was for the ways in which he disagreed with him. For example, during the government's cross-examination, which the district court limited to 10 minutes, Leff acknowledged that "hard" is a widely used term for crack cocaine, and that "soft" is a widely used term for powder cocaine. App. 2685. This testimony, which was unchallenged, conclusively interpreted many of the text messages included in Government Exhibits 3002 and 3004 and placed squarely in the laps of West and Gadson a significant amount of cocaine and crack cocaine.

### G.    Jury Instructions and the Jury's Verdict.

The instant appeals raise two issues related to the district court's jury instructions for Count One, the conspiracy court. First, despite the parties' request to the contrary, for Court One, the district court decided not to provide to the jury special interrogatories that were specific as to each defendant and inquired separately whether each drug type and quantity charged in Count One was attributable to and/or reasonably foreseeable to each defendant. App. 3371-74, 3433-83.

Second, over objection of defense counsel, the district court charged Count One in the disjunctive – that is, using the word "or" – when listing the controlled substances the defendants were alleged to have conspired to distribute. In other words, the district court instructed the jury that it could find guilt on only one of those controlled substances. App. 2830-31. By comparison, the Second Superseding Indictment, is as typical, listed the controlled substances in the conjunctive, that is, it used the word "and" when listing the controlled substances the defendants were alleged to have conspired to distribute. App. 190, 217-18, 224. The judge did not read a separate jury instruction explaining the legal relationship between the conjunctive and disjunctive in this context, as the government requested. App. 2866.

On November 19, 2019, the jury convicted West and Gadson on all counts with which they were charged. The government dismissed Count Eleven at trial, after a cooperating witness on whose testimony this count was based decided not to testify for fear of his safety, but Blanding was convicted on all other counts with which he was charged. Hickson was convicted on Counts One and Twelve; he was acquitted on Count Six. App. 3405-30.

### H.    The Sentencings.

The sentencing hearings for the four trial defendants were set by the district court for April 2020. To that end, the U.S. Probation Office produced draft Presentence Investigation Reports and asked for objections or corrections, which some of the parties provided. Then, on March 13, 2020, Chief Judge Juan R. Sanchez entered a standing order halting jury trials in the Eastern District of Pennsylvania due to the COVID-19 pandemic. Though the Chief Judge's standing order applied only to jury trials, other matters in the courthouse (and throughout the world) were delayed extensively. This included the sentencing hearings initially scheduled for April 2020.

The defendants in this case were sentenced starting in early 2021. Blanding and Hickson were sentenced on April 7, 2021, to 300 months'

imprisonment and 240 months' imprisonment, respectively. App. 19-27. On April 15, 2021, the district court sentenced West to 540 months' imprisonment. App. 28-36. On October 4, 2021, the court imposed on Gadson a sentence of 196 months' imprisonment. App. 37-45.

Although West, Hickson, and Gadson present arguments related to their sentence, only Blanding has presented arguments that require additional factual background.

Following his conviction at trial, Blanding's sentencing hearing was set for April 2, 2020. App. 2904. In anticipation of that date, on December 3, 2019, Blanding and his counsel met with a representative of the U.S. Probation Office, who was assigned to draft the Presentence Investigation Report. Blanding PSR ¶ 114. The Probation Office issued its first draft on February 21, 2020. Blanding PSR at 1. A couple weeks later, on March 2, 2020, Blanding filed posttrial motions pursuant to Federal Rules of Criminal Procedure 29 and 33, which the district court accepted *nunc pro tunc*. App. 2919.

The initial sentencing hearing was then rescheduled due to the COVID-19 pandemic. App. 2918. The work in this case did not stop, however. App. 2929. In fact, on May 29, 2020, Blanding's trial counsel submitted detailed objections to the draft PSR, and the final PSR was

issued on June 15, 2020. App. 2911. The government submitted its
sentencing memorandum on April 5, 2021. App. 179.

Blanding was ultimately sentenced on April 7, 2021, more than a year
after the date on which his sentencing hearing was originally scheduled and
nearly a year and a half after he was convicted at trial. App. 2916-65.
Importantly for one of Blanding's arguments on appeal, two days earlier, on
April 5, 2021, Blanding's counsel filed a motion to continue the sentencing
hearing, which the government opposed, prompting the district court to
hold a telephone conference that same day. App. 2906-14.

During the conference, Blanding's counsel informed the court that
Blanding had been in the special housing unit for approximately 28 days
and, as a result, was without certain legal papers. App. 2908-09. But
counsel also acknowledged that legal visits had resumed fully on
February 16, 2021, after several fits and starts related to pandemic-related
pauses, and that he met with his client on April 2 for several hours. App.
2909. Blanding's counsel also informed the district court that he planned to
meet with Blanding each of the following two days, for several hours at a
time, to prepare for the upcoming sentencing. App. 2910-11. Notably, in
arguing for a continuance, Blanding's counsel did not cite a need to have
family members present – in fact, his counsel explicitly stated that he did

not want family present – nor did he assert a need for extra time to prepare for his potential allocution. App. 2906-14.

Based upon this information, the court denied the motion to continue the sentencing, finding that Blanding was not prejudiced by moving forward on April 7, as scheduled. App. 2911. The court, however, gave Blanding's counsel the option to reassert his request to continue should the circumstances change. App. 2912-13. The district court also allowed Blanding's counsel to file his sentencing memorandum late and just prior to the hearing.

The circumstances did not change, yet at the sentencing hearing on April 7, 2021, Blanding renewed his request to continue the sentencing hearing. App. 2921. In so requesting, Blanding addressed the court. He did not claim at that time that he needed extra time to prepare his allocution. Rather, much of his reasoning for a continuance was based on his desire to have participated more in the drafting and review of his posttrial motions, which were filed more than a year earlier. App. 2924-2927. He also expressed a desire to determine whether the PSR contained any inaccuracies or information to which he would like to object, even though his counsel had filed a list of objections on his behalf. Supp. App. 12-44. In

this appeal, Blanding has not identified any issues that did not appear among his counsel's objections.

The district court again denied the request to continue, and the sentencing hearing proceeded as scheduled. App. 2929-65. The district court calculated the applicable advisory sentencing guideline range at 360 months to life imprisonment. This was based on a base offense level of 36 and a two-level increase for maintaining a drug premises, and a criminal history category of VI (based on 20 criminal history points). Notably, this guideline range would not have changed without the two-level drug premises enhancement because Blanding was also a career offender under the Guidelines. Blanding PSR ¶¶ 85-95, 104-107, 139.

During the hearing, the court gave Blanding an opportunity to allocute. Initially, his counsel informed the court that Blanding would be relying on the previously filed sentencing memorandum and related papers. But when pressed by the district court, Blanding decided he would allocute. App. 2952-2953. He expressed that he would take this opportunity to better himself, and he explained to the court that the facts reflected in the PSR did not capture the entirety of his being. App. 2953-2954. He also told the district court that he planned to appeal and that he expected that the

hearing would be continued and so he did not prepare an allocution. App. 2954.

The district court then pronounced sentence, finding that Blanding earned a term of imprisonment of 300 months. App. 2961. This was far in excess of Blanding's request of 20-27 months, which was impossible given that he faced a 180-month mandatory minimum, and also significantly above that mandatory minimum. App. 2946. But the sentence was also less than the government's recommendation of at least 360 months and reflected a downward variance from the applicable guideline range of 360 months to life imprisonment. App. 2946.

The district court attributed this variance to the fact that many of Blanding's prior convictions (which produced 20 criminal history points) were for relatively minor, street-level drug offenses (at least as compared to the expansive drug conspiracy of which he was convicted in this case. App. 2959. The district court did not state that it was basing its sentence on the sentence's relation to any mandatory minimum term of imprisonment.

## STATEMENT OF RELATED CASES

Aside from the proceedings arising from the same district court prosecution as this, *United States v. West, et al.*, Criminal No. 18-249 (E.D. Pa.), the only other related case or proceeding that is completed, pending, or about to be presented before this Court or any other court or agency, state or federal, is *United States v. Eric Brooks-Blanding*, Criminal No. 18-443. Each of the defendants in this prosecution, including the four appellants here, has been sentenced, as has defendant Eric Brooks-Blanding. No other appeals have emerged from these cases.

## SUMMARY OF ARGUMENT

1. The district court did not err in denying Blanding's motion to suppress evidence obtained from two cell phones taken in a search following a traffic stop. During the stop in question, Officer Vargas developed probable cause that Blanding was involved not just in drug possession but in drug trafficking, warranting seizure of the phones. Further, even if that is incorrect, application of the exclusionary rule would be inappropriate here for multiple, independent reasons: Officer Vargas did not commit a deliberate or reckless violation of the Fourth Amendment; the search of the phones by federal authorities took place months later pursuant to a valid federal warrant, and therefore the search was attenuated from any earlier illegality; and the federal agents acted in good faith reliance on the warrant.

2. The district court did not err in denying a motion to suppress evidence obtained from cell phones belonging to Blanding found in the apartment he occupied. The phones were seen in plain view during a protective sweep of the apartment following Blanding's arrest, which was permitted under either *Buie* prong – both because the sweep occurred in the immediate vicinity of the arrest, and because agents had reasonable suspicion that a dangerous person may be nearby. Further, even if there

was an error, the exclusionary rule would not apply, for multiple reasons, including that the agents did not engage in deliberate or reckless wrongdoing, and they relied on a later-issued judicial warrant to search the phones. Finally, any error was harmless, as virtually no evidence from these cell phones was offered at trial.

3. The district court did not err in ruling that the government acted in good faith in obtaining prospective cell site location information (CSLI) regarding Hickson under the Stored Communications Act, without a warrant, prior to the Supreme Court's *Carpenter* decision. This issue was resolved in *United States v Scarfo*, 41 F.4th 36 (3d Cir. 2022), which Hickson overlooks. Further, any error was harmless given the overwhelming evidence presented with regard to Hickson's involvement in the drug trafficking enterprise.

4. The district court did not abuse its discretion in admitting evidence of a murder as intrinsic to the charged conspiracy. That murder directly proved the conspiracy charged. It proved the existence of the conspiracy, the hierarchal structure of the organization, and the expectation that lower-ranking members carry out violent acts including murder, and how OBH dealt with rival drug dealers. Moreover, it directly proved that West was the leader of the drug trafficking organization as charged in the indictment.

5. The district court did not abuse its discretion in admitting evidence from rap lyrics and videos in which, the government asserted, West admitted his criminal conduct, including direction of a murder. West's suggestion that the jury could not properly resolve the factual question presented here – whether the songs were simply artistic expression, or confessional – is frivolous, and rejected by all pertinent case law. Further, the court gave an instruction which properly cautioned the jury not to reach a decision based on improper considerations.

6. The district court did not abuse its discretion in denying severance of the charges against Hickson. The jury was fully able to compartmentalize the evidence against the various defendants, as evidenced by its acquittal of Hickson on one charge.

7. The district court did not abuse its discretion in limiting the cross-examination by Gadson's counsel of the government's drug trafficking expert witness. After counsel established general points, the examination became repetitive and argumentative, and the court permissibly insisted that counsel focus on specific transactions or conclude the examination. Further, any error was harmless in light of the largely undisputed nature of the expert's opinions.

8. The district court did not constructively amend the indictment by instructing the jury that Count One, charging conjunctively a conspiracy to distribute various narcotics, may be proved disjunctively. It is hornbook law that an offense charged conjunctively may be proved disjunctively.

9. The district court did not commit any error, let alone plain error, in admitting a summary chart that, according to Hickson, included one factual error. Hickson asserts that the lengthy summary included one mistake in attributing a particular phone and text message to him. But the government presented evidence attributing the phone to him, and the jury was fully capable of resolving this factual issue. Further, in light of the overall evidence, any error was harmless.

10. The district court did not err in instructing the jury to find the quantity involved in the conspiracy as a whole without attribution to individual defendants, where the court did not then impose any mandatory minimum sentence on this count. This approach was authorized by and consistent with this Court's decision in *Williams*. The lack of a finding of individual attribution did not in any way undermine the jury's guilty verdict as to each defendant on the conspiracy count. Further, Hickson's particular challenge to the sufficiency of the evidence regarding the quantity involved in Count One is meritless, as he misapprehends this applicable law.

11. The district court did not abuse its discretion in denying Blanding's motion for a continuance of the sentencing hearing. The court carefully considered defense counsel's request, and was assured that counsel and the defendant had sufficient time to prepare for the hearing, which took place over a year after the conviction. Further, Blanding's claim for the first time on appeal that his ability to allocate was somehow limited is without merit. The court did not commit plain error in that regard; to the contrary, it encouraged Blanding, who had stated that he did not intend to allocate, to make a statement, which Blanding did in detail.

12. Blanding waived his challenge to the calculation of the statutory mandatory minimum sentences on Counts Six and Twelve, premised on the argument that the state definition of cocaine is overbroad and therefore his prior state conviction cannot qualify as a "serious drug felony" under 21 U.S.C. § 841(b)(1). He expressly stipulated at trial that the offense in fact qualifies. Further, even if considered on plain error review, the claim fails as he cannot show prejudice, given that his final sentence was not influenced at all by the mandatory minimum terms.

13. The district court did not commit clear error in imposing on Blanding the two-level increase for maintaining drug premises, § 2D1.1(b)(12), as he obtained and controlled access to the group's stash

house at One Water Street. Further, even if there was error, it was harmless, as the enhancement did not affect the final guideline range given Blanding's undisputed status as a career offender.

14. The district court did not commit clear error in denying Gadson's request for a minor role reduction in the guideline calculation. The evidence established Gadson's persistent role in distributing narcotics on behalf of the organization, and the court reasonably determined that he did not meet the test for a minor role.

15. Gadson's argument that his sentence on Count Six exceeds the guideline range for that count rests on a misunderstanding of the proper application of the Guidelines. Under the Guidelines, the court determines a single sentence for all counts of conviction, and then imposes that term concurrently on each count (if, as here, the statutory maximum for each count permits that). The suggestion that the court should calculate a separate range for each count is incorrect.

16. The district court properly calculated the drug quantity attributable to Hickson, as its calculation rested exclusively on drugs for which Hickson was personally responsible, as determined in a substantive count of conviction. Further, the court did not commit any error under *Nasir*. The career offender guideline in this case was not applied to Hickson

based on a prior inchoate offense, and more importantly, the guideline range for Hickson was not determined by the career offender guideline at all.

**INDEX**

| Issue | Raised by Appellee (Page No.) | Government's Response -- Page No. |
|---|---|---|
| Suppression re cell phones seized from Blanding's car | Blanding, p. 26 | p. 68 |
| Suppression re Blanding's cell phones seized in apartment | Blanding, p. 33 | p. 82 |
| Admission of CSLI evidence | Hickson, p. 19 | p. 92 |
| Admission of evidence of Johnson murder | West, p. 11 | p. 98 |
| Admission of rap lyrics | West, p. 34 | p. 116 |
| Severance | Hickson, p. 43 | p. 130 |
| Limitation on cross-examination | Gadson, p. 9 | p. 136 |
| Constructive amendment | Hickson, p. 30 | p. 142 |
| Admission of summary chart | Hickson, p. 37 | p. 146 |
| Jury instructions re Count One | Hickson, p. 17 Gadson, p. 21 | p. 151 |
| Sufficiency of the evidence regarding Count One | Hickson, p. 26 | p. 159 |

| | | |
|---|---|---|
| Denial of continuance of Blanding's sentencing | Blanding, p. 40 | p. 165 |
| Treatment of prior conviction as "serious drug felony" | Blanding, p. 56 | p. 171 |
| Sentencing enhancement for maintaining drug premises | Blanding, p. 61 | p. 179 |
| Denial of minor role adjustment for Gadson | Gadson, p. 29 | p. 185 |
| Challenge to Gadson's sentence on Count Six | Gadson, p. 35 | p. 190 |
| Challenges to Hickson's sentence | Hickson, p. 51 | p. 193 |

# ARGUMENT

## I. THE DISTRICT COURT DID NOT ERR WHEN IT DECLINED TO SUPPRESS EVIDENCE THAT WAS LAWFULLY SEIZED AND WAS LATER SEARCHED PURSUANT TO A VALID SEARCH WARRANT

### Standard of Review

"This Court reviews the District Court's denial of a motion to suppress for clear error as to the underlying factual findings and exercises plenary review of the District Court's application of the law to those facts." *United States v. Perez*, 280 F.3d 318, 336 (3d Cir. 2002)

### Discussion

Defendant/appellant Jamaal Blanding asserts that the district court erred in denying suppression of evidence obtained from two cell phones taken during a traffic stop. He is incorrect.

Blanding was stopped by a Philadelphia Police Officer while driving a rental car on a suspended license on October 25, 2017. During the stop, Officer Michael Vargas developed probable cause to search Blanding's vehicle and to arrest Blanding in connection with his possession of suspected THC oil and liquid codeine, and Blanding does not suggest otherwise. Officer Vargas seized incident to Blanding's arrest several items, including two cell phones and some mail, which he found in the car, and

entered them as evidence in his state case. The FBI later searched those cell phones pursuant to a federal search warrant.

On appeal, Blanding takes issue with the seizure of the two cell phones and the U.S. mail (the U.S. mail was entirely inconsequential to the trial in this matter, and so in this appeal, the government addresses only the cell phones). Contrary to his position in the district court, Blanding now acknowledges that the traffic stop and the subsequent search of his vehicle were valid, but he argues that Officer Vargas lacked probable cause to seize the cell phones, and therefore, evidence contained on the cell phones should have been suppressed.[8] Blanding is wrong. The officer was justified in seizing the cell phones, but even if he was not, the district court correctly declined to apply the exclusionary rule.

---

[8] In the district court, Blanding's counsel filed a series of motions in connection with the traffic stop on October 25, 2017. In those motions, he raised a litany of issues, but during the subsequent evidentiary hearing and oral argument, the parties and the court focused almost entirely on the validity of the stop and the application of the exclusionary rule, with scant mention of the seizure of the items from Blanding's vehicle. In fact, the only reference to the propriety of the seizure of the cell phones during those two hearings came during a discussion of the independent source doctrine, which the district court rightly applied to this case, as discussed below.

### A.    The Initial Seizure of Blanding's Cell Phones Was Appropriate.

Although the Fourth Amendment generally requires police to secure a warrant before conducting a search, the longstanding "automobile exception" to the warrant requirement allows police to search a vehicle so long as there is probable cause to believe the vehicle contains evidence of criminal activity. *Arizona v. Gant*, 556 U.S. 332, 347 (2009). Probable cause exists if there is "a belief, reasonably arising out of circumstances known to the seizing officer that an automobile or other vehicle contains that which by law is subject to seizure and destruction." *United States v. Moody*, 485 F.3d 531, 534 (3d Cir. 1973) (citing *Carroll v. United States*, 267 U.S. 132 (1925)). *See also Illinois v. Gates*, 462 U.S. 213, 238 (1983) ("probable cause is a 'fluid concept' that requires a court to analyze the totality of the circumstances to determine whether 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'").

Blanding appears to concede that Officer Vargas had probable cause to stop the vehicle, to search the vehicle, and to arrest Blanding. Rather, he disputes that there was probable cause to seize the cell phones once Officer Vargas had searched the car. But Blanding ignores all the facts leading up

to their seizure that established probable cause for those other admittedly valid police actions, and in turn, supported the seizure of the cell phones.

Here, the totality of the circumstances supports a finding that Officer Vargas had probable cause to believe that there was evidence of a crime on Blanding's phones. Following the traffic stop, Officer Vargas, a 19-year veteran of the Philadelphia Police Department with an expertise in interdiction and car stops, noted the smell of burnt marijuana, which he recognized through his extensive law enforcement experience. *See United States v. Ramos*, 443 F.3d 304, 308 (3d Cir. 2006) (it is well-settled in the Third Circuit that "the smell of marijuana alone, if articulable and particularized, may establish not merely suspicion but probable cause."). Vargas also observed Blanding's extremely nervous demeanor, including that his hands were shaking and that he was breathing heavily. Blanding was also driving on a suspended license with a large sum of money in his pockets, and importantly, a narcotic detection canine alerted to the vehicle. *See United States v. Berry*, 90 F.3d 148, 153 (6th Cir. 1996); *United States v. Glover,* 957 F.2d 1004, 1013 (2d Cir. 1992); *United States v. Sundby*, 186 F.3d 873, 876 (8th Cir. 1999); *United States v. Scarborough,* 128 F.3d 1373, 1378 (10th Cir. 1997).

Therefore, as Blanding concedes, Officer Vargas had probable cause to search the vehicle for evidence of a crime, which he found. After finding that evidence, which included suspected contraband and multiple cell phones, which are commonly possessed by drug traffickers, Officer Vargas seized them and entered them as evidence in his state case.

Notably, Blanding mischaracterizes the record in this case in an attempt to paint the seizure of the cell phones as something nefarious. Although Vargas was asked by FBI investigators to stop Blanding's vehicle, at the time, he knew nothing of Blanding. That Vargas developed probable cause to charge Blanding with state crimes had nothing to do with the original request to conduct a traffic stop.

Nor did the seizure of the cell phones. Blanding states in his brief that "[t]he officer arrested Blanding on suspicion of [a] misdemeanor offense, yet proceeded to seize (and turn over to the FBI) U.S. mail and two cell phones . . . ." Blanding Br. 27. But that is not entirely true. Officer Vargas certainly developed probable cause to charge Blanding with state drug crimes, and in turn, seized cell phones as evidence of those crimes, but those cell phones also had potential evidentiary value for other crimes, such a drug trafficking, given other facts uncovered by Vargas, such as the presence of multiple phones and a large amount of cash. Those cell phones

then sat in Philadelphia Police Department evidence for three months, until FBI agents took possession of them and obtained a search warrant for them. App. 336. That the FBI eventually took possession of those cell phones and searched them pursuant to a valid federal search warrant does not impact the officer's initial seizure of those cell phones in any way.

**B.    The Later Search of the Cell Phones Pursuant to a Valid Federal Search Warrant Was Permissible.**

Further, even if Officer Vargas was not permitted to seize the cell phones, the exclusionary rule should not apply. The "exclusionary rule" requires the suppression of evidence obtained in violation of the Fourth Amendment. *United States v. Pelullo*, 173 F.3d 131, 136 (3d Cir. 1999). However, it is a fundamental rule that "[t]he fact that a Fourth Amendment violation occurred – *i.e.*, that a search or arrest was unreasonable – does not necessarily mean that the exclusionary rule applies. Indeed, the exclusionary rule is not an individual right, but rather an extreme remedy that can be justified only by deliberate culpable police conduct." *Herring v. United States*, 555 U.S. 135, 140 (2009) (citations omitted).

Here, there was no misconduct on the part of law enforcement, let alone the type of misconduct that might lead to suppression. A Philadelphia police officer conducted a pretextual traffic stop based on an actual traffic violation, which he was fully permitted to do. *See Whren v. United States,*

517 U.S. 806, 813 (1996) ("[W]e have been unwilling to entertain Fourth Amendment challenges based on the actual motivations of individual officers"); *see also United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006) (pretextual motivations are irrelevant so long as the officer witnesses "any technical violation of a traffic code). During that traffic stop, the officer learned that the driver, Blanding, was driving on a suspended license and that he was in possession of illegal narcotics and a large sum of cash in his pocket, which is typical of drug traffickers. App. 256-58. He arrested Blanding, which Blanding concedes was done with probable cause, and he seized certain items he believed would have evidentiary value in his state case. App. 265-269.

He *did not*, as Blanding suggests, immediately turn those cell phones over to federal investigators. Rather, federal agents took possession of them on February 2, 2018 – more than three months after Blanding was arrested and charged in state court as a result of the traffic stop – when they sought, and a federal magistrate authorized, a federal search warrant for the phones. App. 336.

If Vargas erred, that isolated mistake does not warrant suppression. In *Herring v. United States*, 555 U.S. 135 (2009), upon weighing the purpose of the exclusionary rule – to deter misconduct by officers – against

the enormous cost of its application – possibly letting criminals walk free – the Supreme Court decreed that exclusion applies only when law enforcement officers "exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights . . . ." *Id*. at 144. On the other hand, "when police mistakes are the result of negligence . . . rather than systemic error or reckless disregard of constitutional requirements, any marginal deterrence does not 'pay its way.'" *Id*. at 147-48 (quoting *United States v. Leon*, 468 U.S. 897, 907 n.6 (1984)).

Here, it is apparent that if Vargas was mistaken, after seeing evidence of Blanding's possession of multiple drugs and multiple cell phones, and his demeanor, that error at most amounted to one-time negligence, not the type of deliberate or reckless official conduct that supports application of the exclusionary rule.

And even if that is not true, the exclusionary rule still may not apply here, because the ultimate search of the phones by federal authorities was even more attenuated from any wrongdoing. Although the affidavit in support of the warrant includes a reference to the traffic stop (and the items seized as a result of the traffic stop), the warrant did not rely on the traffic stop to establish probable cause. The affidavit includes 43 paragraphs, including many which detail Blanding's involvement in drug trafficking.

App. 3138-68. Even if the initial stop was somehow wrongful, suppression of the evidence obtained from the cell phones would not follow because the evidence was obtained from a valid search warrant independent of and sufficiently attenuated from the traffic stop.

Under the independent source doctrine, "evidence initially discovered during, or as a consequence of, an unlawful search, but later obtained independently from activities untainted by the initial illegality" may be introduced as evidence. *United States v. Price*, 558 F.3d 270, 281 (3d Cir. 2009) (internal citations & quotations omitted). Where there has been a violation of the Fourth Amendment, evidence seized in a subsequent, warranted search should not be suppressed where "no information gained from the illegal entry affected either the law enforcement officers' decision to seek a warrant or the magistrate's decision to grant it." *Murray v. United States*, 487 U.S. 533, 540 (1988).

In this case, the detailed affidavit in support of the warrant to search Blanding's phones articulated probable cause based on months of investigation, not on the October 25, 2017, stop leading to Blanding's arrest. Given the length of, and the detail included in, the affidavit in support of the warrant, the magistrate judge would have certainly issued the warrant without any reference to the traffic stop. *See Price*, 558 F.3d at

282 (when warrant stripped of information, probable cause still present); *United States v. Burton*, 288 F.3d 91, 102 (3d Cir. 2002) (same); *Perez*, 280 F.3d at 340 (same). Further, there is no question that the agents would have sought the warrant regardless of the traffic stop given the breadth of their investigation. The probable cause established by the warrant simply cannot be said to depend on the traffic stop, and therefore, the independent source doctrine should apply.

Even if the warrant did rely on the traffic stop to establish probable cause, any alleged constitutional violation is sufficiently attenuated to the otherwise valid warrant such that the alleged wrong should not operate to invalidate it. It is a "well-established principle that 'evidence is not to be excluded if the connection between the illegal police conduct and the discovery and seizure of the evidence is so attenuated as to dissipate the taint.'" *Perez*, 280 F.3d at 338, quoting *Segura v. United States*, 468 U.S. 796, 797 (1984). Here, federal agents sought a warrant more than three months after Blanding was arrested, during which time they investigated the drug trafficking organization run by Blanding and his co-conspirators, and in the process, the agents uncovered ample probable cause to search Blanding's cell phones. The time that elapsed, the subsequent investigation, and the lack of any intentional misconduct on the part of Officer Vargas

dissipates whatever little taint could be said to flow from the October 25, 2017, traffic stop. *See Brown v. Illinois*, 422 U.S. 590 (1975) (factors to consider when applying the attenuation doctrine include: (1) the temporal proximity between the unconstitutional conduct and the discovery of the evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the misconduct).

Blanding argues that independent source and attenuation do not apply because the agents would not have accessed the cell phones without the stop, and because law enforcement cannot let evidence sit on a shelf to cure it of any unconstitutional taint. Blanding Br. 31 n.16. This posits a "but-for" analysis that is inconsistent with the courts' articulation of the attenuation doctrine. Blanding ignores the rule that evidence is not the "fruit of the poisonous tree" "simply because it would not have come to light but for the illegal actions of the police." *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963). Rather, as explained above, attenuation arises where there is a sufficient break with the original illegality to dissipate the taint, as plainly occurred here.

Moreover, Blanding's argument rests on a skewed interpretation of the record. There is nothing in the record to suggest that Officer Vargas and the FBI were in cahoots to seize Blanding's phones and mail. Rather,

Vargas arrested Blanding on charges the federal government did not later adopt and seized items of evidentiary value for the state case, which the state maintained. That they had evidentiary value for a separate federal prosecution was a fortunate circumstance, but one that was not determined until much later.

Blanding also ignores the fact that he was pulled over driving a rental car on a suspended license and that Officer Vargas arranged for the rental car company to collect its property. Before returning it, officers inventoried the contents of the vehicle, taking possession of a sound bar speaker, shoes, and Sixers tickets. App. 264, 268-70. Had Officer Vargas not seized the phones as evidence, he certainly would have included them among the items seized during the inventory search. Blanding does not challenge the seizure of these items, so he cannot now argue that the FBI would not have ultimately had access to the cell phones.

Finally, assuming for the sake of argument that the seizure of the cell phones was flawed, the evidence taken from the cell phones still should not have been suppressed, because the agents executing the warrant were acting in good faith reliance on a valid warrant. The purpose of the exclusionary rule is to "deter police conduct that violates constitutional rights of citizens." *United States v. Zimmerman*, 277 F.3d 426, 436 (3d Cir.

2002) (citing *United States v. Leon*, 468 U.S. 897, 919 (1984)). That purpose is not served by exclusion where the investigators acted in good faith as opposed to "deliberate, reckless, or grossly negligent conduct, or in some circumstances recurring or systemic negligence." *Herring*, 555 U.S. at 144. To apply the exclusionary rule, the benefits of deterrence must outweigh the costs, and "[t]he principal cost of applying the rule is, of course, letting guilty and possibly dangerous defendants go free - something that 'offends basic concepts of the criminal justice system.'" *Id.* at 701 (quoting *Leon*, 468 U.S. at 908). This is why exclusion "has always been our last resort, not our first impulse." *Herring*, 555 U.S. at 140.

Under the good faith exception to the exclusionary rule, suppression of evidence "is inappropriate when an officer executes a search in objectively reasonable reliance on a warrant's authority." *United States v. Hodge*, 246 F.3d 301, 305 (3d Cir. 2001). In fact, the mere existence of a warrant typically suffices to prove that an officer conducted a search in good faith and justifies application of the good faith exception. *Leon*, 468 U.S. at 922. There are only four narrow situations in which an officer's reliance on a warrant will be considered unreasonable and, therefore, lacking in good faith:

1.  [when] the magistrate [judge] issued the warrant in reliance on a deliberately or recklessly false affidavit;

2.    [when] the magistrate [judge] abandoned his judicial role and failed to perform his neutral and detached function;

3.    [when] the warrant was based on an affidavit 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable'; or

4.    [when] the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized.

*Hodge*, 246 F.3d at 308.

Blanding has not – and cannot – argue that the warrant on which federal investigators relied three months after the initial valid seizure of the cell phones falls into one of these four narrow categories. As set forth above, the traffic stop at issue in this case was valid, but even if it was not, federal agents acted in good faith in executing the warrant to search the two cell phones seized during the stop, and Blanding is unable to show otherwise. The district court's denial of Blanding's motion to suppress should therefore be affirmed.

## II. THE DISTRICT COURT PROPERLY DENIED BLANDING'S MOTION TO SUPPRESS EVIDENCE FROM CELL PHONES SEIZED DURING THE PROTECTIVE SWEEP OF THE APARTMENT IN WHICH HE WAS ARRESTED

### Standard of Review

"This Court reviews the District Court's denial of a motion to suppress for clear error as to the underlying factual findings and exercises plenary review of the District Court's application of the law to those facts." *United States v. Perez*, 280 F.3d 318, 336 (3d Cir. 2002).

### Discussion

Blanding also sought to suppress evidence obtained from two cell phones which were seized by federal agents during a protective sweep of the apartment in which he was arrested on October 18, 2018. Blanding argues that the FBI agents who arrested him needed – and lacked – reasonable suspicion to conduct the protective sweep, and accordingly, they were not permitted to seize cell phones found in plain view. Blanding is wrong. But in any event, the data from the cell phones was not used as evidence in the trial against Blanding and his co-defendants, thus rendering any error harmless.

### A. Law Enforcement Was Permitted to Conduct a Protective Sweep of the Apartment.

In *Maryland v. Buie*, 494 U.S. 325 (1990), the Supreme Court considered the authority of the police to search a house immediately following the arrest of an individual in that house. Not only is an arrest the kind of serious step that can provoke a violent reaction, but "an in-home arrest puts the officer at the disadvantage of being on his adversary's 'turf.' An ambush in a confined setting of unknown configuration is more to be feared than it is in open, more familiar surroundings." *Buie*, 494 U.S. at 333.

To deal with these very practical, and potentially very deadly, safety concerns, the Supreme Court equipped law enforcement officers who are making an arrest with the right to carry out two distinct, albeit limited, warrantless searches: (1) a search "incident to an arrest . . . limited to those places immediately adjoining the place of arrest from which an attack could be immediately launched"; and (2) a "search of a home based on reasonable and articulable suspicion that the areas being searched may harbor an individual who poses a danger to those present at the scene of the arrest." *United States v. White*, 748 F.3d 507, 511 (3d Cir. 2014) (setting forth the two prongs of *Buie*).

Where an arrest is made at a safe distance from the home, only the second prong of *Buie* is available. *See id.* (finding that search following arrest made 20 feet from home required reasonable suspicion). However, in this case, Blanding was arrested in the entranceway of the apartment, the door to which opened to a confined hallway, so both prongs of *Buie* are pertinent. *See id.* at 513 (distinguishing not precedential opinion in *United States v. Latz*, 162 Fed. App'x 113 (3d Cir. 2005), based on location of arrest). And indeed, here, both apply.

Blanding claims – as he did in the district court – that he was arrested outside the apartment, and therefore, the agents needed reasonable suspicion to conduct a protective sweep. Neither the record nor the law supports this argument. During an evidentiary hearing on this issue, Special Agent Simpson testified that the agents arrested Blanding as soon as he opened the door and that any movement toward the hallway was due to them taking him into custody. App. 827, 843. Indeed, this makes sense, as law enforcement would not push an arrestee into a confined apartment to effectuate the arrest without first conducting the protective sweep that Blanding now claims they were not permitted to do. Nor would they allow him to simply mosey into the hallway before arresting him.

Blanding's attorney brought with him to the evidentiary hearing on this issue a video from a camera that was inside the apartment on the day of Blanding's arrest. App. 837-43. Defense counsel played it in what appeared to be a failed attempt to impeach Agent Simpson after Simpson testified that Blanding was arrested in the doorway. App. 837-43. But the video did nothing of the sort.

After viewing the video and hearing testimony from Special Agent Simpson, the trial judge found Simpson to be credible and specifically found that the door did not even shut behind Blanding as he was taken into custody. App. 63-64. To suggest that he was outside the apartment at that point defies logic, so based on the facts before the district court, it found that the protective sweep of the apartment was justified under *Buie*'s first prong. App. 64.

Blanding argues that this was improper, but the cases on which he relies on this point are unhelpful. In *Sharrar v. Felsing*, 128 F.3d 810 (3d Cir. 1997), for example, the plaintiff (*Sharrar* was a 1983 action) was arrested after he and three other men, who were in a house surrounded by law enforcement, walked out of the house backwards, one-by-one, and laid down in the back yard at the instruction of law enforcement. 128 F.3d at 815-16. A panel of this Court analyzed the protective sweep that followed

under *Buie*'s second prong, but that is hardly what happened in this case, as agents met Blanding in the entranceway to the apartment.

And in *United States v. Henry*, 48 F.3d 1282 (D.C. Cir. 1995), a case from another circuit, a deputy U.S. Marshal was stationed in a stairwell adjacent to the apartment in which the defendant was thought to be. *Id.* at 1283. Other officers were outside the apartment building. *Id.* After Henry stepped from the apartment on his own volition, the deputy U.S. Marshal placed him under arrest and radioed for backup. *Id.* The other officers came to assist, subdued Henry, and placed him in handcuffs. *Id.* The deputy U.S. Marshal and four officers then took Henry into the apartment and conducted a protective sweep of the apartment, finding a firearm and drugs in plain view. *Id.*

Henry moved to suppress the items seized during the protective sweep, and the district court denied his motion. *Id.* The appellate court then affirmed that ruling, analyzing the search under *Buie*'s second prong. *Id.* at 1284-85. Blanding argues that the district court here erred by not following *Henry*'s lead and analyzing Blanding's claim under *Buie*'s second prong, but *Henry* is of course not binding on the district court or this Court. And in any event, there are key factual differences between Blanding's arrest and the arrest of Henry.

For example, Henry stepped from the apartment on his own volition, after which a single law enforcement officer attempted to place him under arrest and others gathered to assist. Blanding, by comparison, was arrested after nine officers, including Special Agent Simpson, stood outside the door to the apartment, and knocked and announced their presence. Blanding opened the door and was arrested at the front door. App. 826. As Special Agent Simpson testified, Blanding "got to the threshold" but "he didn't exit the residence." App. 843. Rather, he was removed from the threshold and placed into custody. App. 843. The door behind him remained open, and agents then conducted a brief protective sweep simultaneously with his arrest. App. 849.

Thus, it cannot be said that Blanding was arrested "just outside" the residence, as Henry was, so even if *Henry* was the law in this circuit – and it is not – *Buie*'s first prong would still be available for the district court to analyze the protective sweep in this case. Notably, this would be consistent with both *Sharrar* and with Judge Becker's not-precedential decision in *Latz*, in which a panel of this Court relied on *Buie*'s first prong where the defendant was arrested on the porch, which is certainly beyond the threshold, where Blanding would have this Court draw the line. 162 F. App'x at 118-19.

Because the district court here found that the first prong of *Buie*

applied, it did not need to reach the question of whether the protective

sweep was justified under the second prong of *Buie*. But there are reasons

to think it would have. For example, the district judge summarized the

credible testimony of Special Agent Simpson, in relevant part, as follows:

> In relating the events leading up to the protective sweep . . . , SA
> Simpson explained that the arrest team did not know if Blanding was
> in the apartment alone, and that the FBI believed there was a "high
> likelihood" Blanding could have been accompanied by another
> individual, including Miller (who the apartment belonged to) or other
> members of the DTO.

Given other issues presented in this appeal, specifically, those related to

violence, the potential for danger to the agents was obvious.

The video Blanding presented also supports this conclusion. Based on

a months-long investigation, Special Agent Simpson knew Blanding to be a

member of the Original Block Hustlers, who, in addition to being active in

the rap music industry, engaged in drug trafficking and acts of violence,

including murder. App. 817-18. That Blanding tried to shut the door behind

him as agents dragged him into the hallway suggested to the agents that

there was something or, more importantly, *someone* in the apartment

whom Blanding did not want the agents to see. Thus, this fits squarely with

the reasons why the Supreme Court in *Buie* crafted these exceptions to the

warrant requirement. The agents were effectuating an arrest, which had the

potential to provoke a violent response, in a confined area on someone else's turf. Because they were lawfully inside the apartment, the plain view doctrine applies, and they were permitted to conduct a brief protective sweep and seize the cell phones seen in plain view.[9]

Moreover, even if the protective sweep of the apartment was somehow flawed – and the government makes no such concession – the district court's analysis was still not in error, as the cell phone evidence would not have been suppressed because the exclusionary rule would not have applied in this case. As set forth above, the "exclusionary rule" requires the suppression of evidence obtained in violation of the Fourth Amendment. *United States v. Pelullo*, 173 F.3d 131, 136 (3d Cir. 1999). However, here again, the application of this "extreme remedy" is unwarranted. *Herring v. United States*, 555 U.S. 135, 140 (2009) (citations omitted).

There was no misconduct on the part of law enforcement, let alone the type of misconduct that might lead to suppression. The record does not support a finding of either deliberate or reckless misconduct by the agents.

---

[9] Blanding does not claim that the cell phones were not in plain view or that the requirements of the plain view doctrine were not satisfied, except to the extent that he challenges whether the agents were lawfully in the apartment.

At most, in the pressured and split-second situation of an arrest in a major drug trafficking case, the agents erred in suspecting that a person may be present who posed a danger to them. This is exactly the type of singular and understandable error to which the exclusionary rule does not apply.

Further, there are at least two exceptions to the exclusionary rule that apply as well. First, even if the search of the apartment was somehow wrongful, suppression of the evidence obtained from the cell phones would not follow because the independent source doctrine applies. Following the seizure of the cell phones during the protective sweep, the FBI obtained a judicially authorized warrant to search the phones. Supp. App. 89-111. Although the affidavit in support of the warrant includes reference to the arrest and seizure of the phones, the warrant did not rely in any way on the search to establish probable cause. Supp. App. 99. Rather, the affidavit includes many details regarding Blanding's involvement in drug trafficking. Supp. App. 91-98.

Second, the agents searching the contents of the phones seized during the protective sweep were relying in good faith on a judicially authorized warrant. *See United States v. Hodge*, 246 F.3d 301, 308 (3d Cir. 2001) (setting forth four narrow categories in which good faith exception does not apply).

Finally, any error in denying suppression was harmless. There was a mountain of evidence presented in this case, including dozens of text messages and other electronic evidence seized from cell phones belonging to Blanding. But little to none of that evidence came from these two cell phones. To demonstrate this point, Government Exhibits 3001, 3002, 3003, and 3004 show that these phones – identified as Phones 39 and 40 on Government Exhibit 3001 – were not the source of any of the text messages presented in this case, nor were either of the numbers associated with these phones the recipient of any text messages shown to the jury. App. 3551-3669. Any error on this point was therefore harmless.

## III. THE DISTRICT COURT PROPERLY CONCLUDED THAT HICKSON'S CSLI SUPPRESION CLAIMS COULD NOT OVERCOME THE GOVERNMENT'S GOOD FAITH

### Standard of Review

"This Court reviews the District Court's denial of a motion to suppress for clear error as to the underlying factual findings and exercises plenary review of the District Court's application of the law to those facts." *United States v. Perez*, 280 F.3d 318, 336 (3d Cir. 2002).

### Discussion

Appellant Jameel Hickson challenges the admission of evidence obtained from tracking his mobile telephone, which was accomplished through "hybrid applications and orders" that involved both (a) authorization to install pen registers and trap and trace devices on a telephone and (b) disclosure of prospective "cell site location information" ("CSLI") regarding a mobile telephone. DDE # 329. He asserts that the government required a search warrant to conduct this surveillance, but in fact, the government acted consistently with prevailing law at the time and thus in good faith.

> CSLI is a type of metadata that is generated every time a user's cell phone connects to the nearest antenna. The user's cell phone service provider retains a time-stamped record identifying the particular antenna to which the phone connected. Because most people constantly carry and frequently use their cell phones, CSLI can

provide a detailed log of an individual's movements over a period of time.

*United States v. Goldstein*, 914 F.3d 200, 202 (3d Cir. 2019). "Prospective" CSLI means data collected after the government obtains court permission to acquire it, while "historical" CSLI describes data already recorded at the time of the court order. *In re Application of U.S. for an Order Authorizing Installation & Use of a Pen Register & Caller Identification System*, 402 F. Supp. 2d 597, 599 (D. Md. 2005).

Hickson moved to suppress the fruits of the CSLI applications and disclosure orders, claiming that controlling case law at the time required the government to demonstrate probable cause and obtain a warrant to gain access to prospective CSLI. Therefore, according to Hickson, the government could not rely on good faith for the admission of the CSLI obtained. DDE # 304.

Based on then-existing law, the district court correctly rejected Hickson's claim that the government was required to demonstrate probable cause and obtain a warrant to gain access to prospective CSLI. Although the Supreme Court reached the contrary conclusion in *Carpenter v. United States*, 138 S. Ct. 2206 (2018), the government was entitled to rely on the law as it existed when it acquired CSLI without a warrant. App. 58, DDE # 338.

The "good faith" exception recognizes that the exclusionary rule loses its deterrent value when law enforcement authorities "act[] with an objectively reasonable good-faith belief that their conduct is lawful." *Davis v. United States*, 564 U.S. 229, 238 (2011) (citations and quotation marks omitted). "Under *Davis*, only binding appellate precedent is relevant to the good faith exception." *Goldstein*, 914 F.3d at 204. Otherwise stated, if binding precedent does not forbid the conduct at issue, the exclusionary rule is inapplicable. *See United States v. Katzin*, 769 F.3d 163, 185 (3d Cir. 2014) (en banc) (rejecting the argument that "the good faith exception would not apply unless our own Court had established binding appellate precedent directly on point and approving the officer's conduct").

Here, the government obtained judicial orders for the disclosure of historical and prospective CSLI in 2017 and 2018, *before* the Supreme Court issued its decision in *Carpenter*. At that time, the federal courts of appeals had not addressed whether Section 2703(d) permitted prospective tracking without a warrant. *See United States v. Graham*, 824 F.3d 421, 428 (4th Cir. 2016) (citing decisions from the courts of appeals on the subject), *overruled by Carpenter; see also United States v. Chavez*, 894 F.3d 593, 608 (4th Cir. 2018). The federal district courts were divided on the issue. *See United States v. Jones*, 908 F. Supp. 2d 203, 213 (D.D.C.

2012). In that legal landscape, the Stored Communications Act ("SCA"), 18 U.S.C. § 2073(d), "permit[ed] precisely what the government" did here. *United States v. Stimler*, 864 F.3d 253, 262 (3d Cir. 2017), *reh'g granted, opinion vacated in part sub nom., United States v. Goldstein*, 902 F.3d 411 (3d Cir. 2018), *and on reh'g sub nom., United States v. Goldstein*, 914 F.3d 200 (3d Cir. 2019). Overturning all existing circuit precedent, *Carpenter* held that the Fourth Amendment requires a warrant and probable cause to obtain prospective CSLI. 138 S. Ct. at 2221. Before *Carpenter*, therefore, the government acted in good faith when it sought such disclosure without a warrant, relying on existing statutory authority. *See Goldstein*, 914 F.3d at 204 (pre-*Carpenter* order for the warrantless collection of CSLI in 2010 did not violate the Fourth Amendment because the Government relied in good faith on that order and § 2703(d)).

Hickson disagrees, arguing that "*Goldstein* is not the law with regard to prospective CSLI, which is precisely what the Government asked for and obtained in this case." Hickson Br. 15. Curiously, Hickson states that the Third Circuit has always held that prospective CSLI required a warrant. *Id.* Hickson is wrong.

This Court's decision in *United States v Scarfo*, 41 F.4th 36 (3d Cir. 2022), which Hickson does not address on appeal, resolves this matter

decisively. In *Scarfo*, the defendant claimed that the government lacked a good-faith basis for seeking 11 months of prospective CSLI data – three more months than at issue here – without a warrant. Similar to Hickson, the defendant in that case argued that the decisions in *Carpenter* and *Goldstein* applied only to historical CSLI and the real time tracking of the defendant involved a greater intrusion of privacy requiring a warrant even prior to *Carpenter*. *Id.* at 168. In rejecting the defendant's claim, this Court held that the government could rely on good faith in the collection of prospective CSLI prior to *Carpenter*. The Court explained, "In sum, then, the officers lacked clear guidance from any caselaw, much less binding precedent, that would have put them on notice that obtaining prospective CSLI would require compliance with the Fourth Amendment." *Id.*

The present case presents an identical situation. Hickson is unable to show any pre-*Carpenter* authority from appellate courts that would have put the government on notice that seeking prospective CSLI required doing more than satisfying the SCA's requirements. *Scarfo* dictates that Hickson's objection is without merit, under any standard of review.

Moreover, even if Hickson is correct and the prospective CSLI should have been suppressed, any error would be rendered harmless due to the overwhelming evidence in this case. The CSLI evidence was only used to

corroborate Hickson's numerous trips to and from the West Coast with other members of OBH. Other evidence, including social media, text messages, and physical observation provided ample evidence of Hickson's whereabouts. Moreover, the trips to California were only a small part of the government's case. Indeed, the evidence presented as to Hickson's involvement in the conspiracy was overwhelming and included evidence of Hickson and other members of OBH working together to obtain false identification to secure properties for OBH to store narcotics, including the One Water Street apartment where large amounts of narcotics were seized by the FBI. App. 2205-27; *see also, e.g.*, Supp. App. 27-28, 37-39. Finally, the government obtained historical cell-site information via search warrant, predicated on probable cause, for the time period of March 1, 2017, to August 3, 2018. This warrant provided virtually identical information as was seized via court order pursuant to Section 2703(d). Hickson did not challenge this search warrant in the district court and does not challenge it on this appeal. For all of these reasons, Hickson's challenge fails.

## IV. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN ADMITTING EVIDENCE OF THE MURDER OF ROBBIE JOHNSON

## Standard of Review

The district court's decision regarding the admissibility of evidence is reviewed for abuse of discretion. *United States v. Serafini*, 233 F.3d 758, 768 n.14 (3d Cir. 2000).

"To show an abuse of discretion, appellants must show the district court's action was 'arbitrary, fanciful or clearly unreasonable.' *Stich v. United States*, 730 F.2d 115, 118 (3d Cir.1984). We will not disturb a trial court's exercise of discretion unless 'no reasonable person would adopt the district court's view.' *Oddi v. Ford Motor Co.*, 234 F.3d 136, 146 (3d Cir.2000)." *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 412 (3d Cir. 2002). "If reasonable men could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion." *Lindy Bros. Builders, Inc. v. American Radiator & Standard Sanitary Corp.*, 540 F.2d 102, 115 (3d Cir. 1976) (en banc).

## Discussion

Appellant Abdul West claims that the district court abused its discretion by admitting evidence of the murder of Robert Johnson as intrinsic to the charged conspiracy. He also claims that the evidence should

have been excluded under Federal Rule of Evidence 403. West Br. 19-33.[10]
West fails to show an abuse of discretion, and any error was clearly
harmless given the overwhelming evidence of guilt.

Federal Rule of Evidence 404(b) provides for the admission of
evidence of wrongful acts but only if those acts are "extrinsic" to the
charged offenses. Evidence that is "intrinsic" does not fall within the rule.
*United States v. Green*, 617 F.3d 233, 245 (3d Cir. 2010). In *Green*, the
Court explained that the "intrinsic" label is reserved "for two narrow
categories of evidence." *Id.* at 248. "First, evidence is intrinsic if it 'directly
proves' the charged offense." *Id.* (citations omitted). "Second, 'uncharged
acts performed contemporaneously with the charged crime may be termed
intrinsic if they facilitate the commission of the charged crime.'" *Id.* at 249
(*quoting United States v. Bowie*, 232 F.3d 923, 929 (D.C. Cir. 2000)). "[A]ll
else must be analyzed under Rule 404(b)." *Green*, 617 F.3d at 249.

Prior to Stewart's testimony, the court informed the parties that the
court believed the proffered evidence was intrinsic to the charged
conspiracy:

> Now, it's my view, having read the briefs and some of the case law,
> that that is intrinsic evidence . . . . Does anybody object to my

---

[10] Hickson and Blanding purport to adopt the arguments made by
West in his brief but do not expand on those arguments. Hickson Br. 55;
Blanding Br. 64.

considering it as intrinsic evidence? It's not a question of instructing the jury. I don't think the law requires me to instruct the jury about the difference. But for admissibility, it it's intrinsic evidence, it comes in as relevant to the charges against the defendants. If it is extrinsic evidence, then I have to go through Rule 404(b) analysis, which I would be prepared to do if any defense counsel asserts that it's not intrinsic evidence.

App. 1538.

At this point, counsel for all the appellants objected to the evidence being admitted as intrinsic to the charged conspiracy.[11] The court went on to do a thorough analysis under Rule 404(b), finding that the evidence would otherwise be admissible under Rule 404(b). App. 1539-41. However, after hearing the evidence concerning the murder at trial, including the testimony of Stewart, the court ruled that the evidence was intrinsic and not subject to Rule 404(b):

Next, in reviewing my notes and having heard the testimony and the law, it's my conclusion that the testimony about the murder of Robert Johnson is intrinsic to the alleged conspiracy in this case, and I think the evidence, if it was believed by the jury, would be sufficient to find that it was intrinsic. And for purposes of the charge, I'm not going to charge on 404(b). I'm not going to instruct the jury it's intrinsic. I think it's a legal issue. It's not something that I have to instruct the jury on, but I don't think there's any reason why I should consider it to be 404(b) material. So I'm not going to give a charge on 404(b), and all the defendants have an exception.

---

[11] Notably, Stewart was the defendant who moved to preclude the evidence of the murder. Stewart ultimately pled guilty, and this appears to be the first time that the appellants in this case join in Stewart's original motion.

App. 2025.

The court's ruling was hardly arbitrary or irrational. Indeed, it is hard to imagine the evidence being anything but intrinsic to the conspiracy. Here, West, the leader of a violent drug trafficking organization, ordered Stewart, a lower-ranking member, to kill a rival drug dealer. After the murder was carried out, West arranged for Stewart to be paid in narcotics from other OBH members. Moreover, Stewart ultimately sold the methamphetamine he took from Johnson to a confidential source, which formed the basis of Count Eight in the second superseding indictment.

In short, the evidence directly proved the conspiracy charged. It proved the existence of the conspiracy, the hierarchal structure of the organization, and the expectation that lower-ranking members carry out violent acts including murder, and how OBH dealt with rival drug dealers. Moreover, it directly proved that West was the leader of the drug trafficking organization as charged in the indictment.

In *United States v. Gibbs*, 190 F.3d 188 (3d Cir. 1999), the Court approved the admission of similar evidence as intrinsic. Gibbs was one of the leaders of a cocaine distribution conspiracy. When Gibbs suspected that a person aimed to kidnap him, he dispatched two aides to attempt to kill that person. On another occasion, when Gibbs believed that an erstwhile

co-conspirator, Sydnor, shot him, he delegated two other workers to kill

Sydnor. The government introduced evidence of both these violent acts.

The Third Circuit approved the admission of the evidence as intrinsic, not

subject to Rule 404(b), because the indictment in the case alleged that

Gibbs and others used acts of violence to protect his position as the leader

of the conspiracy. *Id.* at 216. "Since the government introduced evidence of

Gibbs's use of violence to further the illegal objectives of the cocaine

conspiracy by removing threats to himself (since threats to Gibbs meant

threats to the trafficking enterprise), the District Court did not abuse its

discretion in permitting this evidence to come in." *Id.* at 218.

In the instant case, the second superseding indictment alleges the

following as part of the manner and means of the charged conspiracy:

> Defendant ABDUL WEST owned and/or maintained properties in
> Philadelphia, Pennsylvania within which he and the DTO could
> gather to coordinate drug trafficking and manage their drug
> trafficking operation, including 3234 N. Sydenham Street,
> Philadelphia (also known as "the Mansion"), and 2900 N. Taylor
> Street, Philadelphia (also known as "the Lounge"). Defendant WEST
> and other members of the DTO maintained properties within which
> they could gather to coordinate drug trafficking and manage their
> drug trafficking operation, including 2323 Race Street, Philadelphia,
> and 250 N. Christopher Columbus Boulevard, Philadelphia. Members
> of the DTO used false identifications to rent apartments at 2323 Race
> Street, and 250 N. Christopher Columbus Boulevard to prevent
> investigation into their backgrounds and prevent detection by law
> enforcement.

> Members of the DTO kept firearms with them and at the various DTO residences to intimidate those with whom they dealt, and to protect their drug stashes and the profits derived therefrom from others who may attempt to rob them.
>
> Defendants WEST, BOYER and GADSON and other members of the DTO wrote, produced and distributed songs via the Internet and social media which lyrics reflected their drug trafficking activities and threats of violence to others to protect and maintain their drug trafficking activities and prevent witnesses from cooperating with law enforcement.

App. 191, 193.

Section 846 does not require that the government allege or prove an overt act in order to prove a violation of the statute. There are a variety of facts that were alleged in Count One; there were also a variety of facts that were not alleged in the indictment, but which proved the conspiracy. The evidence related to the murder of Robert Johnson related directly to the conspiracy and was admissible despite the fact that it was not specifically discussed in the indictment. *See Gibbs*, 190 F.3d at 217 (holding that defendant's participation in uncharged acts of violence was admissible as direct proof of the conspiracy with which he was charged); *United States v. Thai*, 29 F.3d 785, 812-13 (2d Cir. 1994) ("It is clear the Government may offer proof of acts not included within the indictment, as long as they are within the scope of the conspiracy . . . An act that is alleged to have been done in furtherance of the alleged conspiracy . . . is not an 'other' act within

the meaning of Rule 404(b); rather it is part of the very act charged.")
(internal quotations and citations omitted). In *United States v. Cross*, 308
F.3d 308 (3d Cir. 2002), the Third Circuit explained that "acts are intrinsic
when they directly prove the charged [crime]." *Id.* at 320.

Courts have found that evidence related to threats, violence, and even
murders are directly relevant to drug trafficking charges, recognizing that
violent drug trafficking groups, like the one here in this case, often use
threats and violence to further their drug trafficking activities. *See Gibbs*,
190 F.3d at 217 (finding that district court did not abuse its discretion in
permitting the introduction of evidence of uncharged acts of violence,
which furthered a cocaine conspiracy); *United States v. Jones*, 566 F.3d
353, 365 n.5 (3d Cir. 2009) (holding that evidence of shootings was
relevant to the charged conspiracy because they "tended to show the gang's
hierarchal structure and expectations that lower-ranking members . . . carry
out the violent acts of retaliation, including murder, against other gangs to
ensure one's position within the [gang], solidify its violent reputation, and
protect its drug-distribution territory from rival gangs, among other
things"); *United States v. Baker*, 432 F.3d 1189, 1209 (11th Cir. 2005)
(evidence of murder was admissible in drug conspiracy involving members
of violent drug trafficking group); *United States v. Davis*, 402 F. Supp. 2d

252, 261-62 (D.D.C. 2005) (evidence that defendant committed murder was admissible in drug conspiracy prosecution even though defendant had been acquitted of murder); *United States v. Hicks*, 368 F.3d 801, 807 (7th Cir. 2004) (evidence of murder committed by co-conspirator with drug conspiracy leader's permission because he believed that victim stole a drug dealer's drugs was admissible in drug conspiracy); *United States v. Estrada*, 320 F.3d 173, 183 (2d Cir. 2003) (holding that "use of violence to secure the organization's drug turf [and] carrying and using firearms to enforce its control over the drug market" are overt acts of narcotics conspiracy); *United States v. Grimmond,* 137 F.3d 823, 831-32 (4th Cir. 1998) (evidence of defendant's involvement in two shootings was intrinsic evidence of drug charges); *United States v. Miller*, 116 F.3d 641, 682 (2d Cir. 1997) (concluding that evidence of numerous killings was admissible as direct evidence of narcotics conspiracy and enterprise); *United States v. McCullah*, 76 F.3d 1087, 1104 (10th Cir. 1996) (permissible for jury to find that defendants "understood that the murder . . . was not an end in itself but rather was part of the . . . organization's larger drug distribution operation"); *United States v. Chin*, 83 F.3d 83, 87-88 (4th Cir. 1996) (holding that statements about contract murder made during drug deal were intrinsic to drug conspiracy); *United States v. Baker*, 855 F.2d 1353,

1358 (8th Cir. 1988) (evidence of murder by defendants in drug conspiracy

prosecution admissible where it occurred during course of conspiracy).

Moreover, even if the evidence of Robert Johnson's murder was not

intrinsic, and instead properly admitted through Rule 404(b), the evidence

was nonetheless admissible, as it showed intent, plan, preparation, and the

identity and relationship of the co-conspirators.[12] Although the district

court correctly concluded that this was not Rule 404(b) evidence, there was

no error admitting this evidence even if it is not intrinsic. Although the

district court did not give a *specific* limiting instruction or final jury

instruction under Rule 404(b)—because it had found the evidence to be

intrinsic—the final instructions when taken as a whole adequately

instructed the jury that it must find the defendants guilty of the specific

---

[12]  West asserts that *United States v. Green*, 617 F.3d 233 (3d Cir. 2010), supports his position, but that is not so. There, the defendant was charged with attempted possession of a kilogram of cocaine with intent to distribute. This Court held that a district court did not abuse its discretion in admitting evidence under Rule 404(b) regarding the defendant's efforts to acquire dynamite in order to kill an undercover officer involved in an earlier case, because the evidence helped explain the conversations between the defendant and a cooperator, and to explain the cooperator's motives in assisting law enforcement. *Green* therefore does not remotely establish that the evidence in this case, where the murder was committed to further the drug trafficking conspiracy, was not intrinsic; *Green* did not involve evidence of violent conduct related to the charged crime, but only evidence that bolstered a cooperator's credibility. And even then, *Green* approved the admission of the evidence under Rule 404(b), as would also be appropriate here.

charges in the indictment stating, "the government must prove each and every element to the offense charge beyond a reasonable doubt . . . . If, having now heard all the evidence, you are convinced that the Government proved each and every element of the offense charged beyond a reasonable doubt, you should return a verdict of guilty for that offense . . . . [I]f you have a reasonable doubt about one or more of the elements of the offense charged, then you must return a verdict of not guilty." App. 2818-19. *See United States v. Gibb*s, 190 F.3d 188, 218 n.21. (3d Cir. 1999) (although not couched under 404(b), the "[d]istrict [c]ourt did give a cautionary instruction to the jury" when it stated "to determine the guilt or innocence of the defendants only as to the specific charges brought against them by the government. Such charges are the only charges before you for consideration. The defendants are not on trial for any conduct by them which is not charged as a crime in the superseding indictment.").

The defendants also argue that this evidence should have been excluded on the basis of Federal Rule of Evidence 403, but that claim also fails. Evidence may be excluded under that rule only if its "probative value is substantially outweighed by a danger of *inter alia*, "unfair prejudice, confusing the issues, [or] misleading the jury." Fed. R. Evid. 403. "Evidence should be excluded under Rule 403 only sparingly since the evidence

excluded is concededly probative." *Spain v. Gallegos*, 26 F.3d 439, 453 (3d Cir. 1994). "The balance under the rule should be struck in favor of admissibility." *Id.*

A district court's discretion "'is construed especially broadly in the context of Rule 403.'" *United States v. Figueroa*, 729 F.3d 267, 276 n.15 (3d Cir. 2013) (quoting *United States v. Kemp*, 500 F.3d 257, 295 (3d Cir. 2007)). "When determining whether evidence violates Rule 403, district courts must balance the probative value of the evidence against its prejudicial effect, clarifying its reasoning on-the-record." *United States v. Bailey*, 840 F.3d 99, 117 (3d Cir. 2016). "When a court engages in a Rule 403 balancing and articulates on the record a rational explanation, we will rarely disturb its ruling." *United States v. Finley*, 726 F.3d 483, 491 (3d Cir. 2013) (citing cases).

Here, the district court explained, in great detail, why the evidence was highly probative when it originally discussed its 404(b) ruling (prior to hearing Stewart's testimony and ruling that the evidence was. intrinsic and not subject to Rule 404(b)). App. 1539-41. The very next day, the first thing the court did was address Rule 403, stating:

> I want to supplement the statement I made under Rule 404(b) by a very short reference to Rule 403 because I am aware of certain instances in which a judge can say that certain relevant evidence should not be introduced because it's outweighed by a danger of

unfair prejudice, confusion misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence. I don't think any of those apply to the evidence that was talked about, whether it's intrinsic or extrinsic, under 404(b).

App. 1547. Notably, nobody objected to the court's ruling or requested that the court expand upon its Rule 403 ruling, most likely because it was obvious to everyone that the evidence was highly probative, as the court had previously explained, and there was no unfair prejudice.

Consistent with the decision cited above, permitting admission of violence and other bad acts associated with drug trafficking groups, Rule 403 favors the admission of the evidence. The rule makes clear that exclusion is allowed only if the prejudicial impact of evidence "substantially outweighs" the probative value. In part, this means that the test is almost surely not met where, as here, the probative value of the evidence is itself very high. The remedy of exclusion is "extraordinary," and should be applied sparingly; the balance should be struck in favor of admissibility. *United States v. Terzado-Madruga*, 897 F.2d 1099, 1117 (11th Cir. 1990); *United States v. Day*, 591 F.2d 861, 878 (D.C. Cir. 1978).

The defendants' reliance on *United States v. Murray*, 103 F.3d 310 (3d Cir. 1997), is misplaced. In *Murray*, the defendant was convicted following a jury trial of an intentional killing in furtherance of a continuing criminal enterprise ("CCE"), in violation of 21 U.S.C. § 848(e)(1)(A);

- 109 -

conspiracy to distribute in excess of five kilograms of cocaine, in violation of 21 U.S.C. §§ 846 and 841(a)(1); and distribution of and possession with intent to distribute cocaine, in violation of 21 U.S.C. § 841(a)(1). During the trial, the government introduced evidence of a prior uncharged murder. In reversing the murder conviction, this Court held that there was little to no evidence that the uncharged murder, which was admitted pursuant to Rule 404(b), was in any way related to the charged CCE.[13] *Id.* at 317. Further, the Court ruled that the admission of the evidence violated Rule 403 because the probative value was slight. *Id.* The Court reasoned that, under the government's best theory of admissibility, the proof of the uncharged murder was relevant to show Murray's role in the CCE, and the probative value was slight because it depended on the uniqueness of the uncharged murder, which the evidence did not support. *Id.* That is not the case here.

In contrast, the evidence in the instant case was highly probative of the conspiracy charged in the indictment. The evidence directly proved the nature of the conspiracy, the relationship between members in the conspiracy, and West's control over the organization.

---

[13] Notably, the Court did not reverse the narcotics trafficking convictions because the inadmissible evidence was harmless as to those charges because of the overwhelming evidence associated with those charges.

"[T]he prejudice against which [Rule 403] guards is unfair prejudice — prejudice of the sort which clouds impartial scrutiny and reasoned evaluation of the facts, which inhibits neutral application of principles of law to the facts as found." *United States v. Starnes*, 583 F.3d 196, 215 (3d Cir. 2009) (quoting *Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 670 (3d Cir. 2002)). The evidence proffered here does not produce unfair prejudice. While the actions of the defendants in the case are horrific, Rule 403 does not provide a shield for defendants who engage in outrageous acts, "permitting only the crimes of Caspar Milquetoasts to be described fully to a jury. It does not generally require the government to sanitize its case." *United States v. Cross*, 308 F.3d 308, 325 (3d Cir. 2002).

Finally, the defendants would not be entitled to relief even if the evidence of the murder should have been excluded. Indeed, no evidence of the murder was admitted against Blanding, so any error was necessarily harmless as to him.[14] *See United States v. Flores-Rivera*, 56F3d 319, 329 (1st Cir. 1995). The evidence against the defendants, apart from evidence concerning the murder of Robert Johnson, was so overwhelming that any error would have been harmless.

---

[14] Similarly, no evidence of the murder was presented against Hickson.

An evidentiary error is harmless if "there is a high probability that the error did not contribute to the judgment," leading to a "sure conviction that the error did not prejudice the defendant." *United States v. Steiner*, 847 F.3d 103, 113 (3d Cir. 2017) (citations omitted). Under that standard, "[t]here is no need to disprove every reasonable possibility of prejudice." *United States v. Copple*, 24 F.3d 535, 546 (3d Cir. 1994) (quotation marks omitted). An error is harmless when the government has provided overwhelming evidence of guilt not affected by the error. *United States v. Cross*, 308 F.3d 308, 326 (3d Cir. 2002) (admission of evidence in violation of Rule 403).

The evidence against the defendants was overwhelming on all counts. The trial included substantial evidence of various stash houses utilized by OBH, including seizures from the Mansion and the One Water Street apartment. Numerous social media posts, text messages, and physical and electronic surveillance connected the defendants to those drug houses. Additional surveillance, both physical and electronic, showed the defendants, including Hickson and Blanding, as they traveled to and from the West Coast to acquire narcotics. Numerous text messages showing the sale of narcotics from West, Blanding, and Gadson were also introduced. Given the overwhelming evidence of guilt—on which evidence of the

murder of Robert Johnson had no bearing—admission of the evidence was, at worst, harmless error. *See United States v. Gricco*, 277 F.3d 339, 354 (3d Cir. 2002) (declining to decide—in a prosecution for failure to report as income money defendant stole from airport parking facilities—a claim that evidence of defendant's uncharged thefts from parking facilities violated Rule 404(b), where "there was overwhelming evidence in the form of the co-conspirators' testimony to establish [the charged] scheme"; "the jury would have [convicted defendant] "even without any evidence [he] participated in the earlier scheme""); *United States v. Boone*, 279 F.3d 163, 188 (3d Cir. 2002) (in a drug trafficking case, admission of evidence of defendant's prior drug trafficking was harmless given powerful evidence of guilt, including testimony of cooperating witnesses); *United States v. Gunn*, 369 F.3d 1229, 1236 (11th Cir. 2004) (admission of gang-related evidence was harmless; "other convincing evidence" "show[ed defendant's] extensive participation in all offenses" and "any error had no substantial influence on the jury's verdict").

The defendants' attempt to manufacture an issue by describing the evidence of Robert Johnson's murder as extensive, thus compounding the alleged error in admitting the evidence, is unpersuasive and wrong. West Br. 21. West's insinuation that the government misled the court by stating

that it would not focus on the Johnson murder "in any type of great detail," is disingenuous at best. West Br. 23. As the government noted, the vast majority of the evidence came from Stewart's testimony. As described above, several other pieces of evidence were submitted that corroborated Stewart's testimony and showed that West was involved in the homicide.

This presentation was of course necessary not only to explain the place of the crime in the conspiracy, but also because Stewart personally participated in the murder and it was essential, in showing his credibility to the jury, for the government to fully disclose his conduct and his acceptance of responsibility for it. *See generally United States v. Universal Rehab. Servs. (PA), Inc.*, 205 F.3d 657, 665-66 (3d Cir. 2000) (en banc) (explaining why the government will permissibly address a witness' criminal conduct on direct examination).

Moreover, the government did not dwell on the homicide. No crime scene photos, video from the scene, ballistic reports, autopsy photos, autopsy report, or pathologist testimony concerning the murder were introduced. Indeed, evidence of the murder of Robert Johnson played a very limited role in a trial that primarily focused on various stash houses, trips to and from California, and numerous text messages between the defendants.

Moreover, the acquittal of Hickson on Count Six provides the clearest proof that the evidence was not so unfairly prejudicial that it caused jurors to suspend rationality. *United States v. Heatherly,* 985 F.3d 254, 268 (3d Cir. 2021) (verdicts of convictions "on some counts, [acquittals] on others, and on one count . . . different conclusions about each defendant" was "not the mark of a jury blinded by rage.").

In sum, the district court acted within its discretion in permitting the murder evidence as proof of the conspiracy, and the defendants did not suffer improper prejudice.

## IV. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY ADMITTING EVIDENCE IN THE FORM OF RAP LYRICS AND VIDEOS

## Standard of Review

"A district court has broad discretion to determine the admissibility of relevant evidence in response to an objection under Rule 403." *United States v. Balter*, 91 F.3d 427, 442 (3d Cir. 1996). "Rule 403 is a balancing test, and '[l]ike any balancing test, the Rule 403 standard is inexact, requiring sensitivity on the part of the trial court to the subtleties of the particular situation, and considerable deference on the part of the reviewing court to the hands-on judgment of the trial judge.'" *United States v. Vosburgh*, 602 F.3d 512, 537 (3d Cir. 2010) (quoting *United States v. Guerrero*, 803 F.2d 783, 785 (3d Cir. 1986)).

## Discussion

Abdul West challenges the admission of highly probative, autobiographical rap lyrics, which were presented to the jury in both written and video form. In doing so, West ignores a body of case law in which such evidence was admitted. Instead, West makes a policy-tinged argument under Federal Rule of Evidence 403, appealing to an unsubstantiated bias on the part of the jury and suggesting that the district judge, due to his age and cultural background, was unable to fairly evaluate

the proffered evidence. West also argues that the curative jury instruction given by the district judge did not meet Constitutional muster, presenting a new objection not stated at trial. West is wrong, and the trial court did not abuse its discretion in admitting the lyrics and videos at issue, nor was the jury instruction, to which no defendant objected, flawed.[15]

Federal Rule of Evidence 403 permits a district court to exclude relevant evidence only if the evidence's probative value is *substantially* outweighed by the danger of *unfair* prejudice. Fed. R. Evid. 403 (emphasis added). "Unfair prejudice" refers to an undue tendency to suggest a decision on an improper basis. *See* Rule 403, Advisory Committee Notes. Rule 403 does not entail a simple "balancing." Rather, the rule makes clear that exclusion is allowed only if the prejudicial impact "substantially

---

[15] Both Hickson, in his brief at page 55, and Blanding, in his brief at page 65, purport to adopt West's objection. But they offer no explanation of how they were prejudiced by admission of the rap evidence. Under Federal Rule of Appellate Procedure 28(i), an appellant may adopt an argument of a co-appellant. "However, general adoptions or ones that concern an argument specific to the arguing party will not be regarded, if they are not accompanied by further elaboration. We refuse to speculate on how an issue applies to a Defendant's sentencing judgment when he himself has declined to do so." *United States v. Williams*, 974 F.3d 320, 374 n.41 (3d Cir. 2020). *See also United States ex rel. LaCorte v. SmithKline Beecham Clinical Lab'ys, Inc.*, 149 F.3d 227, 237-38 (3d Cir. 1998) (elaborating on the rule that general adoption is insufficient to raise a point of error with regard to fact-specific issues such as sufficiency of the evidence).

outweighs" the probative value. In part, this means that the test is almost

surely not met where the probative value of the evidence is itself high.

In speaking of "prejudice," the rule is not asking simply whether the

evidence is harmful to the defendant's case:

> [Rule 403] does not offer protection against evidence that is merely
> prejudicial, in the sense of being detrimental to a party's case. Rather,
> the rule only protects against evidence that is unfairly prejudicial.
> Evidence is unfairly prejudicial only if it has "an undue tendency to
> suggest decision on an improper basis, commonly, though not
> necessarily, an emotional one."

Advisory Committee's Note, Fed. R. Evid. 403; *Carter v. Hewitt*, 617 F.2d

961, 972 (3d Cir. 1980). "[T]he prejudice against which [Rule 403] guards is

unfair prejudice – that is, prejudice of the sort which clouds impartial

scrutiny and reasoned evaluation of the facts, which inhibits neutral

application of principles of law to the facts as found.'" *United States v.*

*Starnes*, 583 F.3d 196, 215 (3d Cir. 2009) (quoting *Goodman v. Pa. Tpk.*

*Comm'n*, 293 F.3d 655, 670 (3d Cir. 2002) (emphasis in original)).

"Virtually all evidence is prejudicial or it isn't material." *Carter*, 617 F.2d at

972 n.14 (quoting *Dollar v. Long Manufacturing Co.*, 561 F.2d 613, 618

(5th Cir. 1977)); *United States v. Cross*, 308 F.3d 308, 323 (3d Cir. 2002)

("[W]hen evidence is highly probative, even a large risk of unfair prejudice

may be tolerable.").

The remedy of exclusion under Rule 403 is "extraordinary" and should be applied sparingly; the balance should be struck in favor of admissibility. *United States v. Terzado-Madruga*, 897 F.2d 1099, 1117 (11th Cir. 1990); accord, *United States v. Dennis*, 625 F.2d 782, 797 (8th Cir. 1980); *United States v. Day*, 591 F.2d 861, 878 (D.C. Cir. 1978). As noted above, "Rule 403 does not provide a shield for defendants who engage in outrageous acts, permitting only the crimes of Caspar Milquetoasts to be described fully to a jury. It does not generally require the government to sanitize its case, to deflate its witnesses' testimony, or to tell its story in a monotone." *Cross*, 308 F.3d at 325 (quoting *United States v. Gartmon*, 146 F.3d 1015, 1021 (D.C. Cir. 1998)).

Here, the evidence was highly probative and was admitted into evidence as intrinsic to the conspiracy charged in Count One, a ruling West expressly does not challenge. West Br. 38. Notably, by not challenging that ruling, West concedes that the evidence was relevant. *See* App. 81-84. Instead, West argues that the potential for unfair prejudice due to the jury's inability to evaluate such evidence fairly and impartially on cultural grounds substantially outweighed any probative value, creating a *de facto* prohibition against the use of rap-derived evidence.

Specifically, West argues that rap lyrics – as opposed to lyrics of other genres – are more powerfully prejudicial due to "concerns about unconscious racial bias and cultural misunderstanding." West Br. 36-37. But notably, at no point did any of the four trial defendants in this case challenge the jury selection process or otherwise indicate that this jury, collectively, or as individual jurors, were biased against the defendants, and to suggest otherwise is irresponsible.

West should instead focus on the body of caselaw permitting the admission of rap lyrics and videos. *See United States v. Recio*, 884 F.3d 230, 236 (4th Cir. 2018) (finding that district court did not err in admitting rap lyrics where lyrics "consist[ed] of a single sentence that described only the type of conduct of which [the defendant was] accused"); *United States v. Miller*, 638 F. App'x 543, 545 (8th Cir. 2016) (unpublished) (affirming admission of lyrics to show possession of firearm despite defendant's claims that lyrics portrayed him as "another dangerous, violent black man"); *United States v. Pierce*, 785 F.3d 832, 840-41 (2d Cir. 2015) (affirming admission of rap lyrics (and tattoos) as evidence of RICO enterprise despite First Amendment concerns); *United States v. Moore*, 639 F.3d 443, 447-48 (8th Cir. 2011) (affirming admission of rap videos under plain error review even though videos totaled more than 20 minutes

in length and were presented to jury without limiting instruction); *United States v. Belfast*, 611 F.3d 783, 820 (11th Cir. 2010) (holding that rap lyrics were relevant and their probative value not substantially outweighed by any unfair prejudice in case where lyrics were used to show that defendant was associated with group that tortured Sierra Leoneans in Liberia); *United States v. Stuckey*, 253 F. App'x 468, 482-43 (6th Cir. 2007) (unpublished) (finding that district court did not abuse its discretion in admitting rap lyrics despite danger of unfair prejudice).

These cases are fatal to West's argument. In *Pierce*, for example, the defendant argued that admission of a rap video violated his First Amendment rights and also "that the rap lyrics were merely 'fictional artistic expressions' and 'perverse puffery' that should not have been admitted against him." 785 F.3d at 841. The Second Circuit disagreed, noting that the rap lyrics were properly admitted to show the defendant's relationship to RICO co-defendants and animosity toward others as his motive for violence. The *Pierce* Court therefore found that the probative value of the lyrics was not outweighed by the danger of unfair prejudice and did not implicate the defendant's First Amendment rights. *Id*.

West attempts to skirt these cases by diminishing the probative value of the proffered evidence, and he relies on the supposedly "uncontested"

testimony of an expert witness, Dr. Richard Cooper, a professor of African American Culture. But Dr. Cooper was no help to the defense at trial, nor is he on appeal. Even if West's characterization of Dr. Cooper's testimony as "uncontested" was accurate – and the government makes no such concession – at best, his testimony established that lyrics alone cannot conclusively prove that a rap artist performed the acts described in his songs. On this point, there is no disagreement.

But here is where this case diverts from West's comparisons to the lyrics of Neil Young, Johnny Cash, and an 18th century balladeer. West is correct that Neil Young could not have been prosecuted for murder simply by writing a song about shooting his "baby" "down by the river." But if Neil Young wrote that song two days after his paramour went missing and was later found murdered near a creek, prosecutors would rightfully seek to use those lyrics against him, especially if, as here, there was other evidence that he played a role in that murder. Without more, the prosecution may not have been able to meet its burden to convict Neil Young of murder, but in light of other evidence, a jury could and should rightfully consider such lyrics.

Like Neil Young, West is an artist, and he has produced a body of work and achieved some success in his genre, but he may not insulate

himself from criminal prosecution simply because he dressed his
admissions as lyrics. You cannot hide a confession in a song and to suggest
otherwise is absurd.

Plainly, West's invocation of songs by artists such as Johnny Cash and
Neil Young is silly. No one ever offered evidence that their references in
songs to murder were in any way autobiographical. The comparisons have
nothing to do with a case in which Stewart ("Tez") facilitated a murder at
West's direction, and four days later, West produced a profane diatribe
celebrating his determination to murder rivals, App. 3670, that included
the statement, "I call Tez and tell him bring dat nigga head to me"; and
where the government offered additional evidence including text messages
and cell-site location information corroborating Stewart's testimony.

West also ignores the other videos offered into evidence, which had
nothing to do with the testimony of Dontez Stewart. For example, during
one video, West rapped, in relevant part, "Quarter million loss, got a broke
heart; And they snatched my dog that's the worst part; One rat destroyed
everything you work for; I pray to God that he don't tell 'em who he work
for." App. 1851-1854 (GX 902d). This was written shortly after the FBI
raided the One Water Street Apartment, seized approximately $120,000 in

cocaine and methamphetamine, and arrested his co-conspirator Richard Chase Hoover.

Also, and importantly, this entire discussion obscures the fact that West admitted at trial that he was a drug dealer. His trial strategy may have been to distance himself from certain substances seized during this investigation (such as the large amount of methamphetamine seized during the search of One Water Street), but to claim that these lyrics were not, at least in part, autobiographical is to contradict the record he created. West cannot have it both ways.

The cases on which West relies are also no help. In *United States v. Gamory*, 635 F.3d 480 (11th Cir. 2011), for example, the Eleventh Circuit found that a rap video that "contained violence, profanity, sex, promiscuity, and misogyny" was "heavily prejudicial" and had "minimal" probative value to the alleged drug and money laundering crimes. Moreover, the defendant in that case did not appear in the rap video at issue. Rather, someone else's lyrics were admitted to prove the crimes of the defendant. By comparison, in this case, West rapped about things the evidence established (and at times, he admitted) he did.

And in *United States v. Bey*, 2017 WL 15470006 (E.D. Pa. April 28, 2017), a district court in this Circuit exercised its broad discretion to keep

out certain undated lyrics that it feared had been cherry picked and taken out of context. Here, the rap lyrics were dated and, as the record established, correctly correlated to actual events that were material to the charges in this case.

Perhaps recognizing the discretion rightfully afforded to trial courts in this context, West attacks the district court opinion – and the district court itself – by claiming that the court's reference to "gangsta rap" as a "*new* type of culturally expression popular in the African American community" shows "a deep-seated cultural disconnect" such that the judge could not help but to abuse his discretion. Putting to the side that "gangsta rap" is, in fact, "new" relative to certain operas referenced earlier in the court's opinion – or to West's own examples of mid-20th century song writers and an 18th century balladeer – West's position would be offensive if it were not so absurd. Taken to its logical conclusion, West argues that only certain judges are positioned to fairly evaluate certain types of evidence. All others need not apply.

In any event, despite what West characterizes as the district judge's "generational and cultural misunderstandings," the trial court recognized – as the government does – the appropriateness of a cautionary instruction to the jury. As this Court has stated, any prejudice may be ameliorated

through a jury instruction which minimizes any potential for unfair prejudice and ensures that the jury does not consider the evidence for an improper purpose. *See, e.g.*, *United States v. Lee*, 612 F.3d 170, 191 (3d Cir. 2010); *United States v. Sriyuth*, 98 F.3d 739, 748 (3d Cir. 1996). Notably, at the time the district court previewed its proposed jury instruction, no one – including West – objected or suggested revisions to that jury instruction.

Nor should they have. The district court's instruction did not run afoul of what West calls the "governing cases." West Br. 45. In reality, however, those cases are inapposite. *Street v. New York*, 394 U.S. 576 (1969)*,* was a case about flag burning, in which the protected First Amendment activity was the proscribed conduct. Similarly, in *Noto v. United States*, 367 U.S. 290 (1961), the defendant was being prosecuted for support of and membership in the Communist Party, which is also protected First Amendment activity. Here, the artistic expression was not itself the proscribed conduct, but rather, it was offered as evidence to prove elements of the crimes with which West (and others) were charged. This is wholly appropriate. *See Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993) ("The First Amendment . . . does not prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent. Evidence of a defendant's previous declarations or statements is commonly admitted

in criminal trials subject to evidentiary rules dealing with relevancy, reliability, and the like.").

But in any event, the jury instruction cautioned the jury that "every person has the right to express himself or herself in a manner or style that is of their choosing and use any words or language they choose," capturing the essence of the First Amendment. The district court may not have used the words "First Amendment," but West has not pointed this Court to any authority requiring it to do so. The district court's instruction did not amount to plain error in any manner.

The government properly asserted that the lyrics and videos were confessional statements for the jury's consideration. This was, at bottom, a factual question for the jury: Were the grotesquely violent lyrics of West's songs emblematic of a genre of music, or were they flat-out admissions of his own violent acts? The question was squarely presented to the jury, including with the admission of expert testimony about rap culture, and extensively debated by the parties. The notion that this Court should reject the jury's factual determination, and essentially create a rule that rap lyrics cannot be considered as truthful expressions by their author, is frivolous. West essentially argues that his expert witness' testimony, that declarations in rap music should not necessarily be considered truthful, must always be

accepted as accurate and preempts any jury's ability to decide otherwise in a particular case. That is obviously untenable. The notion "that jurors will be incapable of determining the credibility of this particular form of artistic expression using their ordinary tools of common sense and human experience," Br. 39, is simply absurd, and nothing more than a rejection of the reliance of our criminal justice system on jurors to resolve disputed facts.

Moreover, it is important to keep the rap-derived evidence in this case in perspective. West describes it as "the most compelling and emotionally evocative of the entire trial," but in truth, it was not. It was certainly probative of the crimes charged, but we are talking about three rap videos (the fourth video contemplated by the district court's ruling was not a rap video at all but was rather Abdul West and OBH member "Skinny Me" speaking about the violence that would result should anything happen to Skinny Me or any other member of OBH). To the extent the government played larger portions of those three videos than initially proposed, it did so at the request of defense counsel, who wanted the jury to note the production value of the videos to buttress their argument that OBH was something other than a drug gang. App. 1798, 1851-52.

Even in their extended form, though, these videos accounted for a handful of minutes in a lengthy trial about an expansive drug trafficking conspiracy, and as the government acknowledged in its closing argument, "this isn't an indictment against rap music." App. 2702. Far from it. It was an indictment against nine members of a violent drug gang, four of whom went to trial, and the government put on two weeks of testimony, the vast majority of which had nothing to do with rap lyrics or videos. Thus, even if the district court should have excluded the rap videos, any error was harmless. For all of these reasons, the admission of the rap evidence did not cause error in this case.

## VI. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN DENYING SEVERANCE OF THE TRIAL OF HICKSON

### Standard of Review

This Court reviews the denial of a motion for severance for abuse of discretion. *United States v. Lore*, 430 F.3d 190, 205 (3d Cir. 2005).

### Discussion

Hickson claims that the district court abused its discretion by denying his motion to sever the charges against him from those against the other defendants.[16] Hickson argues that he "should have been granted a severance based on the prejudicial rap video and lyrics read and played before the jury on November 8, 2019." Hickson Br. 43. In addition, Hickson argues that he was "severely prejudiced" by the "disparities in the proof offered against the defendants," and suffered spill over prejudice from the testimony of Dontez Stewart concerning the murder of Robert Johnson. Hickson Br. 50.[17] Hickson's claims are meritless.

---

[16]  Gadson also purports to adopt the argument regarding "the district court's failure to sever the cases for trial" once it determined to admit evidence of the murder and rap videos. Gadson Br. 38. But he offers no explanation of how he was prejudiced, and thus this argument should not be considered as to him. *United States v. Williams*, 974 F.3d 320, 374 n.41 (3d Cir. 2020). *See* note 15 *supra*.

[17] The government understands Hickson to be challenging this

*continued . . .*

A defendant, properly joined with other defendants in a criminal indictment, has "a heavy burden in gaining severance." *United States v. Quintero*, 38 F.3d 1317, 1343 (3d Cir. 1994). That is because "[t]here is a preference in the federal system for joint trials of defendants who are indicted together." *Zafiro v. United States*, 506 U.S. 534, 537 (1993). This Court has often described this principle as "fundamental." *See, e.g., United States v. Urban*, 404 F.3d 754, 775 (3d Cir. 2005). There are many reasons for this preference, particularly in a case involving an alleged conspiracy. A joint trial promotes efficiency, avoids inconsistent verdicts, *id.*, permits the finder of fact to assess the "full extent of the conspiracy," *United States v. Provenzano*, 688 F.2d 194, 199 (3d Cir. 1982), prevents "the tactical disadvantage to the government from disclosure of its case," *United States v. Jackson*, 649 F.2d 967, 973 (3d Cir. 1981), and may benefit a less responsible defendant whose relative culpability is made clear, *Buchanan v.*

---

evidence only to the extent that he should have been granted a severance from his co-defendants. To the extent he argues that this evidence was improperly admitted, the government disagrees, as discussed above. In addition, Hickson states that he was prejudiced and should have been granted a severance because "an out of context disconnected text from someone named 'Mizzo' to Blanding . . . further prejudiced Appellant Hickson." Hickson Br. 50. The government addresses the "Mizzo" text elsewhere in this brief. Puzzlingly, Hickson appears to suggest that admission of the text mandated severance, however he provides no basis for this assertion.

*Kentucky*, 483 U.S. 402, 418 (1987). *See also United States v. Voigt*, 89 F.3d 1050, 1094 (3d Cir. 1996).

Thus, "a defendant is not entitled to a severance merely because evidence against a co-defendant is more damaging than the evidence against the moving party." *United States v. Lore*, 430 F.3d 190, 205 (3d Cir. 2005) (quoting *United States v. Somers*, 496 F.2d 723, 730 (3d Cir. 1974)). Nor is severance required "merely because [defendants] may have a better chance of acquittal in separate trials." *Zafiro v. United States*, 506 U.S. 534, 540 (1993). "[T]he critical issue 'is not whether the evidence against a co-defendant is more damaging but rather whether the jury will be able to 'compartmentalize the evidence as it relates to separate defendants in view of its volume and limited admissibility.'" *United States v. John-Baptiste*, 747 F.3d 186, 197 (3d Cir. 2014) (quoting *United States v. Davis*, 397 F.3d 173, 182 (3d Cir. 2005)). "A defendant seeking a new trial due to the denial of a severance motion must show that the joint trial led to 'clear and substantial prejudice resulting in a manifestly unfair trial.'" *John-Baptiste*, 747 F.3d at 197 (quoting *United States v. Urban*, 404 F.3d 754, 775 (3d Cir. 2005)). That is a "herculean" task. *United States v. Burden*, 964 F.3d 339, 345-46 (5th Cir. 2020) (affirming denial of severance).

Here, the district court did not abuse its discretion. In *United States v. Eufrasio*, 935 F.2d 553 (3d Cir. 1991), the RICO prosecution of a criminal organization, this Court rejected the same kind of spillover prejudice claims that Hickson now makes. In that case, Eufrasio and Iacona, who were not charged with murder, sought severance from a co-defendant who was. This Court held that severance "was not required, even if some potential for prejudice might be associated with evidence of the . . . murder conspiracy predicate." *Id.* at 568. Since "all appellants were charged with the same conspiracy to participate in the same enterprise, the public interest in judicial economy favored joinder." *Id.* Moreover, "evidence of the . . . murder conspiracy which proves the nature, history and means of the enterprise charged against each appellant" would have been admissible even in a severed trial against Eufrasio and Iacona. *Id.* at 568-69; *see also United States v. Console*, 13 F.3d 641, 655 (3d Cir. 1993) ("[i]n this case, as in *Eufrasio*, the public interest in a joint trial substantially outweighed the possibility of prejudice to the defendant" where "[t]he indictment charged both [moving defendants] with RICO violations related to the [subject] Enterprise"); *United States v. Chavez*, 894 F.3d 593, 605 (4th Cir. 2018) (denial of severance affirmed even though the "trial included evidence of

violent racketeering activity that [defendant] was not directly involved in"). Thus, this Court's precedents soundly defeat Hickson's claims.

Moreover, Hickson completely ignores the fact that one of the rap videos, which he argues was a reason for severance, directly implicates "Melliano" (Hickson) as a source of West's narcotic supply. GX902A-1; App. 1442-49, 1719-20, 1855; Supp. App. 14, 16, 19. Hickson also fails to account for his acquittal on Count Six, notwithstanding the alleged prejudicial evidence. Here, the court provided the standard instruction directing the jury to consider each charge against each defendant separately, and the jury's verdict makes clear that it was quite capable of following that directive and was able to compartmentalize the alleged prejudicial evidence and consider it only against West and other members of the conspiracy involved in the murder of Robert Johnson. *See Diaz*, 176 F.3d at 103 (acquittal of co-defendant of some charges confirmed the absence of prejudice; split verdicts showed "the jury heeded the court's [limiting] instructions and carefully considered the evidence against each defendant separately"); *United States v. Solis*, 299 F.3d 420, 441 (5th Cir. 2002) (severance properly denied where "the jury acquitted some of the alleged co-conspirators," which showed "the jury sorted through the evidence, however complex, and considered each defendant and each count

separately"). Were the jurors not capable of such compartmentalization, and were they as impacted by the evidence Hickson claims mandated his severance, they would have simply convicted him on all counts and gone home. They did not, and their carefully considered verdict should stand.

## VII. THE DISTRICT COURT ACTED WITHIN ITS DISCRETION BY LIMITING THE CROSS-EXAMINATION OF A GOVERNMENT EXPERT BY GADSON'S COUNSEL

### Standard of Review

The district court's decision to limit cross-examination is reviewed for abuse of discretion. *United States v. Ellis*, 156 F.3d 493, 498 (3d Cir. 1998) (citing *United States v. Casoni*, 950 F.2d 893, 902 (3d Cir. 1991)).

### Discussion

Hans Gadson contends that the district court abused its discretion in limiting his counsel's cross-examination of the government's drug trafficking expert. Gadson is incorrect.[18]

It is well-settled that the trial court has great discretion in governing examination of witnesses and may restrict the scope of cross-examination with respect to collateral matters or matters of marginal relevance. *See United States v. Goings*, 517 F.2d 891, 892 (3d Cir. 1975); *United States v. Williams*, 892 F.2d 296, 301 (3d Cir. 1989). This Court "has given district

---

[18] Inexplicably, both West, at page 46 of his brief, and Blanding, at page 65 of his brief, purport to adopt this argument, even though Gadson's argument focuses exclusively on his own cross-examination and how it related to the evidence against Gadson, and West and Blanding state no explanation of how the issue relates to them. This adoption is insufficient to warrant review. *United States v. Williams*, 974 F.3d 320, 374 n.41 (3d Cir. 2020). *See* note 15 *supra*.

courts wide discretion in limiting cross-examination." *United States v. Casoni*, 950 F.2d 893, 918 (3d Cir. 1991). A restriction "will not constitute reversible error unless it is so severe as to constitute a denial of the defendant's right to confront witnesses against him and it is prejudicial to substantial rights of the defendant." *Id.* at 918-19. The Confrontation Clause guarantees "an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish." *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986). The district court is required to strike a balance between the opportunity to cross-examine and the need to prevent abusive or repetitive cross-examination. *Douglas v. Owens*, 50 F.3d 1226, 1230 (3d Cir. 1995).

The government called DEA Special Agent Randy Updegraff as an expert in drug trafficking, in part, to help decipher text messages between and among the defendants. App. 2533-2567. His interpretation of text messages included in Government Exhibit 3002, leading to his opinions, as reflected in Government Exhibit 3004, was undeniably a big portion of his testimony. This was particularly damaging to Gadson, who used text messages to keep West apprised of "the count," that is, amounts of cocaine and crack cocaine that he sold or had on hand, as well as the drug proceeds he had as a result of those sales.

But the damaging effect of the evidence did not mean that Gadson's counsel could take an unreasonable amount of time or ask objectionable questions. Thus, the district court's imposition of a reasonable limit on the scope of cross-examination appropriately and fairly struck a balance between the constitutionally required opportunity to cross-examine and the need to prevent repetitive or abusive cross-examination. *Casoni*, 950 F.2d at 919.

This Court will review the transcript in question in full, which makes clear that the district court did not abuse its discretion. *See* App. 2606-32. Gadson's counsel asked a series of general questions attempting to challenge the witness' ability to decode conversations, and specifically pursuing the notion that Updegraff had simply talked to the case agents and was parroting their conclusions about the nature and scope of the defendants' conducts. As the examination proceeded, the court expressed concern that the questions became repetitive, and urged counsel, if he wished to proceed, to focus on particular transactions. When counsel did not oblige, the court ultimately deemed the examination concluded. At that

point, this was an entirely reasonable limitation within the court's discretion.[19]

Alternatively, even if the district court abused its discretion with respect to limiting the scope of cross-examination, such error was harmless. In *United States v. Williams*, 892 F.2d 296, 302-03 (3d Cir. 1989), this Court, relying on the Supreme Court's holding in *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986), determined that a harmless error analysis is appropriate in evaluating the trial court's limitation of the scope of cross-examination. Factors to be taken into account include "the extent of cross-examination otherwise permitted, and, . . . the overall strength of the prosecution's case." *Williams*, 892 F.2d at 302, quoting *Delaware v. Van Arsdall*, 475 U.S. at 684.

---

[19] Gadson also suggests that the district judge was biased in favor of the prosecution, and points to a letter the judge sent to the FBI director, complimenting the agents and the prosecutors on how they comported themselves during a long and difficult trial, and copying the United States Attorney. *See* Gadson Br. 18-19. Gadson seems to suggest, after the fact, that there was something wrong with the letter, but he ignores that the district judge informed everyone in open court that he intended to send such a letter, and no one expressed any concern, *see* App. 2905, and that the government provided it to defense counsel in the interest of transparency. Curiously, the letter does not serve as the basis for any actual issue presented on appeal. Rather, Gadson simply references it, in what appears to be an attempt to score points on an innocuous (and transparent) post-trial communication between two branches of government.

Here, Gadson's counsel was allowed to cross-examine Special Agent Updegraff for more than 30 minutes, at which point, and after a series of repetitive and argumentative questions, the district court informed Gadson's counsel that he was giving him five more minutes. This was longer than each of the other defense counsel used in cross-examination and much longer than the 10 minutes the trial court granted the government to cross-examine the defense's drug trafficking expert. Thus, the cross-examination was extensive, but the overall strength of the prosecution's case is what solidifies the harmlessness of any error.

Gadson's argument on appeal assumes that with additional cross-examination, his counsel could have beaten back Special Agent Updegraff's opinions. In reality, he could not. This is best seen in light of the government's crucial, albeit abridged, cross-examination of the defense's drug trafficking expert, David Leff.

Gadson makes a point that Agent Updegraff's testimony was "key to the prosecution case against Gadson," but it was "key" because it showed that Gadson was trafficking in powder cocaine (which he and West called "soft") and crack cocaine (which he and West called "hard"). On this point, Agent Updegraff and Mr. Leff were in complete agreement, and for good reason. Hard and soft are widely recognized terms for, respectively, crack

and powder cocaine. Thus, the text messages between West and Gadson were barely coded and no amount of cross-examination could have shown otherwise.

This is buttressed by the fact that West *admitted* during the trial that he was a crack dealer. Thus, even if Gadson's counsel was permitted to proceed with his repetitive and argumentative cross-examination, he would not have fought back one devastating and undeniable conclusion – his client regularly sold cocaine and crack.

This of course says nothing of the other text messages, social media, and testimony of a cooperating witness, all of which implicated Gadson in the drug trafficking conspiracy in this case. Accordingly, should this Court find that the limitation of cross-examination was error (which it was not), such error was "harmless error beyond a reasonable doubt." *Williams*, 892 F.2d at 303.

## VIII. THE DISTRICT COURT DID NOT CONSTRUCTIVELY AMEND THE INDICTMENT IN THIS CASE BY CONCLUDING THAT THE CONTROLLED SUBSTANCES PLED IN THE INDICTMENT MAY BE PROVEN IN THE DISJUNCTIVE

### Standard of Review

This Court generally exercises plenary review in determining whether there was a constructive amendment of the indictment and whether there was a variance between the indictment and the proofs at trial. *United States v. Daraio*, 445 F.3d 253, 259 (3d Cir. 2006).

### Discussion

Hickson contends that the district court constructively amended Count One of the Second Superseding Indictment, charging him and others with conspiracy to distribute controlled substances. Hickson Br. 30. This argument is meritless.[20]

Count One charged the defendants with a conspiracy to distribute a variety of drugs, and it did so in the "conjunctive," that is, it used the word "and" while listing the controlled substances the defendants were alleged to have conspired to distribute. Specifically, the indictment read, in relevant part, that eight of the nine charged defendants, including the four appellants here, conspired to distribute:

---

[20] The argument is adopted by Gadson, Br. 38, without elaboration.

controlled substances, that is, 5 kilograms or more of a mixture and substance containing a detectable amount of cocaine, . . . 280 grams or more of a mixture and substance containing a detectable amount of cocaine base ("crack"), . . . *and* 50 grams or more of methamphetamine (actual) . . . , *and* 100 grams or more of a mixture and substance containing a detectable amount of heroin.

App. 190 (emphasis added).

By comparison, when instructing the jury, the district court suggested that the government could prove the controlled substances involved in the conspiracy in the "disjunctive."  That is, the district court instructed the jury that the defendants were charged with "agree[ing] or conspire[ing] together and with one or more other persons to distribute a controlled substance, specifically, cocaine, cocaine base or crack, methamphetamine, *or* heroin." App. 2830-31. The judge did not read a separate jury instruction explaining the difference between the conjunctive and disjunctive, as the government requested. App. 2866. The jury verdict form, however, listed the controlled substances separately. App. 2849-52.

Hickson now claims that the district court constructively amended the indictment by requiring that the government prove that the defendants conspired to distribute only one of the listed controlled substances. In doing so, Hickson notes that "[t]he defendants strategized and defended the case believing the government needed to prove all illegal substances to

each defendant and the amounts averred in Count One," Hickson Br. 34, although no such declaration appears in the record.

Hickson's claim is incorrect as a matter of law. An indictment is constructively amended when "the evidence and jury instructions at trial modify essential terms of the charged offense in such a way that there is a substantial likelihood that the jury may have convicted the defendant for an offense differing from the offense the indictment returned by the grand jury actually charged." *United States v. Daraio*, 445 F.3d 253, 259-60 (3d Cir. 2006). Thus, there will be a constructive amendment when the court through its jury instructions "broadens the possible bases for conviction beyond those presented by the grand jury." *Id*. There was no constructive amendment in this case.

It is hornbook law that the government may prove in the disjunctive an offense that is charged in the conjunctive.

> [I]t is settled law that where a statute denounces an offense disjunctively, the offense may be charged conjunctively in the indictment. . . . Moreover, guilt may be established by proof of any one act named disjunctively in the statute. *See Turner v. United States*, 396 U.S. 398, 420 (1970); *United States v. Gimelstob*, 475 F.2d 157, 163 (3d Cir. 1973) . . . .

*United States v. Niederberger*, 580 F.2d 63, 68 (3d Cir. 1978).

Thus, this Court has flatly rejected Hickson's argument that, by charging a conjunctive indictment in the disjunctive, a trial court

constructively amends an indictment. *See United States v. Cusumano*, 943 F.2d 305, 311 (3d Cir. 1991) (charging in the conjunctive and instructing in the disjunctive does not constitute an amendment of the indictment); *see also United States v. Vampire Nation*, 451 F.3d 189, 204 (3d Cir. 2006) (no amendment of the indictment, at least under plain error standard, where indictment charged in the conjunctive and court instructed in the disjunctive). None of the cases cited by Hickson undermine this plain and controlling precedent. Thus, the district court did not alter the second superseding indictment when it instructed the jury, and Hickson's argument to the contrary should be rejected.

## IX. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION IN ADMITTING SUMMARY CHARTS

### Standard of Review

A district court decision regarding the admissibility of evidence is reviewed for abuse of discretion. *United States v. Serafini*, 233 F.3d 758, 768 n.14 (3d Cir. 2000). "The general rule is that the use of a summary is a matter that rests within the sound discretion of the trial court." *Pritchard v. Liggett & Myers Tobacco Co.*, 295 F.2d 292, 300-01 (3d Cir. 1961). An objection not presented at trial is reviewed for plain error.

### Discussion

Hickson argues that the district court abused its discretion in admitting a summary chart under Rule 1006, focusing only on one mistake he claims the lengthy summary incorporated. Hickson is incorrect, and his argument badly mischaracterizes what led to its introduction.

As set forth above, in this case, federal investigators seized nearly 60 cell phones and, pursuant to federal search warrants, searched those cell phones for evidence of the crimes charged in this case. They were unable to access the information in some of them, but they gathered strong evidence of the crimes in many others. Most notably, investigators pulled from multiple phones text messages between and among the defendants in this

case, and those text messages conclusively showed that the defendants were engaged in drug trafficking and that they were working together in that endeavor.

As explained above, many of the text messages (and other voluminous electronic evidence) were introduced into evidence through two charts and two compilations of text messages. App. 3511-3669. Notably, at the time the government introduced the summary charts, that is, Government Exhibits 3001 and 3003, no one challenged their admission as summary charts, and it is not clear whether Hickson is challenging them now, as he confusingly refers to "the Mizzo summary chart." Hickson Br. 38.

It appears that Hickson takes issue with the content of a single slide included in Government Exhibit 3002. App. 3516. That slide described a text message as Hickson asking Blanding for "1 of dem ice joints," which Special Agent Updegraff then interpreted as Hickson requesting a pound of methamphetamine from Blanding. App. 3596. His specific complaint seems to be that the government did not adequately show that the phone number saved as "Mizzo 2" in one of Blanding's phones was attributable to Hickson. App. 3590. In this way, he is challenging the veracity of a single piece of information included in Government Exhibit 3003, that is, that a phone

number saved as "Mizzo 2" on several phones seized during this investigation was in fact attributable to Hickson.

The defense attacked the attribution of this phone number, first through Agent Updegraff, who played no role in the attribution, App. 2590-2606, and then through Special Agent Becker, who did, App. 1412-19, 1430-64, 2647-54. The defense's point was that the number attributed to Hickson was not assigned to a phone seized from Hickson, which Agent Becker readily conceded. App. 2653. But searching someone's phone is certainly not the only way to attribute a phone number to that person, and Agent Becker convincingly explained how he attributed that number to Hickson, but in any event, Hickson's argument goes only to the weight of the evidence, not the admissibility of it. App. 2647-54.

Under Rule 1006, summary evidence is admissible "when the jury is properly instructed and the chart is supported by actual evidence." *United States v. Jarmon*, 2021 WL 4187836, at *3 (3d Cir. 2021) (not precedential) (permitting an FBI agent to present a summary chart "showing the Government's theory of how [the drug trafficking group and conspiracy] was organized"). Rule 1006 does not require that the underlying materials be admitted into evidence, just that they are admissible, but a related

rule, Rule 611(a), permits a summary chart to include references to evidence already admitted at trial.

Special Agent Becker explained how the number saved as "Mizzo 2" was attributed to Hickson, not once, but twice, and he was subject to vigorous cross-examination on that point. App. 2651. Hickson has given this Court no reason why any of the charts used by the government were improper. Nor could he.

Ultimately, even if any of the summary charts or compilations of text messages were admitted in error, that error was harmless. Hickson's claim that he was not the "Mizzo" referenced in this one item was fully aired to the jury, and it was entirely capable of resolving the issue. Further, to the extent Hickson claims that the chart should not have been admitted because of one factual error, he never brought that specific objection to the court's attention. As he concedes, review is therefore for plain error, which is certainly not established here.

The "Mizzo" text on which Hickson is entirely focused was a single text message in a case that contained overwhelming evidence of Hickson's involvement in the conspiracy, including additional text messages that Hickson does not – and cannot – challenge as being properly attributed to him. These other text messages included messages from Hickson to other

members of OBH discussing drug trafficking and the loss of the narcotics taken from One Water Street by the FBI. *See, e.g.*, Supp. App. 24, 30-31, 36-37, 39-41.

Also, and importantly, in proving Count One, the conspiracy count, the government argued that the drug weights reflected in Government Exhibit 3004 were attributable to the defendants as part of the conspiracy. But to be clear, the drug weights reflected in Exhibit 3004 were only part of the overall drug weight the government argued was attributable to Hickson as part of the conspiracy. The narcotics seized during the searches of the Mansion and One Water Street, which were substantively charged in Counts Six and Twelve, respectively, were also included in the overall conspiracy charged in Count One. Hickson was acquitted on Count Six, but he was convicted on Count Twelve, and his substantiative conviction on Count Twelve, the underlying conduct of which was part of the overall conspiracy, would suffice to support his conviction under Count One. For all of these reasons, Hickson's argument on this point should be rejected.

## X. THE TRIAL COURT'S JURY INSTRUCTIONS RELATED TO THE CONSPIRACY COUNT WERE NOT REVERSIBLE ERROR, AND HICKSON WAS NOT PREJUDICED BY THE ABSENCE OF AN INDIVIDUAL FINDING REGARDING THE QUANTITY INVOLVED IN THE OFFENSE

### Standard of Review

Where the challenge to the jury instructions turns on a matter of statutory construction, review is plenary. The issue is whether the charge, taken as a whole and in light of the evidence presented, fairly and adequately submitted the issues in the case to the jury. *United States v. Schneider*, 14 F.3d 876, 878 (3d Cir. 1994).

### Discussion

Defendants Hickson, Br. 17, and Gadson, Br. 21, argue that Count One should be dismissed because the jury did not make an individual determination as to the specific drug quantity reasonably attributable to each defendant. This claim is without merit. The jury was properly instructed on the elements of the Count One conspiracy to distribute controlled substances. And while the jury did not make an individual determination as to the specific drug quantity reasonably attributable to the defendants individually, the district court sentenced each defendant without regard to a mandatory minimum on Count One. All of this was in

accord with this Court's decision in *United States v. Williams,* 974 F.3d 320 (3d Cir. 2020).

Further, approaching the same issue from a different angle, Hickson argues that there was insufficient evidence to prove his individual responsibility for the quantity of drugs that warranted application of the statutory penalties for the conspiracy set forth in 21 U.S.C. § 841(b)(1)(A). Hickson Br. 26. His argument, raised for the first time on appeal, reflects a misunderstanding of the law. Under *Williams*, the statutory maximum penalty for a conspiracy offense is based on the quantity involved in the conspiracy as a whole. A jury determination of individual responsibility is only required with regard to application of the mandatory minimum penalty. Here, no such jury determination was made, and therefore at sentencing no mandatory minimum sentence was applied. There was no error.

Notably, both defendants West and Blanding implicitly recognize that *Williams* controls this case, and rejects Hickson's and Gadson's claims. They therefore do not join the arguments of Hickson and Gadson and only contend that *Williams* was decided wrongly to preserve the issue for presentation to the Court *en banc* or on certiorari review. West Br. 46; Blanding Br. 65.

**A.    The Jury Instructions Were Not Erroneous With Regard to the Conspiracy Charge, and Simply Resulted in Abandonment of Any Mandatory Minimum Penalty Related to That Charge.**

Prior to the jury being instructed as to the law, the government filed a proposed jury instruction and verdict form which included special interrogatories to the jury for each defendant who was convicted of the conspiracy charged in Count One of the Second Superseding Indictment. The interrogatories were specific as to each defendant and inquired separately whether each drug type and quantity charged in Count One was attributable to and/or reasonably foreseeable to the defendant. App. 3371-74, 3433-83.

This issue was the subject of extensive discussion prior to the district court instructing the jury and explaining the verdict sheet. App. 2502, 2722-24, 2730-36, 3484-86. Ultimately, over the objection of the government and the defendants' attorneys, the court declined to follow the government's request to present the special interrogatories the government proposed for Count One. Instead, the district court correctly instructed the jury on the elements of the charge in Count One of conspiracy to distribute controlled substances, in pertinent part, as follows:

> And in order for you to find a defendant guilty of conspiracy to distribute a controlled substance, you must find that the Government proved beyond a reasonable doubt each of the following three

elements: First, that two or more persons agreed to distribute a
controlled substance as charged in Count 1 on the indictment. And I
will explain the elements of the offenses of distributing a controlled
substance to you shortly. Second, that the defendant was a part to or a
member of that agreement. And third, that the defendant joined the
agreement or conspiracy knowing of its objective to distribute a
controlled substance and intended to join together with at least one
other alleged conspirator to achieve that objective, that is, that the
defendant and at least one other alleged conspirator shared a unity of
purpose with the intent to achieve a common goal for that objective.

App. 2831.

The district court went on to separately instruct the jury to answer

special interrogatories that would establish the quantity of drugs

distributed by the conspiracy as a whole, if it found guilt on that count. The

first such special interrogatory was worded as follows:

Do you unanimously agree by proof beyond a reasonable doubt that
quantity of the mixture or substance containing a detectable amount
of cocaine, which was involved in the conspiracy and which was
attributable to and/or reasonably foreseeable to the defendants you
have found guilty was 5 kilograms or more, yes or no?

App. 2850. The court gave a nearly identical instruction regarding the 280

grams or more threshold for cocaine base, 50 grams or more threshold for

methamphetamine, and 100 grams or more threshold for heroin. App.

2848-52.

Almost one year after the jury's guilty verdict, this Court clarified, in

*Williams*, that while the statutory maximum penalty for a Section 846

conspiracy charge is determined by the total quantity involved in the

conspiracy, the mandatory minimum term of imprisonment is determined separately for each defendant. *Williams,* 974 F.3d at 365-66. In doing so, the jury may attribute to a defendant only those quantities involved in violations of Section 841(a) that were within the scope of the conspiracy, or in furtherance of it, and were reasonably foreseeable to the defendant as a natural consequence of his unlawful agreement. In other words, the mandatory minimum is not simply based on the quantity involved in the conspiracy as a whole.

On the same day that *Williams* issued, Hickson filed a motion for a new trial pursuant to Federal Rule of Criminal Procedure 33. Hickson argued, *inter alia*, that Count One should be dismissed because the court failed to ask the jury to resolve individual drug quantities in connection with Count One. DDE # 596.

In response, the government acknowledged that the court's jury instruction may have run afoul of *Williams* and suggested to the court that the prudent approach would be to disregard the jury's findings as they related to the determination of the mandatory minimum sentence on Count One. DDE # 623. The government argued that any error in the jury instructions would only serve to undermine the determination of what penalty applies under 21 U.S.C. § 841(b) for a violation of 21 U.S.C. § 846,

and not the underlying finding that the defendants were guilty of violating 21 U.S.C. § 846 in the first place. As such, what is at issue was not the underlying conviction on Count One but the sentence that would be imposed on that count.

Indeed, the jury determined that the amount of drugs involved in the conspiracy was 5 kilograms or more of cocaine, 280 grams or more of cocaine base, and 50 grams or more of methamphetamine. This gave rise to a statutory maximum sentence of life imprisonment, pursuant to 21 U.S.C. § 841(a)(1), (b)(1)(A). However, since there was no jury finding unique to each defendant concerning the drug quantity, the government argued that court should not apply a mandatory minimum in connection with the conspiracy charged in Count One. Thus, the conspiracy offense would have a statutory maximum of life with no mandatory minimum sentence.

All of this follows from application of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Alleyne v. United States*, 570 U.S. 99 (2013). *Apprendi*, of course, held that any fact that increases a statutory maximum sentence must be found by the jury or admitted by the defendant, while *Alleyne* extended that rule to a fact increasing a statutory mandatory minimum sentence. Neither decision concerns nor undermines the conviction for the underlying offense. Rather, each essentially decrees that

a fact increasing a statutory sentence is akin to an element of an aggravated version of the underlying offense.

Thus, in this case, without the jury finding regarding the quantity applicable to each defendant, each defendant is surely convicted of the Section 846 offense, but not an aggravated version in which a statutory mandatory minimum applies. The maximum sentence is life imprisonment, by virtue of the jury's quantity finding regarding the conspiracy as a whole. The statutory sentencing range for the conspiracy charge for each defendant was, in essence, zero to life. The court was then able to determine the sentence within that range by considering the advisory guidelines and all other 3553(a) factors, as in any sentencing proceeding following a conviction. In the meantime, a mandatory minimum sentence of 10 years' imprisonment would apply as to Hickson on Count Twelve in which the jury made the necessary findings.[21]

In its decision denying Hickson's post-trial motion, the court agreed with the government, and stated that it would sentence all defendants convicted at trial without a mandatory minimum on Count One. App. 92.

---

[21] Gadson did not file any post-trial motions but was also subject to a 5-year mandatory term of imprisonment for his conviction on Count Six, pursuant to 21 U.S.C. § 841(a)(1), (b)(1)(B).

The court later sentenced all the defendants, including defendant Hickson and Gadson, in accordance with that ruling. App. 3013, 3113.

In *Williams*, this Court repeated basic controlling propositions. It reaffirmed, "Section 846 does not demand that a person conspire to distribute a particular quantity of a controlled substance." *Williams*, 974 F.3d at 363. It observed that while the government should "charge both 'the circumstances of the crime and the intent of the defendant at the time of commission,' and 'the circumstances mandating [the higher] punishment,' . . . a prosecutor could fail to prove the latter and still prove that the felony had been committed . . . ." *Id.* (quoting *Apprendi*, 530 U.S. at 480-81). This Court concluded that an error had occurred because the jury applied the aggregated drug weight for the entire conspiracy to each of the defendants, without considering the weight foreseeable to each individual defendant. *Williams*, 974 F.3d at 366-67. This Court ultimately determined that the error did not affect the defendants' substantial rights because it had no impact on their overall sentences (which were above the mandatory minimums). *Id.* Thus, in the instant case, the only remedy required has already been carried out by the district court, in sentencing the defendants without regard to a mandatory minimum on Count One. *Williams* makes

clear that there was no other error in this case, and certainly no invalidity in the conspiracy convictions.

### B.  Hickson's Challenge to the Sufficiency of the Evidence is Misplaced.

Hickson again strays in presenting a separate argument that the evidence was insufficient to show the quantity of drugs that was reasonably foreseeable to him. Br. 26. As recounted above, this Court made clear, "Section 846 does not demand that a person conspire to distribute a particular quantity of a controlled substance." *Williams*, 974 F.3d at 363. Hickson was properly convicted of the conspiracy count, based on an abundance of evidence of his participation in the crime, and then at sentencing for Count One he was properly subject to a statutory maximum penalty that rested on the quantity involved in the conspiracy as a whole, but the mandatory minimum term was not applied given the absence of a jury finding of individual responsibility.[22]

---

[22]  Hickson makes no claim that the evidence was insufficient to show his participation in the conspiracy, nor could he. The overwhelming evidence presented at trial, which included social media evidence, text messages, law enforcement surveillance, and electronic surveillance, proved Hickson's guilt. Hickson was a member of OBH and traveled to and from California to help secure narcotics for OBH. The evidence showed that Hickson and his coconspirators obtained false identification to secure properties for OBH to store narcotics including at One Water Street. App. 2035-36, 2216-20; Supp. App. 27-29, 38-39. Also, he was convicted of

*continued . . .*

Hickson incorrectly relies on *United States v. Rowe*, 919 F.3d 752 (3d Cir. 2019), which did not involve a conspiracy charge. First, even if *Rowe* did apply, an error under *Rowe* impacts "the length" of a defendant's incarceration "rather than the integrity of the general verdict." *Williams*, 974 F.3d at 362. Hickson is therefore mistaken in his belief that an alleged *Rowe* error would entitle him to a complete acquittal of his conspiracy conviction. At best, a *Rowe* error would only serve to decrease the statutory maximum sentence.

And *Rowe* has no application here in any event. In *Rowe*, the defendant was convicted of selling at least 1,000 grams of heroin in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A), based on the government's theory that he sold a total of 1,000 grams over the course of several months, but where the largest individual transaction involved only 198.86 grams. In other words, the government asked the jury to aggregate several smaller heroin transactions to reach the 1,000-gram threshold. The Court held that separate substantive acts of drug distribution were separate crimes that could not be aggregated for purposes of reaching the weight thresholds of Section 841(b)(1)(A). *Rowe*, 919 F.3d at 760.

---

Count Twelve for involvement in a particularly large transaction in furtherance of the conspiracy.

The holding in *Rowe* was limited to scenarios where a defendant is charged only with substantive counts. In *Williams*, the Court made clear that where, as here, the defendant is charged with a drug conspiracy in violation of 21 U.S.C. § 846, drug quantities from multiple transactions in furtherance of the conspiracy may be aggregated to determine the statutory penalties. The Court dispatched with the defendants' contention that the drug weight thresholds were *mens rea* elements of a Section 846 conspiracy, explaining that the defendants need not have "consciously cognize[d]" the amount of drugs they were distributing in order to violate the law. *Id.* at 363. The Court preserved the basic tenet that a conspiracy is a continuing agreement to commit several offenses. Thus, "the penalty for a violation of § 846 is appropriately calculated according to the aggregate drug quantity involved in a defendant's continuous execution of the unlawful agreement." *Id.* at 366.[23]

---

[23] The *Williams* Court likewise confirmed that, in a conspiracy prosecution, "the quantities involved in the § 841(a) violations of multiple conspirators may be aggregated for determining the mandatory minimum of any one conspirator, subject to the ordinary limitations on co-conspirator liability." *Williams*, 974 F.3d at 366. As explained above, only because the jury was not asked to make this finding as to each conspirator was no mandatory minimum based on Count One applied in this case.

The appellants here were charged with and convicted of conspiracy to distribute narcotics. The jury found that the defendants were guilty of an aggravated version of a violation of 21 U.S.C. § 846, in that the conspiracy involved at least 5 kilograms of cocaine, 280 grams of crack cocaine, or 50 grams of methamphetamine. Any one of those quantities increase the statutory maximum sentence under 21 U.S.C. § 841(b)(1)(A) to life imprisonment.

Notwithstanding, the Court need not engage in that analysis. Aggregation was not necessary here because Hickson met the applicable drug weight the old-fashioned way—by possessing with intent to deliver over 10,000 grams of cocaine and 2,671 grams of pure methamphetamine, as charged in Count Twelve and alleged as an overt act in the conspiracy.[24]

In short, the evidence offered to support the substantive conviction on Count Twelve also proved the attributable drug weight under Count One. There was no need to aggregate drug weight to meet the threshold necessary to establish the elevated penalties of Section 841(a)(1), (b)(1)(A) as applied to the conspiracy offense. The jury was also properly instructed

---

[24] The government also attributed 453 grams of methamphetamine to Hickson based on a text message between Hickson and Blanding. However, any drug weight aggregation is unnecessary due to the defendant's conviction on Count Twelve.

to make an individual determination as to Hickson for the quantity of narcotics found in relation to Count Twelve. In doing so, the jury found beyond a reasonable doubt that Hickson possessed with the intent to distribute, or aided and abetted the possession with the intent to deliver, 5 kilograms or more of cocaine and 50 grams or more of methamphetamine, in violation of 21 U.S.C. § 841(a)(1), (b)(1)(A). This produced for Count Twelve the same mandatory minimum sentence that Hickson would have also faced concurrently on Count One had the jury made an individual finding regarding that charge. For all of these reasons, there was no error.

## XI. THE COURT DID NOT COMMIT ERROR IN IMPOSING SENTENCE ON BLANDING

### Standard of Review

The district court determines the application of a guideline factor under the preponderance of the evidence standard. This Court exercises plenary review of an interpretation of the Sentencing Guidelines, and reviews factual findings for clear error. *United States v. Grier*, 475 F.3d 556, 570 (3d Cir. 2007) (en banc).

The Court of Appeals reviews the final sentence for unreasonableness. *United States v. Booker*, 543 U.S. 220, 261 (2005). The burden rests on the party challenging the sentence to show unreasonableness, and this Court gives due deference to the district court's judgment. *United States v. Cooper*, 437 F.3d 324, 330 (3d Cir. 2006).

This Court reviews a district court's decision whether to grant a continuance for abuse of discretion. *United States v. Adams*, 36 F.4th 137, 144 (3d Cir. 2022).

### Discussion

Appellant Blanding presents several challenges to the sentencing proceeding, asserting that the court should have granted a continuance; that it assessed an incorrect statutory maximum penalty on Counts Six and

Twelve; and that it wrongly applied an enhancement in the guideline

calculation for maintaining a drug premises. All of these objections are

without merit.

### A. The Court Did Not Abuse Its Discretion in Denying a Continuance.

As stated, this Court reviews a decision regarding the scheduling of a

sentencing hearing for an abuse of discretion. *United States v. Gibbs*, 190

F.3d 188, 207 n.10 (3d Cir. 1999); *United States v. Booth*, 996 F.2d 1395,

1397 (2d Cir. 1993) ("A sentencing court has broad discretion respecting the

scheduling of sentencing procedures.").

Here, Blanding requested a continuance of his sentencing hearing,

but not on the basis of his now-asserted need to prepare for his allocution.

Thus, to the extent he claims that the denial of his request to continue the

sentencing hearing impacted his right to allocution, his claim is reviewed

for plain error. In the context of alleged plain error relating to the right of

allocution, this court applies a rebuttable presumption of prejudice "when a

defendant shows a violation of the right *and* the opportunity for such a

violation to have played a role in the district court's sentencing decision."

*United States v. Adams*, 252 F.3d 276, 287 (3d Cir. 2001) (emphasis in

original); *United States v. Hunter*, 604 F. App'x 214, 215 (3d Cir. 2015) (not

precedential) (describing the presumption of prejudice that stems from an allocution error as "rebuttable").

As this Court has recognized, "a court will only vacate a sentence based on a refusal to continue a sentencing hearing where the denial was arbitrary, and it substantially impaired the defendant's opportunity to receive a fair sentence." *United States v. Olfano*, 503 F.3d 240, 246 (3d Cir. 2007). The district court's decision to deny Blanding's request to delay sentencing certainly was not arbitrary, given the fact that the proceeding had been rescheduled multiple times and was ultimately set for a year after its initial listing and more than 16 months after Blanding was convicted at trial.

Moreover, the district court, upon receiving Blanding's late request to continue, which he filed just two days prior to the scheduled sentencing, convened a conference call to address the motion. On that call, the district court inquired as to the opportunities that defense counsel had (and would have) to meet with Blanding to prepare. Blanding's attorney, who was the same attorney who represented him at trial, and therefore, was well-familiar with Blanding and the case against him, informed the court that he had met with Blanding for several hours the day before and that he would meet with him at least two more times before the sentencing. App. 2910-11.

The district court carefully considered Blanding's position, but based on Blanding's counsel's representations that he had met with him for hours in the days leading up to the call and that he would meet with him again "for as long as he needs," App. 2911, the district court found that Blanding would not be prejudiced by proceeding to sentencing. The court nonetheless told Blanding's counsel that he could reassert his request to continue should circumstances change. At no point did Blanding's counsel suggest that the sentencing needed to be continued for his client to prepare his allocution.

At the sentencing hearing, Blanding again requested a continuance and explained to the district judge why he was requesting one. Blanding, addressing the court, explained that he wanted to participate more fully in the posttrial motions filed by his counsel, which had already been denied, and that he wanted additional time to determine if there was anything in the PSR to which he wanted to object.

But, like the record surrounding Blanding's continuance request, the sentencing record was fully developed at that point. Blanding's counsel filed objections to the PSR in May of 2020, only one of which he now presses on appeal. *See* Supp. App. 42-44. Also, and importantly, Blanding does not present on appeal any issues that were omitted from either his counsel's

objections or from his sentencing memorandum, so it is unclear exactly how, if at all, Blanding would have supplemented his counsel's objections. The presentence investigation report was also completed, and Blanding's counsel filed a sentencing memorandum, which the district court accepted late, after counsel had met with Blanding in the days leading up to the hearing.

And again, at no point while addressing the district court on his desire to continue the sentencing hearing did Blanding say that needed additional time to prepare his allocution. Rather, during his allocution, he made several compelling points to mitigate his sentence, then stated for the first time that he was not prepared because he thought he was getting the continuance (for the other reasons offered). Thus, it cannot possibly be said that the district court's decision was arbitrary. Quite the opposite. Its decision was based on a fully developed record on which the district court based the exercise of its discretion. Nor did the denial of Blanding's request to delay sentencing impair his opportunity to receive a fair sentence.

Blanding relies heavily on *United States v. Chapman*, 915 F.3d 139 (3d Cir. 2019), but it is entirely inapposite. There, this Court explained, upon being brought to court "Chapman immediately told the District Court that he did not know he was to be sentenced that day and, had he known,

his family would have been present in the courtroom." *Id.* at 143. Nothing of the sort happened here. At most, Blanding can state that he was fully aware of the impending sentencing proceeding but simply made the incorrect assumption that it would not go forward, based on considerations (such as his desire to further pursue already-denied post-trial motions) that did not sway the court. Here, unlike in *Chapman*, there was no justifiable basis for Blanding to be unprepared.

Recognizing the broad discretion afforded to district courts in managing the scheduling of sentencing hearings, Blanding attempts to frame the district court's decision as diminishing his ability to exercise his right to allocute. As stated above, this does not match the record, as neither Blanding nor his counsel, in arguing for a continuance, cited Blanding's need to prepare for his allocution. And in truth, he was not denied that right.

While the ancient and venerable right of a defendant to allocute at sentencing is deeply rooted in our legal tradition, *United States v. Adams*, 252 F.3d 276, 282 (3d Cir. 2001), the defendant's right of allocution is not unlimited, and "a sentencing judge may impose procedural limitations during an allocution, so long as the judge personally addresses the defendant and offers him the opportunity to address the court before the

sentence is pronounced." *United States v. Ward*, 732 F.3d 175, 182 (3d Cir. 2013). Congress codified the right to allocution in 1944 by promulgating Federal Rule of Criminal Procedure 32, which instructs that "before imposing sentence, the court must . . . address defendant personally in order to permit the defendant to speak or present any information to mitigate the sentence." Fed. R. Crim. P. 32(i)(4)(A)(ii). The "critical purpose" of allocution is threefold: "1) to allow the defendant to present mitigating circumstances, 2) to permit the defendant to present personal characteristics to enable the sentencing court to craft an individualized sentence, and (3) to preserve the appearance of fairness in the criminal justice system." *Ward*, 732 F.3d at 181.

Here, the district court fully complied with its obligations. In fact, Blanding's counsel stated twice that his client was not going to address the court but would simply rely on his counsel's sentencing papers, which he prepared after meeting with Blanding. It was not until the district court pressed Blanding on the importance of allocution that Blanding decided to address the court, suggesting that any lack of preparation was not due to the denial of his continuance request, but rather due to the district court going out of its way to encourage Blanding to exercise a right he did not plan to. When he did, he did so effectively, asserting that his criminal

history, which was very high, did not capture his total being, and that he planned to take this opportunity to better himself. App. 2953-54.

The district court complied with the requirements of Rule 32(i) and due process in allowing Blanding to speak and provide information in mitigation of sentence. The district court addressed Blanding personally and afforded him ample opportunity to present information about his background and circumstances in seeking leniency from the court. The district court thus fully comported with this Court's sentencing jurisprudence in denying the continuance request and allowing Blanding a full and fair opportunity to allocute.

### B.    Blanding Waived A Challenge to Calculation of the Statutory Penalties on Counts Six and Twelve, and In Any Event There Was No Plain Error.

Blanding presents an argument that has gained favor among defendants in recent years, that is, that no cocaine conviction qualifies as a "serious drug offense" under 18 U.S.C. § 924(e), and thus as a "serious drug felony" under 21 U.S.C. § 841(b)(1)(A), in any state that has not, since 2015, adopted the federal exclusion of "[123I]Ioflupane" from the definition of cocaine. This argument is waived in this case, and fails even if considered

on plain error review, given that the application Blanding challenges had no effect at all on his final sentence.[25]

Blanding's claim concerns whether he had a predicate prior conviction for a "serious drug felony" to warrant the enhanced recidivist penalties in 21 U.S.C. § 841(b)(1), increasing the mandatory minimum penalty on Count Six to 10 years and on Count Twelve to 15 years.

Under 21 U.S.C. § 802, a "serious drug felony" is defined as meeting the following three elements: (i) it is a "serious drug offense" as defined in Section 924(e)(2); (ii) the defendant actually served more than 12 months in prison on that offense; and (iii) the defendant was released from imprisonment within 15 years of committing the offense for which he is being sentenced.

Section 924(e)(2)(A) defines "serious drug offense" as offenses listed in the Controlled Substances Act, Pub. L. No. 91-513, 84 Stat. 1242 (1970), and as state offenses involving substances on the federal schedules of

---

[25] Appellant West adopts Blanding's argument, without any elaboration. West simply states: "The mandatory minimum term applicable to Mr. West on each of Count 4, 5, 6 and 12 was doubled on account of a 2013 state conviction for delivery of crack." West Br. 46. West's challenge fails for the same reasons presented here. He also stipulated that each of his prior convictions qualified as a "serious drug felony," thus waiving the objection. And the determination also had no impact on his final sentence of 540 months' imprisonment, which greatly exceeded the minimum terms on all of these counts.

controlled substances, 21 U.S.C. § 802, that carry a term of imprisonment of ten years or more. As this Court has explained, the determination of whether a state offense qualifies as a "serious drug offense" rests on the much-maligned categorical approach.

Importantly, a state crime may not qualify as a "serious drug offense"—and thus may not serve as an applicable predicate offense—if its elements are different from or broader than the generic version of that offense. *See United States v. Henderson*, 841 F.3d 623, 627 (3d Cir. 2016). Put another way, if the state law governing a particular offense criminalizes more conduct than its generic federal counterpart, then a state conviction for that offense may not count toward the serious drug offense requirement. *See Descamps v. United States*, 570 U.S. 254, 257-58 (2013); *Moncrieffe v. Holder*, 569 U.S. 184, 190 (2013). This requires courts to compare federal and state law. *See United States v. Dahl*, 833 F.3d 345, 349, 353 (3d Cir. 2016). When undertaking this comparison, courts must employ the "categorical approach," looking solely at the elements of the compared crimes and ignoring the particular facts of a case. *Mathis v. United States*, 579 U.S. 500, 504 (2016); *United States v. Brown*, 47 F.4th 147, 149-50 (3d Cir. 2022).

Here, Blanding was subject to increased mandatory minimum terms of imprisonment on the basis of one prior Pennsylvania drug trafficking conviction which involved crack cocaine. Notably, the jury found that his prior drug trafficking conviction met the requirements of a "serious drug felony" after he stipulated that it did at trial. He was then sentenced far in excess of that mandatory minimum. He now claims—for the first time on appeal—that the state definition of cocaine was broader than the federal definition, and therefore his prior state crime should not have qualified as a predicate offense for purposes of increasing the applicable mandatory minimum term of imprisonment.

This claim is waived. A waiver of an issue requires "an intentional relinquishment or abandonment of a known right or privilege." *United States ex rel. O'Connor v. State of New Jersey*, 405 F.2d 632, 634 n.2 (3d Cir. 1969) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). As the Supreme Court has explained, "[w]aiver is different from forfeiture. Whereas forfeiture is the failure to make the timely assertion of a right, waiver is the 'intentional relinquishment or abandonment of a known right.'" *United States v. Olano*, 507 U.S. 725, 733 (1993) (quoting *Johnson v. Zerbst*, 304 U.S. at 64).

In this case, Blanding and his counsel executed a stipulation, which they both signed, and which was then read into the record during a bifurcated portion of the trial. Blanding tries to skirt this stipulation by asserting, without any support in the record, that his trial counsel was unaware of the flimsy legal proposition on which he bases his current appeal. This is obviously inappropriate. This Court is in no position to gauge what Blanding and his counsel believed and/or discussed prior to entering into the stipulation he now disavows. *See United States v. Sussman*, 709 F.3d 155, 162 (3d Cir. 2013) (recognizing that "it would be appropriate to hold that the defendant waived" a sufficiency claim regarding the issue of whether the coins were "money, or [a] thing of value of the United States" when he had conceded that point in his Rule 29 motion, but reviewing the issue for plain error "for the sake of thoroughness"); *United States v. Aparco-Centeno*, 280 F.3d 1084, 1088 (6th Cir. 2002) (defendant waived his challenge to the status of his prior convictions by agreeing with court's characterization of prior convictions as aggravated felonies, as "[a]n attorney cannot agree in open court with a judge's proposed course of conduct and then charge the court with error in following that course") (quoting *United States v. Sloman*, 909 F.2d 176, 182 (6th Cir. 1990)); *United States v. Smith*, 252 F. App'x 20, 31-32 (6th Cir.

2007) (unpublished) (explicit concession that prior felony drug offense qualified for § 841 enhancement amounted to waiver precluding appellate consideration), *vacated on other grounds, Townsend v. United States*, 553 U.S. 1050 (2008).

Moreover, and quite notably, the government would be prejudiced by consideration of the issue for the first time on appeal in this case. As this issue has been raised in numerous matters, the government has come to appreciate that a compelling argument may be made on scientific grounds, mentioned below in this brief, that the state definition of cocaine is not in fact broader than the current federal definition. In an appropriate case, the government will develop a record, including expert testimony, on this point, but in this case, it would be prejudiced by belated consideration of the matter for the first time on appeal. For these reasons, Blanding's waiver of the issue should be enforced.

Even without the waiver, at best, Blanding forfeited his argument, and cannot obtain relief on plain error review.

Blanding's argument, embraced recently by other defendants as well, represents the latest stunning defense effort to employ the "categorical approach" to produce a truly nonsensical result. The baseline assertion is that no conviction in Pennsylvania (and nearly every other state for that

matter) for trafficking in cocaine qualifies anymore as a "serious drug offense," because in 2015 Congress removed from the definition of cocaine a rare substance that is used for only one benign and highly specialized purpose: as a pharmaceutical agent in the diagnosis of Parkinson's disease.

The issue is complex. The government presented an exhaustive discussion in *United States v. Anthony Cann*, No. 22-2525 (brief filed at docket no. 31 on Mar. 6, 2023, at pages 11-32). As explained there, the state and federal definitions of cocaine are in fact materially identical, and the removal of "[123I]Ioflupane" from the state list of controlled substances does not alter that conclusion. The government will so establish at an evidentiary hearing in a case in which the issue is timely raised.

And moreover, there is a timing issue that has not been resolved, that would affect consideration of the issue with respect to Blanding. The Supreme Court is presently considering, in *United States v. Brown*, No. 22-6389, whether a court must compare the state and federal definitions as they existed at the time of the state offense, at the time of the federal offense, or at the time of the federal sentencing.

But regardless of the outcome of these debates, it is apparent that Blanding's sentence would not be affected, and thus he cannot establish prejudice under any standard of review. Blanding was sentenced to a term

of imprisonment of 300 months, well above the highest mandatory minimum sentence of 180 months. Blanding's suggestion that the court's choice of a sentence 10 years above the perceived minimum was somehow influenced by that minimum is irrational.

Rather, as in every sentencing proceeding, the district court focused on the advisory guideline range, and on the fundamental question whether to impose a sentence within that suggested range or vary from it. It is that guideline range, under federal sentencing law, that provides "the starting point and the initial benchmark" in sentencing proceedings. *Gall v. United States*, 552 U.S. 38, 49 (2007). Here, that range was 360 months to life imprisonment (with or without the drug premises enhancement Blanding challenges elsewhere in his brief), and that assessment is completely unchanged by the calculation of the statutory mandatory minima he challenges.

The evidence in this case showed that Blanding was responsible for, among other things, traveling to California to source the narcotics that OBH then sold in and around Philadelphia. He was therefore one of the more culpable members of the conspiracy. His 25-year sentence is sensibly viewed as appropriately between the sentence received by co-defendant Abdul West (45 years) and co-defendant Jameel Hickson (20 years). But

even that ignores the variety of factors considered by a federal district judge in fashioning an appropriate sentence. To isolate Blanding's sentence as dependent on a mandatory minimum, especially one well below the sentence he actually received, is to overly simplify the important work trial courts undertake in sentencing criminal defendants.

In sum, Blanding waived this challenge, and even if it is reviewed, the Court should conclude that any error was entirely harmless.

### C.    The District Court Did Not Commit Clear Error in Imposing the Drug-Premises Enhancement.

Blanding also disputes the district court's application of a two-level increase under U.S.S.G. § 2D1.1(b)(12) for his maintaining of a drug-related premises. Blanding argues that the district court applied the wrong standard and, in doing so, reached the wrong result. Blanding is incorrect.

Section 2D1.1(b)(12) provides for a two-level increase for a defendant who "maintained a premises for the purpose of manufacturing or distributing a controlled substance." For the enhancement to apply, the government must prove by a preponderance of the evidence that the defendant "(1) knowingly (2) open[ed] or maintain[ed] any place (3) for the purpose of manufacturing or distributing a controlled substance." *United States v. Carter*, 834 F.3d 259, 261-62 (3d Cir. 2016) (quoting *United States v. Johnson*, 737 F.3d 444, 446 (6th Cir. 2013)). According to the

guidelines commentary, this provision "applie[s] to a defendant who knowingly maintain[ed] a [building, room, or enclosure] for the purpose of manufacturing or distributing a controlled substance, *including storage of a controlled substance for the purpose of distribution*." § 2D1.1 app. note 17. In weighing whether this provision applies, "courts should consider . . . (A) whether the defendant held a possessory interest in . . . the premises and (B) the extent to which the defendant controlled access to . . . the premises." *Id.* The defendant's use of the premises for drug-related purposes "need not be the sole purpose for which the premises was maintained, but must be one of the defendant's primary or principal uses" for it. *Id.*

To decide if the enhancement applies, this court considers "whether the defendant exercised control over the property 'or supervised or directed others to engage in certain activities at the premises.'" *United States v. Rodriguez*, 40 F.4th 117, 122 (3d Cir. 2022) (quoting *Carter*, 834 F.3d at 262). This Court also considers "control, curation, acquisition of the site, renting or furnishing the site, repairing the site, supervising, protecting, supplying food to those at the site, and continuity." *Id.* (internal quotation marks omitted). "Although ownership is probative, the enhancement 'does not require either ownership or a leasehold.'" *Id.*

Blanding's use of the One Water Street Apartment plainly meets this test. As the testimony at trial established, the defendants had been using an apartment on Race Street, rented under the fictitious name Tabitha Bishop, as their stash house, and the government introduced evidence to establish that Blanding was involved in securing that apartment under that name. But the apartment management was not renewing the lease, so the defendants needed a new location. App. 1924.

Blanding then worked with others, including Hickson, to procure a false California driver's license with Blanding's photograph but in the name of "DeAngelo Smith." This driver's license was then used to apply for a new stash house, that is, the apartment at One Water Street. App. 2034-36.

Blanding argues that someone else could have used the false identification with his photograph on it to procure the apartment, but this ignores the fact that Blanding had secured the group's prior stash house and that he maintained the keys for the new stash house. We know this because when Hoover returned from California in May 2018, and he brought with him ten kilograms of cocaine and five pounds of methamphetamine, his first stop was the One Water Street apartment. He was met there by Blanding, who, as depicted on video, unlocked the door for Hoover.

Thus, even if the district court had viewed the evidence in the light most favorable to the defense, Blanding could have and should have received this enhancement. There is simply no reason for him to obtain under false pretenses an apartment to which his co-conspirator brought distribution amounts of cocaine and methamphetamine that they sourced together in California. There is nothing to suggest that Blanding was living there, but even if he was, it would not matter. *See United States v. Harris*, 788 F. App'x 135, 152–53 (3d Cir. 2019) (not precedential) (citing favorably *United States v. Miller*, 698 F.3d 699, 707 (8th Cir. 2012), for proposition that the enhancement "applies when a defendant uses the premises for the purpose of substantial drug-trafficking activities, even if the premises was also her family home at the times in question").

Ultimately, however, Blanding is unable to show prejudice, because with or without the drug-premises enhancement, Blanding's guideline range would have been the same. As set forth in the PSR, and not challenged on appeal, Blanding was a career offender under U.S.S.G. § 4B1.1. The career offender enhancement did not apply, however, because Blanding's adjusted offense level, with the two-level enhancement, was greater that the enhanced offense level of 37. Also, his criminal history score, based on 20 criminal history points, placed him in criminal history

category VI, with or without the career offender enhancement to his criminal history.

In other words, without the two-level enhancement he now disputes, his offense level would not have dropped to 36. Rather, the carer offender provision would have applied, and his offense level would have been 37. With an offense level of 37 and a criminal history category of VI, the applicable guideline range in this case would still be 360 months to life imprisonment, that is, the range that the court applied at sentencing. Any error on the part of the district court was therefore harmless.

## XII. THE DISTRICT COURT DID NOT COMMIT ERROR IN IMPOSING SENTENCE ON GADSON

### Standard of Review

The standards of review applicable to sentencing decisions are set forth in Part XI above. In addition, and specifically, this Court employs a mixed standard of review when considering whether a defendant is entitled to a base level reduction for being a minimal or minor participant in the criminal activity. "When the district court's denial of a downward adjustment is based primarily on a legal interpretation of the Guidelines the defendant claims to be erroneous, we exercise plenary review. By contrast, when the defendant takes issue with the district court's denial of a reduction for being a minimal or minor participant which was primarily [based] on factual determinations, we review only for clear error." *United States v. Carr*, 25 F.3d 1194, 1207 (3d Cir. 1994). In this case, the dispute is purely factual, and review is for clear error.

### Discussion

Appellant Gadson presents two challenges to the sentencing determination in his case. He objects to the court's denial of a minor role reduction under U.S.S.G. § 3B1.2. And he asserts that the sentence imposed

on Count Six exceeded the guideline range. Both arguments are without merit.

### A. The Court Did Not Commit Clear Error in Denying a Minor Role Reduction Under U.S.S.G. § 3B1.2.

Gadson asserts that the district court committed clear error in declining to grant him a downward adjustment for his minor role in the offense, pursuant to Section 3B1.2(b). He is incorrect. Based on the evidence presented in this case, the district court permissibly concluded that the appellant was not a minor participant, but was a key member of the drug trafficking organization that transported and distributed large quantities of narcotics across the country. Gadson was a trusted member of the organization who worked closely with OBH's leader, Abdul West, keeping West constantly apprised of the amounts of drugs he sold, and the drug proceeds he collected.

As an initial matter, Gadson states that he was precluded from arguing for the minor role reduction. This argument is belied by the record. Prior to sentencing, the defendant filed a lengthy sentencing memorandum, which included his argument for a minor role reduction. Supp. App. 45-54. At the sentencing hearing, the district court acknowledged the defendant's argument set forth in his memorandum, and rejected that argument, concluding, "[h]e is not a minor participant under the case law and under

the sentencing guidelines as I interpret them." App. 3123. Despite the

district court's explicit finding, Gadson somehow complains that the court

denied him the opportunity to be heard on this point. And yet, on appeal,

Gadson repeats—verbatim—the same argument from his sentencing

memorandum. He does not present an additional fact or a new argument

that was not already considered by the district court. The district court

heard this argument and squarely rejected it. The court was not required to

say more.

> The appropriateness of brevity or length, conciseness or detail, when to write, what to say, depends upon circumstances. Sometimes a judicial opinion responds to every argument; sometimes it does not; sometimes a judge simply writes the word "granted" or "denied" on the face of a motion while relying upon context and the parties' prior arguments to make the reasons clear. The law leaves much, in this respect, to the judge's own professional judgment.

*Rita v. United States*, 551 U.S. 338, 356 (2007).

Further, even assuming the defendant was precluded from making

this argument, which he was not, it fails on the merits. The determination

of Gadson's role "is to be made on the basis of all conduct within the scope

of § 1B1.3 (Relevant Conduct)" for the offense. U.S.S.G. Ch.3, Pt. B

(Introductory Commentary); *United States v. Murillo*, 933 F.2d 195, 198

n.1 (3d Cir.1991); *United States v. Nichols*, 151 F.3d 850, 854 (8th Cir.

1998). Section 3B1.2 of the Sentencing Guidelines defines a "minor

participant" as one "who is less culpable than most other participants but whose role could not be described as minimal." § 3B1.2 app. note 5. Because Gadson was not less culpable than most other participants in the conspiracy, he does not merit such a reduction.

This Court has set forth three factors that are relevant to the determination of the applicability of the minor role adjustment: "(1) the defendant's awareness of the nature and scope of the criminal enterprise; (2) the nature of the defendant's relationship to the other participants; and (3) the importance of the defendant's actions to the success of the venture." *United States v. Brown*, 250 F.3d 811, 819 (3d Cir. 2001). Each factor should be considered in relation to the other criminal participants. *Id.* (citing *United States v. Isaza-Zapata*, 148 F.3d 236, 239 (3d Cir. 1998)).

Gadson bore the burden of proving his mitigating role in the offense. *United States v. Holman*, 168 F.3d 655, 660 (3d Cir. 1999); *United States v. Price*, 13 F.3d 711, 735 (3d Cir. 1994). The issue "is a question of fact, subject to review for clear error." *See United States v. Haut*, 107 F.3d 213, 218 (3d Cir. 1997). "The district courts are allowed broad discretion in applying this section, and their rulings are left largely undisturbed by the courts of appeals." *Isaza-Zapata*, 148 F.3d at 238.

In his argument for a mitigating role reduction, Gadson cherry-picks portions of the Second Superseding Indictment that do not include Gadson and compares his conduct to leaders of the drug trafficking organization. In doing so, Gadson ignores the overwhelming evidence presented at trial that shows Gadson was as an integral part of the bicoastal poly-drug organization. For his part, Gadson worked closely with OBH's leader, Abdul West, to distribute cocaine and crack cocaine to other dealers and users. The evidence established that Gadson was responsible for distributing at least 2,631 grams of crack cocaine, 1,131 grams of cocaine, 534 grams of either crack cocaine or cocaine, and 112 grams of methamphetamine throughout the entirety of the conspiracy. App. 2567, 3669.

Gadson was also aware that his co-conspirators sold other narcotics and that the DTO's narcotics were stored at One Water Street. Indeed, it is Gadson who attempted to warn other members of the conspiracy of law enforcement's search of the Water Street apartment. App. 2231; Supp. App. 1. The district court did not commit clear error in deciding that Gadson was not a minor participant.[26]

---

[26] Gadson also contends that he is entitled to the mitigating role reduction because he was not associated with any of the violence perpetrated by OBH. Whether or not he committed acts of violence on behalf of OBH does not make him any less a participant in the criminal drug activity.

Considering Gadson's role, and the nature of his relationship with other members of the conspiracy and their respective roles, Gadson was not a minor participant in the drug trafficking organization. The district judge echoed this sentiment when the court granted the defendant's request to vary downward in Gadson's ultimate sentencing, reasoning, "I conclude here that the defendant is in basically the middle group of the criminal defendants here, as reflected by the evidence and will sentence him accordingly." App. 3135.

This Court has affirmed the decision of a district court denying a downward adjustment for a minor role, where the defendant was far less involved in the drug conspiracy than was Gadson. *United States v. Carr,* 25 F.3d 1194 (3d Cir. 1994). In *Carr*, the defendant repeatedly transported large sums of money (proceeds from illegal drug deals) to a foreign destination but claimed to be merely a traveling companion to the actual courier. During one trip, Carr was stopped, searched, and found to have $180,000 in marked bills in his possession. The money was hidden in coffee cans in his carry-on luggage, which was in his possession at all times. Carr was convicted, and his request for a two-level reduction for being a minor participant was denied by the district court. In affirming the lower court's decision, this Court reaffirmed its conclusion in *United States v.*

*Headley*, 923 F.2d 1079, 1084 (3d Cir. 1991), that "[t]he fact that a defendant's participation in a [conspiracy] was limited to that of courier is not alone indicative of a minor or minimal role." *Carr*, 25 F.3d at 1208.

Here, Gadson was not a mere courier. He was a frequent, if not daily, participant in the conspiracy, who carried out the group's objective of selling drugs. The district court's guideline calculation was fully supported by the evidence, was not clear error, and should be affirmed. *See United States v. Trigg*, 119 F.3d 493 (7th Cir. 1997) (appellant was not a minor participant even though he was involved in the conspiracy for a limited time); *Molano-Garza v. U.S. Parole Com'n,* 965 F.2d 20, 23 (5th Cir. 1992) (appellant was neither a minimal nor minor participant even though he participated in the conspiracy for only one week and made only one drug delivery, but was aware of the scope and structure of the operation).

## B.    The Defendant Was Not Sentenced Above the Applicable Sentencing Guidelines Range On Count Six.

On appeal, Gadson argues that the district court was required to determine a separate sentencing guideline range for his conviction on Count Six of the Second Superseding Indictment and the court's failure to do so resulted in a sentence that exceeded the applicable sentencing guidelines on that count. This argument presents a basic misunderstanding of the operation of the Guidelines.

Gadson was convicted of the drug trafficking crimes charged in Counts One and Six. Pursuant to Section 3D1.2(d), all such offenses subject to Section 2D1.1 are grouped together. As Section 3D1.2(d) directs, the offense level for all such grouped counts is based on the aggregate total of the substance involved in all counts. Thus, the district court correctly grouped all the drug trafficking convictions together. The district court adopted the probation officer's determination that Gadson was responsible for 10,173.7 kg of Converted Drug Weight. Gadson PSR ¶ 92. The defendant does not contend that this finding was erroneous, nor did he present a challenge to it on direct appeal. That calculation led to an advisory range of 210 to 262 months (at offense level 34, criminal history category IV), and the court then, upon consideration of the 3553(a) sentencing factors, imposed a concurrent below-range sentence of 195 months on each count.

Gadson's suggestion that the court should calculate a different guideline range for each count is wrong. Section 5G1.2 provides in pertinent part:

> (b) For all counts not covered by subsection (a) [regarding imposition of a mandatory consecutive sentence], the court shall determine the total punishment and shall impose that total punishment on each such count, except to the extent otherwise required by law.

> (c)  If the sentence imposed on the count carrying the highest statutory maximum is adequate to achieve the total punishment, then

> the sentences on all counts shall run concurrently, except to the extent otherwise required by law.

In other words, the court is directed to determine a single total punishment, and then impose that sentence to run concurrently on each count so long as the statutory maximum term for each count accommodates that term (as was the case here). The court did not commit error with respect to the sentence imposed on Count Six.

## XIII. THE COURT DID NOT ERR IN CALCULATING HICKSON'S SENTENCE

### Standard of Review

*See* Part XI.

### Discussion

Hickson complains that the district court failed to make a "finding or any degree of estimation at sentencing" concerning the drug weight attributable to Hickson. He also asserts that he was incorrectly sentenced as a career offender. Hickson Br. 53. These claims are without merit.

Hickson's first challenge rests on the declaration that the court failed to undertake an individualized assessment, as required by this Court's precedent, of his responsibility for the quantity of drugs trafficked by the conspiracy charged in Count One. But he overlooks that the drug quantity attributed to him at sentencing was based on the quantity with which he was personally involved and for which he was convicted of a substantive crime in Count Twelve.

That count concerned the seizure of narcotics that Hickson and others arranged to be transferred from California to Philadelphia in May 2018. On May 17, 2018, following the defendant's sixth trip to Los Angeles, and after co-conspirator Hoover's transportation of narcotics back to

Philadelphia, the FBI searched the group's storage location at apartment #717 of the One Water Street Apartments and recovered approximately 10 kilograms (10,004 grams) of cocaine and 5 pounds (2,671 grams) of methamphetamine. The conviction of Hickson in Count Twelve for a substantive offense rested on that event. This seizure alone, that Hickson does not address, supported the guideline calculation.[27]

Based solely on these quantities (and a much smaller amount of methamphetamine that did not affect the guideline calculation, as explained in the margin), the PSR suggested and the court found that Hickson's base offense level was 36, increased by 2 because he maintained premises for the purpose of distributing a controlled substance. Hickson offers no challenge to this assessment, and his appeal of the sentence therefore fails.

In addition, Hickson argues that under this Court's decision in *United States v. Nasir*, 17 F.4th 459 (3d Cir. 2021) (en banc), the career offender offense level calculated in his PSR was incorrectly based on his conviction under docket CP-51-CR-0411641-2002 because he was convicted of a

---

[27] The Probation Office also attributed 453 grams of methamphetamine to Hickson based on a text message between Hickson and Blanding. However, this additional drug quantity had no effect on the guideline calculation, which produced a base offense level of 36 regardless of this additional quantity.

"Pennsylvania's drug conspiracy charge" which is an inchoate offense and not a qualifying conviction. Hickson Br. 54. But in doing so, he fails to acknowledge that, in addition to his conviction for conspiracy, Hickson was convicted in that case of actually trafficking narcotics in violation of 35 Pa. Stat. § 780-113(a)(30). Hickson PSR ¶¶ 99, 108. Notably, he does not and cannot contend that a violation of Section 780-113(a)(30) does not qualify as a career offender predicate. *See United States v. Glass*, 904 F.3d 319 (3d Cir. 2018) (a violation of 35 Pa. Stat. § 780-113(a)(30) qualifies as a predicate controlled substance offense under U.S.S.G. § 4B1.1(a)(2)).

As importantly, Hickson's designation as a career offender played no role in the court's calculation of Hickson's ultimate sentencing guidelines range. As noted in the PSR, since Hickson's career offense level was lower than his otherwise adjusted offense level, the greater level of 38 was used. Hickson PSR ¶ 99. At sentencing, the district court recognized that the career offender enhancement played no role in its guideline calculation and explained to Hickson why his sentencing guidelines would not change even if the court granted his objections to the career offender enhancements. App. 2985.

In sum, Hickson's offense level is 38 regardless of whether he is a career offender. Any error under *Nasir* – and none exists – would be harmless.

# CONCLUSION

For the reasons stated above, the government respectfully requests that the judgments of the district court be affirmed.

Respectfully submitted,

JACQUELINE C. ROMERO
United States Attorney

*/s Robert A. Zauzmer*
ROBERT A. ZAUZMER
Assistant United States Attorney
Chief of Appeals
Pa. Bar No. 58126

*/s Everett Witherell*
EVERETT WITHERELL
New York Reg. No. 4521738
TIMOTHY M. STENGEL
Pa. Bar No. 314573
Assistant United States Attorneys

United States Attorney's Office
615 Chestnut Street, Suite 1250
Philadelphia, PA  19106
(215) 861-8200

## CERTIFICATION

1. The undersigned certifies that this brief contains 41,023 words, exclusive of the table of contents, table of authorities, signature block, and certifications, and therefore complies with the limitation on length of a brief stated in the Court's order in these appeals dated October 17, 2023, permitting the filing of a consolidated brief of the appellee consisting of no more than 46,000 words.

2. I hereby certify that the electronic version of this brief filed with the Court was automatically scanned by OfficeScan Real-Time Scan Monitor, version 10.5, by Trend Micro, and found to contain no known viruses. I further certify that the text in the electronic copy of the brief is identical to the text in the paper copies of the brief filed with the Court.

*/s Everett Witherell*
EVERETT WITHERELL
Assistant United States Attorney

# CERTIFICATE OF SERVICE

I hereby certify that this brief has been served on the Filing Users

identified below through the Electronic Case Filing (ECF) system:


Peter Goldberger, Esq.
50 Rittenhouse Place
Ardmore, PA  19003
peter.goldberger@verizon.net
*Attorney for Abdul Ibrahim West*

Lisa A. Mathewson, Esq.
Mathewson Law LLC
123 South Broad Street, Suite 1320
Philadelphia, PA  19109
lam@mathewson-law.com
*Attorney for Jamaal Blanding*


Troy A. Archie, Esq.
Afonso Archie Law P.C.
21 Route 130 South
Cinnaminson, NJ  08077
archie@aafnjlaw.com
*Attorney for Jameel Hickson*

Robert E. Goldman, Esq.
353 Hamilton Street, Suite 302
Allentown, PA  18101
reg@bobgoldmanlaw.com
*Attorney for Hans Gadson*


*/s Everett Witherell*
EVERETT WITHERELL
Assistant United States Attorney


DATED:  November 13, 2023.